1

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF QUEENS:  CRIMINAL TERM, PART K-11

3  -------------------------------------------------------X

4  THE PEOPLE OF THE STATE OF NEW YORK,            Indictment No.

5      -against-                                   1568-89

6  FELIPE RODRIGUEZ,                               **DISMISSAL OF CONVICTION**

7                  Defendant.
   -------------------------------------------------------X

8

9                              December 30, 2019
                               125-01 Queens Boulevard
10                             Kew Gardens, New York 11415

11  B E F O R E :

12      HONORABLE JOSEPH ZAYAS,
                                        Justice,

13

14  A P P E A R A N C E S :

15  <u>FOR THE PEOPLE:</u>

16      JOHN M. RYAN, ESQ.
        District Attorney, Queens County,
17      BY:  ROBERT J. MASTERS, ESQ.
            Assistant District Attorney

18

19  <u>FOR THE DEFENDANT:</u>

20      THE INNOCENCE PROJECT
        NINA MORRISON, ESQ.

21
        ZACHARY MARGULIS-OHNUMA, ESQ.
22      260 Madison Avenue
        New York, New York  10016

23                              **GAIL J. NEUFELD, RPR**
                                SENIOR COURT REPORTER
24

25

gjn

FELIPE RODRIGUEZ - Proceedings                                    2

1          THE CLERK:    On the K-11 calendar, calendar four, indictment
2   1568 of 1989, Felipe Rodriguez.
3          Mr. Rodriguez is out and present before the Court.
4          Counselors, your appearances, please.
5          MS. MORRISON:    Nina Morrison from the Innocence Project for
6   Mr. Rodriguez.
7          MR. MARGULIS-OHNUMA:    Zachary Margulis-Ohnuma, 260 Madison
8   Avenue also for Mr. Rodriguez who is standing next to me.
9          Good morning, your Honor.
10         MR. MASTERS:    For the People, Robert J. Masters.
11         Good morning, your Honor.
12         THE COURT:    Good morning, everyone.
13         Good morning, Mr. Rodriguez.
14         THE DEFENDANT:    Good morning, Judge.
15         THE COURT:    Mr. Masters, we will start with you.
16         Let me just remind the press I have allowed -- I did get an
17  application for still photography, I know there is a request for
18  videography, I have allowed it, I have already vetted the attorneys
19  with respect to this, they have no objection; the People take no
20  position, but just be cognizant this is a court of law, obviously do
21  not make any noise on your end.
22         Yes, Mr. Masters.
23         MR. MASTERS:    Judge, I would like to start by thanking you for
24  accommodating the parties on such short notice and committing us to
25  calendar on this matter here today.

1      Judge, not to bury the lead, at the request of the defendant's

2   counsel, the People have undertaken a reinvestigation of the

3   defendant's conviction.  Ms. Morrison will more fully I think

4   describe her efforts and the avenues that she and cocounsel have

5   pursued over the last twelve years.  The defendant has maintained

6   his innocence since before his arrest and accordingly has asked us

7   to review this case through the prism of actual innocence.

8      At this juncture despite an exhaustive reinvestigation of all

9   the proceedings and transcripts, police files from two separate

10  agencies, all the laboratory records, the medical examiner files,

11  reinterviews with many of the witnesses including a two-day

12  interview of the critical witness that resulted in the defendant's

13  arrest, indictment and conviction who has since recanted his

14  incriminating testimony as recently as 2017, I am at this point

15  unable to find a credible basis to disturb the presumption of the

16  defendant's guilt that attached upon the return of a guilty verdict

17  pursuant to People versus Session, S-E-S-S-I-O-N, 34 NY 2d 254;

18  People versus Richetti, R-I-C-H-E-T-T-I, 302 NY 230.

19      However, the reinvestigation revealed documents from the now

20  defunct Long Island Rail Road Police which careful review of the

21  record, as well as interviews with two former assistant district

22  attorneys who handled the case through indictment then through

23  trial, revealed that neither of them had ever seen the documents

24  before and particularly a memo book entry by a Long Island Rail Road

25  detective which would not only have served to impeach the star

gjn

1    witness, it would have provided a significant avenue to attack the

2    thoroughness and competence of the police work resulting in the

3    accusations that have stood all these years.  It may well have

4    provided weight to the trial counsel's efforts during the trial to

5    nominate as many third-parties as the crime's author as possible.

6         Because the documentation of the investigation's conclusion

7    does not appear to be in sequence or complete because the record of

8    Rosario compliance met the standards of 30 years ago but would no

9    longer seem to be adequate for our purposes today, I am neither

10   comfortable or able to rely on the presumption of regularity that

11   ordinarily attaches to these proceedings pursuant to People versus

12   Glass, 43 NY 2d 283.

13        Rather, I have concluded something quite the opposite occurred.

14        I am satisfied that critical material, information reflecting

15   on the guilt of the defendant existed and was in the possession of

16   the Long Island Rail Road police.  I am also satisfied that for

17   whatever reason this information was never provided to the

18   defendant.

19        Frustratingly, I have uncovered a Brady-type violation but one

20   without a culprit.  The fact that responsibility for this error

21   cannot be connected to any individual or any agency does not spare

22   the conclusion that the defendant should have gotten this material

23   and that had he not, it undermines the validity of the conviction

24   that was returned in 1990.  That's pursuant to Brady versus

25   Maryland, 373 US 83; Giglio versus United States, G-I-G-L-I-O, 405

FELIPE RODRIGUEZ - Proceedings                        5

1    US 150; People versus Vilardi, V-I-L-A-R-D-I, 76 NY 2d 67; and Kyles
2    v Whitley, 514 US 419.
3            Because of these conclusions, Acting District Attorney Ryan has
4    authorized me to make the information available to defense counsel and
5    to invite the motion which brings us here today.  We will be joining in
6    it and requesting the Court to grant the extraordinary relief of
7    setting aside the defendant's conviction.
8            Furthermore, the defendant now returned to his pre-conviction
9    status the indictment reinstated.  I'll be moving to dismiss it because
10   in light of the critical witness Javier Ramos's recantation.
11           While I don't find it to be that persuasive in the slightest bit,
12   I could not in good faith attempt to convict the defendant again on the
13   quality of the evidence that remains.  Accordingly, at the conclusion
14   of these proceedings, I will be moving to dismiss the indictment.
15           But first, Judge, some context is necessary.
16           The case has its origin in the November 26, 1988 murder of Maureen
17   "Nina" Fernandez, a 35 year-old mother of three whose body was found on
18   Thanksgiving morning in a desolate Long Island Rail Road yard in
19   Maspeth, a reputed lovers' lane.  Ms. Fernandez was partially clothed
20   and had been stabbed 37 times.  Autopsy revealed that several of her
21   wounds were likely fatal.  Additionally, evidence suggested that she
22   had been beaten, and indeed she sustained a broken nose.  Other
23   evidence suggested that although not conclusive, evidence pointed
24   strongly to sexual assault.  Of note, Ms. Fernandez's blood alcohol
25   level was .33.

gjn

1    The murder resulted in an investigation undertaken by the 104

2    precinct detective unit and the Long Island Rail Road Police.  Despite

3    the appearance of the crime scene with a great deal of blood  and fresh

4    tire tracks present, little evidence of forensic value was revealed.

5    As a result, the investigation was propelled by evidence to piece

6    together the deceased's movements in the hours before her remains were

7    discovered.

8    Despite the resort to criminal profilers, the use of police

9    sketches, the investigation was stalled from us.  It was only upon

10   tracing a car observed leaving the rail yard to a security employee of

11   Wyckoff Heights Hospital where the deceased's daughter was being

12   treated the evening before the murder did the investigation  develop

13   focus.

14   The investigation culminated on March 27, 1989 with the arrest of

15   the defendant, Felipe Rodriguez based upon alleged admissions he made

16   to his best friend, Javier Ramos.  A lineup identification by Robert

17   Thompson who had seen the deceased and the defendant together at a bar

18   drinking to excess approximately one hour before Ms. Fernandez's

19   estimated time of death.

20   Additionally, circumstantial evidence corroborated the

21   identification and the evidence was complemented by a statement made by

22   the defendant six months before his arrest that, although denying

23   involvement in the crime, mentioned a disturbing fascination with the

24   Wyckoff Heights Hospital morgue and a macabre interest in the bodies of

25   homicide victims.

gjn

FELIPE RODRIGUEZ - Proceedings                    7

1    The defendant was tried on the instant indictment in April and May

2    of 1990 before the Honorable Ralph Sherman and a jury. He was

3    convicted of murder in the second degree and sentenced to 25 years to

4    life imprisonment on May 25th of 1990. The conviction has survived

5    appellate review in both the state and federal court systems as well as

6    collateral attack based on an alleged Brady violation.

7    The defendant was granted clemency by Governor Andrew Cuomo three

8    years ago to the day, December 30, 2016, owing to the defendant's

9    stellar record as an inmate. Provided an opportunity, our office

10   voiced no opposition to the governor's action. It should be noted that

11   the defendant had always maintained his innocence. Indeed, he was

12   denied parole in 2014 due to his failure to voice remorse for the crime

13   and actually declined to appear before the Parole Board in the weeks

14   before the Governor's intervention because he could not admit remorse

15   for a crime he claimed he had no involvement in.

16   At this point, Judge, I think it's appropriate for Ms. Morrison to

17   detail her efforts over the past twelve years made on behalf of the

18   defendant.

19   THE COURT:    Thank you, Mr. Masters.

20   Ms. Morrison.

21   MS. MORRISON:    Thank you, Judge. Thank you, Bob.

22   It is my great honor and privilege to appear here today on

23   behalf of Felipe Rodriguez and formally present our unopposed motion

24   to vacate his conviction and sentences.

25   This day has been a long, long time coming for all of us. It

gjn

FELIPE RODRIGUEZ - Proceedings                    8

1   was over 32 years ago, when I was still in high school,

2   November 1987 when Ms. Fernandez was murdered. And it was almost 30

3   years ago in May 1990 that my client, Felipe Rodriguez, stood in

4   this very courthouse on the third floor and heard the jury pronounce

5   him guilty of a crime he didn't commit and to hear the judge say

6   that he had no choice but to sentence him to the maximum 25 to life

7   for that charge.

8        It was 13 years ago after spending many years on our very long

9   waiting list that Felipe became an Innocence Project client and I was

10  assigned to become his lawyer then. I was at the time pregnant with my

11  daughter who is here today and who is now twelve years old. We took

12  Felipe's case for a few reasons. We take only about one percent of the

13  cases of those who write to us. One reason was it appeared there was

14  DNA evidence that could tell us conclusively whether or not his claim

15  of innocence was real – meaning testing DNA to prove whether or not he

16  committed this crime.

17       The other reason was that his case had all of the hallmarks that

18  we have seen in wrongful convictions proven by DNA evidence. As

19  Mr. Masters mentioned, he was convicted primarily based on the

20  testimony of a man who had himself been a suspect in the crime

21  initially and he admitted to having given at least one false statement

22  to police investigators early in the investigation naming another man

23  who then acknowledged that was actually him.

24       There was one eyewitness who picked Mr. Rodriguez out of the

25  lineup out of four who saw the lineup and that witness was both drunk

gjn

1    and high on drugs that night.  And his initial description said that

2    the man at the bar who he saw with the victim was a stocky, white or

3    Italian male with hazel eyes and reddish brown hair which clearly did

4    not match Mr. Rodriguez's description.

5           Felipe himself was a devoted father of a young son.  He had no

6    arrests or convictions or history of violence towards anyone and there

7    was no physical evidence connecting him with the crime.  In fact at the

8    time he was thinking of becoming an NYPD officer and he was in the

9    auxillary police force.

10          So we started by searching for DNA.  Some of the former law

11   students who worked with us are now lawyers themselves and are here

12   today.  And with the cooperation of the DA's office we spent several

13   years looking for any scrap of DNA evidence that would clear him of

14   this crime.  Unfortunately very early on we learned that almost

15   everything that we thought to test that could have determined the

16   killer's identity had been destroyed even before Felipe faced trial

17   under the procedures that were in place at the time.

18          We were then fortunate enough to have several students on the case

19   who begged me not to close it and who said we just can't leave this man

20   in prison, we have to keep searching.  So we took a long-shot and kept

21   looking for several years with the help of, in particular, Eric

22   Rosenbaum, an assistant district attorney in the Queens district

23   attorney's office.

24          Finally we found a few hairs and other items in a warehouse that

25   got lost during Hurricane Sandy again and had been found again.

gjn

1    Unfortunately the testing did not yield any DNA from the male so there

2    was nothing we could do to pursue his claim of innocence with DNA.

3          At that point I managed to convince my friend and colleague,

4    Zachary Margulis-Ohnuma to join our case and help us and do some

5    additional work we might need to get Felipe out of prison and we

6    brought a clemency application to Governor Cuomo. I will always be

7    grateful to the Governor's staff for recognizing that the fact that

8    Mr. Rodriguez could not and would not express remorse for a crime he

9    didn't commit, should not mean that he was not a deserving applicant

10   for a commutation of sentence.

11         He was released from prison in January of 2017, nearly three years

12   ago. The first client in Innocence Project history to get a

13   commutation of sentence in New York and we continue d to investigate.

14   We made him a promise we would do everything in our power not just to

15   free his body from prison, but to clear his record and restore his good

16   name.

17         In 2017 Mr. Masters himself said he would investigate the case

18   anew with fresh eyes and open dialogue. This was no small thing to

19   agree to. He has -- as most people in this courtroom know, is no small

20   thing, he has considerable responsibilities other than digging around

21   in 30-year old murder cases. And we had already lost one motion to

22   vacate, "we" meaning Mr. Rodriguez, before the Innocence Project got on

23   the case and would have had a hard time getting back into court for

24   another one without the DA's cooperation.

25         We worked together to create a list of missing files, for

gjn

FELIPE RODRIGUEZ - Proceedings                          11

1   documents that we thought we needed, issues in the case. I trusted him

2   so much that I even sent him my own internal memos on certain aspects

3   of the case because I believed that he was going to take the evidence

4   where it led.

5          While they were reviewing the evidence we managed to locate Javier

6   Ramos, the main witness against Mr. Rodriguez. And when Mr. Ohnuma and

7   an investigator spoke with him, as Mr. Masters mentioned, he admitted

8   the testimony given at trial was a lie. Rather than go to court with

9   that information we took it to the DA's office and let them continue to

10  investigate as they saw fit.

11         In December of 2018 we had a big break. It turned out the NYPD

12  files that we did not have for many years were in storage, despite both

13  sides searching for them for some time, and over the next two years

14  Mr. Masters I know personally as well as Detective LoVerdi had gathered

15  and continued to review the evidence in that file. We didn't always

16  see the issues or the facts of this case in the same light but we were

17  candid with one another and I never doubted for a minute the commitment

18  to get the job done and to put the time and effort needed to give

19  Mr. Rodriguez his day in court.

20         Mr. Masters could have handed this off to someone else but he kept

21  it and I know that with the death of Judge Brown this year it was no

22  small thing for him to do. And I will and always will remain forever

23  grateful to him.

24         So here is what brings us here today. A number of documents

25  provided to us over the last two months from the police file, the Long

gjn

FELIPE RODRIGUEZ - Proceedings                    12

1    Island Rail Road file -- I will not detail them all here, we might not

2    get out of here before 5:00, but suffice to say it amounted to very

3    significant Brady material that the defense appears not to have

4    received -- I say "appears" because Felipe's trial lawyer passed away

5    some time ago, but it was pretty clear to all of us from the record

6    that there were certain things that she clearly did not have.

7          They directly supported the misidentification and innocence

8    defense and further eroded the credibility of the witness , Javier

9    Ramos.  This is actually the first motion that I filed in Felipe's case

10   since I became his lawyer 13 years ago because we were able to work

11   this process through collaborative, or if not always quickly as we all

12   might have liked.

13         And before I turn it over to Mr. Margulis-Ohnuma, I just want to

14   say a few more things briefly about Felipe as a man, as a person, of

15   course.  He is a deeply religious and good man who found comfort in his

16   faith even in the darkest of times.  He has shown me how to make

17   adversity into strength.  In prison he showed kindness and comfort to

18   those who had no one, who never had a hope of getting out of prison who

19   knew they would probably die there.  He stayed determined to be a

20   devoted father to his son who was just three years old when he went to

21   prison and lost his dad for the next several decades -- and he did

22   maintain that bond, they were as close when he got out as when he went

23   in there.  He kept his faith in our case.  He told me often that he

24   didn't think it was a mere coincidence that the murder victim had the

25   nickname of Nina which is my name and that it was a sign from God that

FELIPE RODRIGUEZ - Proceedings                    13

1    his luck was going to turn.  Even when I abandoned him to go on

2    maternity leave three months after taking his case, he decided that my

3    daughter must be his guardian angel and she would guide our work and

4    she brought good luck to everything we did.

5         But he also had faith in the ordinary human beings who walked this

6    earth; that the flawed men and women who run the legal system, and we

7    are flawed, that we try our best.  That those of us who had failed him

8    so badly in 1990 and then the decades that followed would nonetheless

9    some day bring the truth to light and acknowledge the grief he had to

10   live through.

11        And it is my honor and privilege to stand beside him on the day

12   that once again vindicates his faith.

13        THE COURT:    Mr. Ohnuma.

14        MR. MARGULIS-OHNUMA:     Thank you very much, your Honor.

15        I think at this time we move pursuant to 440.10(G) and (H) to

16   vacate the conviction and dismiss the indictment.

17        I will say a couple words if I may about my involvement in the

18   case.  Most of all I want to be express gratitude both on behalf of

19   my client and personally to the Queens County District Attorney's

20   office, your Honor, to the Court, most of all the Innocence Project.

21   The work they do is incredibly resource intensive and these cases

22   kind of really can't happen without them.  Very grateful to be a

23   part of one that ended up successful and I think we all owe a real

24   debt of gratitude to the Innocence Project for what they do.

25        When Nina came to me five years ago I reviewed the file.  I think

                                                                    gjn

1    there was a central observation that I made that's relevant to

2    Mr. Masters's remarks which is whether or not Javier Ramos was telling

3    the truth, there was no connection whatsoever between the car the

4    police had identified and the murder.  There was no biological evidence

5    as the Innocence Project's hard work had revealed inside the car.

6           The Prosecutor's closing statement was that the murder happened

7    inside the car because that was consistent with Javier Ramos's false

8    statement.  So with that central observation, we could go forward and

9    investigate it and build brick by brick with hard work, paralegal after

10   paralegal both from my office, associates in my office, paralegals at

11   the Innocence Project and Nina and I overseeing it all and put ting it

12   together and knowing what we were looking for in the material  that was

13   turned over last month.  And I am so grateful to the Innocence Project,

14   to Felipe and the Queens County District Attorney's office for putting

15   us there.

16          I also want to echo what Ms. Morrison said.  You cannot imagine a

17   more thoughtful, diligent, heartfelt, unbiased person than Felipe

18   Rodriguez.  I mean he has gone through what none of us can ever imagine

19   and he has done it with entire and complete grace.  Today was really

20   the first time he has ever been late in my experience.

21          MS. MORRISON:    That was because of an accident on the freeway

22   for the record.

23          MR. MARGULIS-OHNUMA:    So for all those reasons, Mr. Rodriguez

24   moves pursuant to CPL 440.10 to vacate the conviction.

25          MR. MASTERS:    Judge, in the interest of fairness and candor,

1    our basis for rejecting the defendant's claim of actual innocence is

2    based on the rejection of Mr. Ramos's recantation, for just as his

3    testimony was necessary to commence the prosecution, crediting his

4    recantation would be necessary to erase the notion of the

5    defendant's innocence.

6            The legal prism through which this recantation must be viewed

7    informs my conclusion. The time-honored legal principles regarding

8    his recantations have this famous quote from the Court of Appeals

9    seminal decision from 1916, People versus Shilitano,

10   S-H-I-L-I-T-A-N-O, 218 NY 161: Therein Judge Samuel Seabury wrote

11   this oft-cited principle: There is no form of proof so unreliable

12   as recanting testimony. In the popular mind it is often regarded of

13   great importance. Those experienced in the administration of

14   criminal law know well its untrustworthy character.

15           I don't wish to belabor my conclusions regarding Mr. Ramos. He

16   was kind enough to be flown here from out of state and be

17   interviewed in the presence of his own attorney over two days by

18   myself, by Sergeant LoVerdi of my office and former Assistant

19   District Attorney David Dikman who took Mr. Ramos's sworn

20   incriminating statement on March 27th of 1989 and adduced an even

21   more detailed version before the grand jury which indicted the

22   defendant two days thereafter.

23           But as a result of my reinvestigation I must say that I remain

24   singularly unpersuaded by Mr. Ramos's recantation. Sergeant LoVerdi

25   and Mr. Dikman share my opinion. Apart from the suspect view of

gjn

FELIPE RODRIGUEZ - Proceedings                    16

1    recantations provided by our common law, Mr. Ramos's recantation is

2    entirely devoid of logic, adequate recall and appears to be

3    motivated in part by intense animus towards the police. Indeed,

4    Mr. Ramos's trial testimony, although extensively challenged was,

5    supported by internal logic which his current version fails to

6    approach. Accordingly, the defendant's conviction, although hardly

7    based on overwhelming evidence, remains presumptively valid and

8    based on adequate evidence supported by credible circumstantial

9    evidence. Therefore it is my opinion that the claim of actual

10   innocence cannot be accepted as it is almost entirely based upon

11   Mr. Ramos's claims.

12          But the basis of the action we take today is a discovery

13   violation, your Honor. Some detail of that violation and its

14   relevance I believe is necessary. Because Ms. Fernandez's body was

15   discovered at a Long Island Rail Road yard, their police extensively

16   participated in the investigation. The lead agency who was the NYPD

17   in the case was investigated out of the 104 precinct detective unit.

18   The investigation commenced on November 26th of 1987. It changed

19   hands on April 1st of 1988 when the first NYPD detective retired and

20   it was assigned to another. From the commencement of this case

21   until October 1 of 1988, there are 212 numbered DD-5s. More than

22   half authored by two Long Island Rail Road detectives assigned to

23   the system now. However over the last six months of the

24   investigation pendency there are approximately only an additional

25   three to five DD-5s, and none of them are numbered.

FELIPE RODRIGUEZ - Proceedings                    17

1      The documentation concludes with the events of March 27 th of
2      1989, that is the reinterview of Mr. Ramos, his identification of
3      the defendant as the car's borrower and the author of the
4      incriminating admissions previously described as well as DD-5s
5      documenting the preparation of a taped statement – a typed
6      statement made by ADA Dikman, the coordinated efforts of the
7      83rd precinct auxillary police to have the defendant available to be
8      taken to custody, as well as the lineup identification by
9      Mr. Thompson.  Subsequent DD-5s note the enlisting of Lifecoder in
10     an attempt at DNA testing on the car seat covers which yielded
11     nothing.
12         Any objective review of the investigator files are concerning.
13     The most critical portions of the investigation, indeed were most
14     sparingly documented.  Were the paucity of the documentation the
15     only issue revealed in our review of this matter, I would not
16     recommend disturbing this conviction; however, it is clear that
17     although the Long Island Rail Road  police were utilizing NYPD DD-5s
18     to document their work, simultaneous reports were filled out to
19     explain their activity to justify overtime and progress in the case.
20     Inconsistencies in their paperwork  are apparent and it seems
21     inconceivable they would not have been the subject of
22     cross-examination, particularly considering the defense trial
23     strategy.
24         However most troubling and decisive is the discovery of a
25     photocopy of a memo book identified as having been written by

gjn

FELIPE RODRIGUEZ - Proceedings                    18

1    Detective Sullivan of the Long Island Rail Road police.  The
2    handwritten note states:  Rodriguez showed up at Ramos's house
3    6:00 A.M. Thanksgiving morning with male black friend, 25 years old,
4    slim, dark-skinned black.
5        Sullivan has no memory of it.  NYPD Detective Beisel never saw
6    it and candidly admits he would have pressed for an identification
7    of the male black.  Concerned that he could have been an additional
8    witness against the defendant but also a potential accomplice to the
9    crime or perhaps even the actual perpetrator.
10        An examination of the trial record reveals no hint it was in
11   counsel's possession.  It is unimaginable that a defense strategy of
12   nominating as many candidates for this crime's commission as
13   possible would not have premiered this statement to establish that
14   and to cast doubt on the investigation's failure to pursue such a
15   significant lead.  As a result, I am persuaded these materials were
16   not provided to the defendant.  That conclusion was only
17   strengthened by that conversation with former ADAs Dikman and Safran
18   who tried the case.  Neither ever saw these materials and both would
19   have taken steps to address their significance and relevance.
20        Judge, while analyzing what I had uncovered I came across a
21   decision published in last Monday's Law Journal.  It was actually from
22   the First Department hand downs of December 19th of 2019, People versus
23   Darrin McGhee, M-C-G-H-E-E, 2019 Westlaw 6902810, an opinion written by
24   Judge Mazzarelli.  It opens by saying:  The Brady rule is based on the
25   requirement of due process and its purpose is not to displace the

gjn

FELIPE RODRIGUEZ - Proceedings                    19

1    adversary system as the primary means by which truth is uncovered but

2    to ensure that the accused receives a fair trial.  Here the People

3    admittedly failed to disclose a witness statement that could have aided

4    the defense in attempting to impeach the only eyewitness to the

5    shooting in question and that could have opened up an additional avenue

6    investigation.  Indeed where the information gathered if true would

7    have directly contradicted the People's theory of the case, it must be

8    considered Brady.

9              Judge, that holding is familiar to all of us but I think the

10   articulation is particularly apt to the case before us.  In sum, the

11   information, particularly that memo book entry, though its author

12   theorized that Ramos promptly walked back what it was that he said

13   those details, he admits is pure conjecture, Sullivan does, and it has

14   no impact ultimately on the legal analysis.  It was favorable to the

15   defendant.  Very favorable.  On a number of planes it would have

16   impeached Mr. Ramos.  It would have impeached the detective.  It would

17   have impeached the entire investigation.  It would have lent support

18   for the defense theory of another perpetrator.  Because it was

19   favorable, it was our obligation to get it into the defendant's hands.

20             That I cannot fairly accuse or blame anyone, that I have no

21   culprit for this mistake, doesn't in any way alleviate our

22   responsibility not to make it in the first place.  Nor does it mitigate

23   the legal impact of what occurred.  I cannot offer a defense to these

24   based on materiality.  Based upon my entire career only working within

25   the practice of criminal law it would have been a different trial had

gjn

1    this piece of paper been made available and no one would have been

2    surprised by a different verdict.

3           Because of that I am compelled to join in the motion. Because

4    Mr. Ramos's current disposition and his version now, I can neither

5    retry the case or let the indictment stand.

6           On a personal note I must thank defense counsel and the defendant

7    for the patience that they showed us during this long journey that's

8    gone on for several years. I must also thank Sergeant LoVerdi for his

9    remarkable devotion in the investigation as well as all the retired

10   detectives and former ADAs. They took my calls, they answered my

11   questions, admitted that which they could and recognized where time had

12   eroded their memories.

13          Finally I recognize, frustratingly, I provide a conclusion that is

14   in some ways unsatisfying to everyone: To the defendant I cannot lift

15   the cloud of suspicion but I can lift the burden of his conviction.

16          To everyone who worked so hard on this case 30 years ago, I have

17   ultimately disturbed the satisfaction that they felt from achieving

18   justice in such a difficult case.

19          For the deceased's family, I have taken the closure that our

20   system tries to provide to all families of deceased. That I have taken

21   that from them.

22          And for Maureen Fernandez, I have now terminated her case without

23   a conclusion. I pray that her eternal slumber is not disturbed as a

24   result.

25          To Mr. Rodriguez, a last order of business is due: Guilty or not,

gjn

1    you were entitled to that information.  Accused of murdering a young

2    mother of three, you were owed the best the criminal justice system

3    could provide.  Not perfection because no system can accomplish that,

4    but when things were cut in your favor should find their way in your

5    attorney's hands, that seems not to have happened here and for that I

6    am sorry.

7         Because it didn't, we take the action we do now and we take  today.

8    Judge, I move and join in the motion to set aside the conviction

9    pursuant to CPL 440.  Upon that being granted I will move to dismiss

10   this indictment against the defendant.

11        THE COURT:    Thank you, Mr. Masters.

12        I understand that Mr. Felipe Rodriguez would like to make a

13   statement.

14        THE DEFENDANT:    Yes.

15        THE COURT:    Mr. Rodriguez.

16        THE DEFENDANT:    Thank you, your Honor.

17        First and foremost I want to thank God for allowing me to be

18   here today.  Thank you, your Honor, Mr. Masters, thank you for all

19   your work.

20        There is no doubt in my life this day would come.  There is no

21   question that there was a crime committed and I hope and pray that

22   one day whoever did commit the crime can be found or maybe his

23   conscience can make him come forward.  Either that or anything else

24   that is going to show what happened on that Thanksgiving morning.

25        My son was three years old.

gjn

FELIPE RODRIGUEZ - Proceedings                                    22

1      THE COURT:    By the way, I know that your son was on his way.

2   Has he arrived?

3      THE DEFENDANT:    He is here.

4      He is big now.  Bigger than me.  But if it wasn't for Nina

5   Morrison and Zack and all their efforts, the fact that I probably

6   would have still been in prison the rest of my days, I want to thank

7   the supervisor, I want to thank Arthur Browne who worked hard on

8   this case.  I want to thank Father Ogbunna who is here today who

9   actually counseled me in prison and helped me become the man that I

10  am today.  Part of hope right here in court.  I am grateful for all

11  the attention he gave me.  It's too many people that I got to thank

12  and I think the list is so long so I'm not going to tire the Court

13  with that.  But I want to thank everybody:  My family, my wife, my

14  kids.

15     It's hard to come out of prison after 27 years and not be

16  angry, sometimes to act natural.  And my wife put up with it and she

17  has helped me greatly.  I am really grateful to my wife and my kids

18  mostly and thank you.

19     THE COURT:    Mr. Rodriguez, I think it's important for the Court

20  to acknowledge that sometimes the criminal justice system makes

21  mistakes.

22     THE DEFENDANT:    Thank you.

23     THE COURT:    Sometimes the defense attorney makes mistakes,

24  sometimes the Court makes mistakes -- not this Court but some courts

25  might make mistakes -- even this Court makes mistakes, and sometimes

gjn

1       the prosecutor makes a mistake.  And sometimes these mistakes are

2       minor and do not effect a defendant's right to a fair trial and

3       sometimes these mistakes are consequential, monumental and they do

4       in fact deprive a defendant of his right to a fair trial.

5               What is important to me is that we have a criminal justice

6       system that is self-reflective, that is willing to look in the

7       mirror, to look inward so that we can quickly correct miscarriages

8       of justice when they occur.

9               Now in your case, Mr. Rodriguez, the miscarriage of justice

10      took way too long to discover and it took an act outside of the

11      criminal justice system, the governor's, Governor Cuomo's

12      commutation of your life sentence and release from prison after 27

13      years.  Mr. Rodriguez, you deserve better than that.  Yet it seems

14      from everything I'm hearing that you never lost faith and you are

15      lucky enough, you are blessed enough to have the Innocence Project

16      take up your cause and lucky enough to have the District Attorney's

17      office reinvestigate your case and discover that there were indeed

18      some documents in your case, some Brady material, some evidence that

19      was favorable to you which would likely have affected the jury's

20      verdict.

21              The miscarriage of justice in your case, Mr. Rodriguez, took

22      too long to discover and I regret that, but I am glad that we

23      finally got here even though I recognize that, as Mr. Masters said,

24      this brings no comfort or solace to the victim's family or to your

25      beautiful family – I just became familiar with this case in the

gjn

FELIPE RODRIGUEZ - Proceedings                    24

1    last week or so.  I did not preside over Mr. Rodriguez's trial or

2    his earlier motion to vacate his conviction.  Nevertheless, I do

3    wish to thank the Innocence Project, Ms. Morrison and

4    Mr. Margulis-Ohnuma, for their work on this case and the work they

5    do generally in this area as well as the District Attorney's office,

6    Mr. Masters and acting District Attorney Jack Ryan for

7    reinvestigating the case after the Governor commuted your sentence .

8         So I say simply to you:  Good luck to you, Mr. Rodriguez, the

9    motion to vacate the conviction is granted and the indictment is

10   hereby dismissed.  I will seal -- I will stay sealing until I have

11   an application to seal the conviction.  And again, good luck to you,

12   sir.  Thank you.

13        THE DEFENDANT:    Thank you.

14        MR. MASTERS:    Thank you.

15

16              *        *        *        *        *

17

18   CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF

19   THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS

20   PROCEEDING.

21

22   _____

     GAIL J. NEUFELD, RPR
23   Official Court Reporter

24

25

                                                            gjn