UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FELIPE RODRIGUEZ,

                           Plaintiff,

                -against-

THE CITY OF NEW YORK, METROPOLITAN
TRANSPORTATION AUTHORITY, LONG ISLAND
RAIL ROAD COMPANY, JOHN BEISEL, in his
individual and official capacities; THOMAS SULLIVAN,
in his individual and official capacities; CHARLES
WENDEL, in his individual and official capacities; JERRY
FENNEL, in his individual and official capacities; JOHN
CALIFANO, in his individual and official capacities;
JOHN WILDE, in his individual and official capacities;
GEORGE ZAROOGIAN, in his individual and official
capacities; and OTHER AS-YET-UNKNOWN POLICE
OFFICERS & SUPERVISORS JOHN and JANE DOES #
1–10

                           Defendants.

---

21-cv-1649

**AMENDED
COMPLAINT AND
JURY DEMAND**

Plaintiff FELIPE RODRIGUEZ, by his attorneys, Zachary Margulis-Ohnuma, Joel B. Rudin, and Benjamin Notterman, complaining of the defendants, respectfully alleges as follows based on information and belief:

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................3
JURISDICTION ........................................................................................................5
VENUE.....................................................................................................................7
JURY DEMAND.......................................................................................................7
PARTIES ..................................................................................................................8
FACTS....................................................................................................................12
A.      Background ..............................................................................................12

B.     The body of Maureen Fernandez is found behind a warehouse in Queens on Thanksgiving morning of 1987. ..................................................................12

C.     Hours before her death, Ms. Fernandez had arrived at the Little Liva Bar with an unknown man in a black Monte Carlo. ....................................................14

D.     Witnesses describe the man who arrived at the bar with Ms. Fernandez in the black Monte Carlo.........................................................................................16

E.     Detectives investigate the victim's husband and other suspects. ................18

F.     More than nine months after the murder, the investigation shifts to a car formerly owned by Javier Ramos, a Wyckoff Heights Hospital security guard.........................22

G.     Detectives coerce Javier Ramos into accusing Richard Pereira, who is arrested, cleared, and released. ...................................................................................24

H.     Detectives secretly record Ramos admitting that he did not have any information about the murder and that his car was not even operable on Thanksgiving 1987........29

I.     Det. Beisel fabricates a report about an interview with Felipe's wife. ........31

J.     Det. Beisel unsuccessfully attempts to elicit a confession from Felipe, then files a false police report to make Felipe appear guilty. ................................................32

K.     Detectives coerce Javier Ramos into signing a false affidavit accusing Felipe of murder ...........................................................................................................33

L.     Detectives arrest Felipe for a murder they know he did not commit. ..........36

M.     Detectives fabricate lineup evidence by manipulating Robert Thompson into "identifying" Felipe........................................................................................37

N.     Felipe is indicted based on fabricated evidence and the suppression of exculpatory evidence........................................................................................................39

O.     Felipe is convicted based on fabricated evidence and the suppression of exculpatory evidence........................................................................................................43

P.     Felipe is wrongfully imprisoned for almost 27 years before receiving executive clemency from Gov. Andrew Cuomo. ..........................................................51

Q.     Felipe is fully exonerated based on Ramos's recantation and newly discovered evidence released by the Queens District Attorney's office. .........................52

DAMAGES ......................................................................................................54

COUNT I
     New York Common Law Malicious Prosecution — All Defendants ............56

COUNT II
     42 U.S.C. § 1983 Malicious Prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments — All Individual Defendants ..................................57

COUNT III
     42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments — Fabrication of Evidence — All Individual Defendants ......................................................................................................58

COUNT IV
    42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and
    Fourteenth Amendments — *Brady* — All Individual Defendants ..................................59
COUNT V
    42 U.S.C. § 1983 Fourth and Fourteenth Amendment Excessive Pretrial Detention —
    Individual Defendants....................................................................................................60
COUNT VI
    42 U.S.C. § 1983 Civil Rights Conspiracy — Individual Defendants ...........................61
COUNT VII
    42 U.S.C. § 1983 Violation of the Equal Protection Clause of the Fourteenth
    Amendment — Defendant John Beisel ..........................................................................63
COUNT VIII
    42 U.S.C. § 1981 Violation of Right to Full and Equal Benefit of the Law - Defendant
    John Beisel.....................................................................................................................65
COUNT IX
    42 U.S.C § 1983 *Monell* municipal liability for conduct of police officers relating to
    withholding exculpatory evidence, fabrication of evidence, and initiating the prosecution
    without probable cause — Defendant City of New York ...............................................67
COUNT X
    42 U.S.C § 1983 *Monell* municipal liability for conduct of LIRR PD officers relating to
    withholding exculpatory evidence, fabrication of evidence, and initiating the prosecution
    without probable cause — Defendants Metropolitan Transportation Authority and Long
    Island Rail Road Company..............................................................................................82
COUNT XI
    42 U.S.C. § 1983 *Monell* Municipal liability for the Queens District Attorney's Office's
    Policy of Deliberate Indifference to Fair Trial Violations — Defendant City of New
    York ...............................................................................................................................87

## PRELIMINARY STATEMENT

1.      This is an action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the civil rights, as secured by said statutes, the common law, and the Constitutions of the State of New York and the United States, of Felipe Rodriguez ("Felipe")

who was wrongfully convicted of the 1987 homicide of Maureen Fernandez in Queens, New York.

2.      After spending nearly 27 years in prison for a murder he did not commit, Felipe was granted executive clemency by New York Governor Andrew Cuomo and released in January of 2017. After Felipe's release, the Queens District Attorney's Office re-investigated the case and, in December 2019, joined Felipe's motion to the vacate the conviction. The Queens County Supreme Court granted the motion on the basis of (1) newly discovered evidence of innocence, including a recantation by the prosecution's main witness, Javier Ramos, who revealed that his false statements implicating Felipe were coerced by detectives, and (2) *Brady* violations and other police misconduct that, according to the District Attorney's Office, "impeached the entire investigation." *People v. Felipe Rodriguez*, Ind. 1568/89, 12/30/2019 Hearing Tr. at 19:15.

3.      Detectives engaged in a litany of misconduct that violated Felipe's Fourth Amendment, due process and fair trial rights, directly causing his wrongful conviction and incarceration. Eager to "close" a homicide investigation that was entering its second year, detectives from the New York City Police Department ("NYPD") and Long Island Rail Road Police Department ("LIRR PD") fabricated police reports, withheld exculpatory

information from prosecutors and the defense, and coerced Mr. Ramos into implicating Felipe. In the course of the investigation, detectives drove Ramos to a cemetery and threatened to kill him if he did not implicate Felipe in the murder. Assistant district attorneys withheld crucial exculpatory information from the defense, including a tape recording in which Mr. Ramos—unaware that he was being recorded—admitted to a co-worker that he knew nothing about the murder.

4.      The police and prosecutors engaged in the misconduct pursuant to policies of deliberate indifference by final policymakers, for which the City of New York, the Long Island Rail Road Company, and the Metropolitan Transportation Association, the suable entity that took over the LIRR Police, are liable. Felipe suffered unimaginable damages during the course of prosecution, conviction and imprisonment, and deserves substantial compensation for the suffering he endured and continues to endure as a direct result of the violations of his constitutional rights.

## **JURISDICTION**

5.      Felipe Rodriguez brings this action for compensatory and punitive damages, affirmative and equitable relief, an award of costs and attorney's fees, and such other and further relief as this Court deems equitable and just.

5

6.     This action is brought pursuant to 42 U.S.C. § 1983 *et seq.* to redress the deprivation under the color of law of Felipe Rodriguez's rights as secured by the United States Constitution, and pursuant to 42 U.S.C. § 1981 to redress the deprivation of Felipe Rodriguez's right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

7.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Mr. Rodriguez's claims brought under the laws of the State of New York.

9.     Mr. Rodriguez has complied with the requirements of New York General Municipal Law Section 50-I by making and serving a notice of claim on the Comptroller of the City of New York on March 27, 2020.

10.     The notice was served within the time required by the New York General Municipal Law Section 50-e.

11.     More than thirty days have elapsed since the service of that notice and no offer of settlement has been made.

12.     At the request of the City of New York, Mr. Rodriguez submitted to a hearing pursuant to New York Municipal Law Section 50-h on November 19, 2020.

13.     Mr. Rodriguez has complied with the requirements of New York General Municipal Law Section 50-I by making and serving a notice of claim on the Metropolitan Transportation Authority Legal Department on March 27, 2020.

14.     The notice was served within the time required by the New York General Municipal Law Section 50-e.

15.     More than thirty days have elapsed since the service of that notice and no offer of settlement has been made.

## **VENUE**

16.     Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b), because this is the district in which the claim arose and Plaintiff currently resides in this district and resided in this district in 1990.

## **JURY DEMAND**

17.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

18.     Plaintiff FELIPE RODRIGUEZ ("Felipe") is a Hispanic man born in Puerto Rico, a citizen of the United States, and has been at all relevant times a citizen and resident of the City and State of New York.

19.     Defendant CITY OF NEW YORK was and is a municipal corporation that is a political subdivision of the State of New York, was the employer of several of the individual defendants, and was at all times relevant to this Complaint responsible for the administrative and managerial policies, practices and customs of the New York City Police Department ("NYPD") and the Queens County District Attorney's Office ("QDAO").

20.     Defendant METROPOLITAN TRANSPORTATION AUTHORITY ("MTA") is a public-benefit corporation that administers mass transportation in the New York City metropolitan area. At all times relevant to this Complaint, the Long Island Rail Road ("LIRR"), which in 1990 had its own police force ("LIRR PD"), was a subsidiary unit of the MTA. The MTA is liable for torts committed by its employees, including torts committed by detectives and officers of the LIRR PD, and was at all times relevant to this Complaint responsible for the administrative and managerial policies, practices and customs of the LIRR PD.

21.     Defendant LONG ISLAND RAIL ROAD COMPANY is a subsidiary unit of Defendant Metropolitan Transportation Authority. At all times relevant to this Complaint, the LIRR had its own police force, the LIRR PD, which merged by statute into Defendant MTA's police force in 1998. *See* N.Y. Pub. Auth. Law § 1266-h(1).

22.     At all times relevant to this Complaint, the LIRR PD performed traditional police functions in and around the New York City metropolitan area. *See* N.Y. Pub. Auth. Law § 1266-h(1). Officers and detectives of the LIRR PD were "police officers" for the purposes of the Criminal Procedure Law. *See id*.

23.     Defendant Detective JOHN BEISEL was at all times relevant to this Complaint employed by the City of New York as a detective for the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions.  He is sued in his individual and official capacities.

24.     Defendant Detective JOHN CALIFANO was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions.  He is sued in his individual and official capacities.

9

25.     Defendant Detective JOHN WILDE was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

26.     Defendant Detective JERRY FENNEL was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

27.     Defendant Sergeant GEORGE ZAROOGIAN was at all times relevant to this Complaint a duly appointed and acting officer of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

28.     Defendant Detective THOMAS SULLIVAN was at all times relevant to this Complaint a duly appointed and acting detective of the LIRR PD and also acted as an agent of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

29.     Defendant Detective CHARLES WENDEL was at all times relevant to this Complaint a duly appointed and acting detective of the LIRR PD and an agent of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

30.     Defendant Detective John Doe #1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was at all times relevant to this Complaint a duly appointed and acting detective of the NYPD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions. He is sued in his individual and official capacities.

31.     Defendants Does #2 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors, and/or other agents and employees of the City of New York, MTA or LIRR PD, acting under color of law and within the scope of his employment in carrying out investigative and other law enforcement functions, who participated in the misconduct described herein. They are sued in their individual and official capacities.

## FACTS

### A.    Background

32.    In November of 1987, Felipe Rodriguez was 22 years old.

33.    He resided at 635 Watkins Street in Brooklyn with his wife Gladys Rodriguez and their 18-month-old son, Felipe Rodriguez Jr.

34.    The building was owned by Gladys's father, who operated a small grocery store on the first floor.

35.    Felipe worked as a maintenance mechanic for Cosmopolitan Corp.

36.    Felipe was a member of Local 32BJ of the Service Employees International Union.

37.    Felipe had volunteered as an auxiliary police officer at the 83rd Precinct in Brooklyn from 1982 and 1984.

38.    Felipe had no criminal record.

### B.    The body of Maureen Fernandez is found behind a warehouse in Queens on Thanksgiving morning of 1987.

39.    On the morning of November 26, 1987, which was Thanksgiving Day, the body of 35-year-old Maureen Fernandez ("Ms. Fernandez") was found in a remote industrial lot in Glendale, Queens.

40.     The lot was located behind Dubofsky's wholesale warehouse, which ran adjacent to train tracks.

41.     Ms. Fernandez's body was discovered at around 9:00 a.m. by the owner of the security company hired to guard the lot.

42.     Detectives and officers responded to the scene at around 9:30 a.m.

43.     Ms. Fernandez's body had 35 stab wounds to the neck, back, and pelvic area.

44.     Tire impressions were found in close proximity to Ms. Fernandez's body, leading police to believe that Ms. Fernandez had been transported to the scene in a car driven by her killer.

45.     No physical evidence collected from the crime scene proved useful in identifying the vehicle or its driver.

46.     No murder weapon was ever found.

47.     The day after the body was found, detectives interviewed Robert Soloney, the night watchman at the Dubofsky's lot on Thanksgiving morning of 1987.

48.     Soloney told police that he saw "a 1980-81 2 dr. white Cadillac" leave the lot between 3:00 a.m. and 4:00 a.m.

49.     Soloney described the driver of the white Cadillac as a white male in his 20s, with no eyeglasses, a thin mustache, short dark hair, and wearing a white tank top.

50.     Soloney did not see any passengers in the white Cadillac.

51.     Because the location where the victim was found in Queens belonged to the Long Island Railroad, the LIRR PD assisted the NYPD's investigation of the crime.

### C.     Hours before her death, Ms. Fernandez had arrived at the Little Liva Bar with an unknown man in a black Monte Carlo.

52.     Ms. Fernandez spent much of Thanksgiving Eve, November 25, 1987, at Wyckoff Heights Hospital, 374 Stockholm Street in Brooklyn, where her young daughter was being treated.

53.     A witness who was at the hospital that day told police they observed Ms. Fernandez drinking from a liquor bottle.

54.     At around 1:00 a.m. on November 26, 1987, Ms. Fernandez used a hospital phone to call her husband, Carney Fernandez.

55.     The couple began arguing over the fact that Ms. Fernandez was drinking while watching the baby, and Ms. Fernandez hung up on her husband.

56.     Ms. Fernandez left the hospital shortly after that phone call and traveled to the Little Liva Bar at 1189 Gates Avenue in Brooklyn, New York.

57.     No witnesses actually saw Ms. Fernandez leave the hospital, so detectives did not know whether she left on foot or by car.

58.     The Little Liva Bar was located approximately one mile from Wyckoff Heights Hospital and approximately two miles from where Ms. Fernandez's body would be found hours later behind Dubofsky's warehouse in Queens.

59.     According to bar patrons, Ms. Fernandez arrived at the Little Liva between 2:00 and 2:30 a.m. in the company of an unknown male.

60.     Bar patrons told police that they believed that Ms. Fernandez and the unknown male arrived in a black, late-1970s model Chevrolet Monte Carlo.

61.     Detectives believed that Ms. Fernandez and the man likely departed together in the black Monte Carlo.

62.     Accordingly, for the next several months, detectives focused on locating the black Monte Carlo and its driver.

63.     Carney Fernandez, Ms. Fernandez's husband, was also considered a suspect.

**D.**      **Witnesses describe the man who arrived at the bar with Ms. Fernandez in the black Monte Carlo.**

64.      In the days following the murder, detectives interviewed witnesses who interacted with Ms. Fernandez and the unknown man at the Little Liva Bar shortly before she was murdered.

65.      Detectives obtained detailed descriptions of the unknown man from bartender Joseph Castillo and bar patrons Robert Thompson and William Perry.

66.      All three witnesses described the unknown man as approximately 30-years-old, between 5'7 and 5'9, with no mustache and no eyeglasses.

67.       Thompson added that the man had "reddish brown" hair, was "bow-legged," and was a wearing a "multicolored sweater," "beige pants," and a gold ring.

68.      In a second interview in February 1988, bar patron William Perry told Det. Wendel and Det. Sullivan that the man with Ms. Fernandez on Thanksgiving morning 1987 was Italian or Irish, "not Hispanic," and had "hazel or green" eyes.

69.      The February interview referenced in the foregoing paragraph was not documented in a DD-5.

70.      The February interview was not disclosed in any way to Mr. Rodriguez or his attorneys prior to his trial.

71.     More than four months after the murder, on March 17, 1988, Dets. Sullivan and Wendel conducted a videotape-recorded interview of Robert Thompson.

72.     Thompson added several details to his earlier description.

73.     Thompson said the man called himself a "plumber's helper."

74.     Thompson said that the man did not speak with an accent.

75.     Thompson said that the man looked Italian, not Hispanic.

76.     Thompson added one further detail to his description of the man seen with Ms. Fernandez at the bar: he claimed that the man had a tattoo between his palm and index finger and four letters tattooed across his fingers, which appeared to read, "LOVE."

77.     The descriptions did not resemble Felipe Rodriguez, who had a thick mustache, wore eyeglasses, was 22 years old, stood approximately 6'1" tall, never had any tattoos, and never wrote the word "LOVE" on his hands.

78.     Felipe never drove or had access to a black Monte Carlo, the car driven by the suspected killer.

79.     Felipe is Hispanic and has brown eyes.

80.     In November 1987, Felipe was a mechanic. Felipe never identified himself as a "plumber's helper."

81.     In November 1987, Felipe spoke with a Puerto Rican-inflected Spanish accent.

**E.     Detectives investigate the victim's husband and other suspects.**

82.     From the beginning, detectives working on the Maureen Fernandez homicide had information pointing to a number of potential suspects other than Felipe.

83.     One suspect was Ms. Fernandez's husband, Carney Fernandez.

84.     Carney had no alibi for the time of his wife's murder.

85.     Ms. Fernandez's friends and family told detectives that Carney physically abused Ms. Fernandez, had threatened to kill her, had a violent temper when drinking, was jealous of her, and that she wanted to leave him.

86.     According to police records, one month before the murder, Ms. Fernandez told her ex-boyfriend Manny Rivera that "she had just had a fight with her husband . . . the fight was over her husband being too jealous of her," and that "Ms. Fernandez was afraid to talk with anyone in the neighborhood since her husband would follow her to see who she would meet and talk to."

87.     Ms. Fernandez's friend, Liz Velez, told police that Ms. Fernandez was so afraid of Carney that she asked Liz for a gun to defend herself.

88.     On the night of the murder, Carney and Ms. Fernandez made plans to have dinner with their neighbors, James and Mildred White.

18

89.     James White told Det. Sullivan that "Carney began to get upset when [Ms. Fernandez] failed to call or come to the White's house by about 7:00 p.m."

90.     James White "informed [Det. Sullivan and Det. Murphy] that Carney is a close friend of his but [Mr. White] does not like to be around him when he is angry since he has a very bad temper."

91.     Mr. White said that Carney remained at the White's home until approximately 12 midnight and then left.

92.     Nobody reported seeing Carney again that night.

93.     Both the Whites and Carney and Maureen Fernandez lived at 531 Lexington Street in Brooklyn, within one-and-a-half miles of the Little Liva Bar, where Ms. Fernandez was seen hours before her death, and within three miles of where Ms. Fernandez's body was found.

94.     According to police records, as Ms. Fernandez was leaving the Little Liva Bar hours before her murder, she told family friend William Perry, "please don't say anything to Carney."

95.     The NYPD, in conjunction with the FBI's Behavior Science Unit, conducted a Criminal Personality Profile of Ms. Fernandez's killer. The Profile was based upon information provided by Det. Sullivan, Det. Wendel, and other detectives.

96.      The Profile stated: "It is believed that the homicide began . . . in a private residence . . . [that] this offender should be Hispanic and over the victim's age of 35. He would be between 5'6" and 5'11" . . . [.] The offender's relationship to the victim was not casual. The rage displayed in the initial assault clearly indicated the victim was involved in an ongoing relationship with the offender. The homicide was the culmination of a continuing problem they failed to resolve."

97.      Police also had information pointing to a suspect name Jose Perez Rivera.

98.      Less than a month after the murder, detectives received an anonymous call that "the male in the [police] sketch . . . lives across the street from the Emergency Room of Wyckoff Hospital. . . [and] has an older model Monte Carlo good condition."

99.      Detectives learned that this man was Rivera, who lived across from Wyckoff Hospital and owned a black 1978 Monte Carlo, just like the one bar patrons said Ms. Fernandez arrived and departed in on Thanksgiving morning.

100.      Records showed that Rivera was 5'7 tall, within the 5'7 to 5'9 range of the man seen with Ms. Fernandez at the Little Liva Bar.

101.    In August 1988, Police characterized Rivera as "a person of interest," but appear to have abandoned their investigation of Rivera after encountering difficulty locating him.

102.    Detectives identified another man, Eddie Ruiz as a suspect who fit the description the man seen at the bar: 5'7 or 5'8, thin build, wore gold jewelry, and drove a black car.

103.    According to police reports, Eddie Ruiz was believed to have known Ms. Fernandez, and on one occasion he assaulted Ms. Fernandez's female relative.

104.    In Febru、ary 1988, bartender Joseph Castillo identified Ruiz out of a photo array as the person who was with Ms. Fernandez the morning she was murdered.

105.    Castillo's identification of an alternative suspect was not documented in a DD-5.

106.    Castillo's identification of an alternative suspect was not disclosed to the defense before the trial.

107.    Additionally, in April of 1988, detectives received a tip that a person named Edward Denning fit the composite sketch of the man seen with Ms. Fernandez the morning she was murdered.

108.  The tipster stated that Denning "has a very violent temper and is known to frequent bars."

109.  Denning, a 28-year-old white man, was a police officer with NYPD's 60th Precinct.

110.  All three bar witnesses—Joseph Castillo, William Perry, and Robert Thompson—described the man with Ms. Fernandez as being white, between ages 28 and 32. *See* ¶¶ 68, 75, 317.

111.  In May 1988, detectives interviewed the tipster, who described Denning as a "crazy wacko" who used drugs, "beat up his sister," and "was not very stable."

112.  In July 1988, detectives contacted the NYPD's Internal Affairs Division and learned that Denning was "on sick report" from November 23 to November 25, 1987 (Thanksgiving eve), and that Denning also did not work on November 26 (when the murder took place) or November 27, 1987.

113.  Despite this information, detectives failed to pursue Denning as a suspect in Ms. Fernandez's murder.

**F.  More than nine months after the murder, the investigation shifts to a car formerly owned by Javier Ramos, a Wyckoff Heights Hospital security guard.**

114.  In April 1988, Det. Beisel was assigned by the NYPD to lead the investigation into Ms. Fernandez's murder.

115.    Struggling to track down the black Monte Carlo or its owner, Det. Beisel shifted the investigation's focus to the white Cadillac that watchman Robert Soloney had seen leaving the lot where Ms. Fernandez's body was found.

116.    Detectives learned about a white car owned by Pete Sierra, a security guard at Wyckoff Heights Hospital, where Ms. Fernandez spent time on Thanksgiving Eve 1987 before going to the Little Liva Bar.

117.    In August 1988, detectives located Sierra's car near Wyckoff Heights Hospital.

118.    Sierra's car was different from the car Soloney described as leaving the lot on Thanksgiving morning of 1987.

119.    First, Sierra's car was an Oldsmobile, but Soloney described a Cadillac.

120.    Second, Sierra's Oldsmobile had a red roof, but Soloney described an all-white car.

121.    Despite these differences, Det. Beisel obtained permission from Sierra to voucher the white-and-red Oldsmobile as evidence.

122.    Sierra had purchased the Oldsmobile in early 1988 from a fellow Wyckoff Heights Hospital security guard named Javier Ramos.

123.    Ramos, not Sierra, owned the car at the time of the murder, in November 1987.

124.    On or about September 9, 1988, Ramos visited the 104th Precinct to inquire why his former car, the white-and-red Oldsmobile, had been taken by the police.

125.    When Ramos entered the precinct, he was unaware that detectives were trying to connect his former car to a homicide.

### G.    Detectives coerce Javier Ramos into accusing Richard Pereira, who is arrested, cleared, and released.

126.    At the 104th Precinct, Det. Beisel took Ramos into an interrogation room.

127.    Led by Det. Beisel, detectives interrogated Ramos for approximately 13 hours.

128.    Detectives used coercive tactics to get Ramos to either confess to the murder or lead them to another suspect.

129.    Det. Beisel was assisted in the interrogation by NYPD Sergeant Zaroogian, NYPD detectives John Califano, John Wilde, and Jerry Fennel, and LIRR PD detectives Thomas Sullivan and Charles Wendel.

130.    The detectives told Ramos, falsely, that they "knew" his former car was used in a murder and that either he committed the murder or knew who did it.

131.    Detectives threatened to prosecute Ramos for the murder.

132.    Det. Beisel pushed Ramos, threatened to maim or kill him, called him a "spic" and a "Hispanic prick," denied him food, water, and the use of a bathroom, and refused his request to leave.

133.    The other detectives failed to intervene.

134.    Ramos told detectives he had painted the roof of his car red in September or October of 1987, which was before the murder was committed at the end of November.

135.    This meant Ramos's car, besides not being a Cadillac, could not have been the all-white vehicle observed by the night watchman.

136.    Ramos told the detectives that, in the past, he had loaned his car to two friends, Richard Pereira and Felipe Rodriguez, but did not indicate he had done so at the time of the murder.

137.    Det. Beisel demanded that Ramos take him to Felipe's residence.

138.    Det. Beisel, Det. John Califano, and Det. John Wilde put Ramos in an unmarked police car and directed Ramos to lead them to Felipe's residence, 635 Watkins Street in Brooklyn.

139.    On the way, the detectives stopped at Cypress Hill Cemetery in Brooklyn and threatened to kill Ramos if he did not either admit to the murder or implicate Felipe.

140.    Ramos gave the detectives what they demanded: he told them that he loaned the car to both Felipe and Pereira at the time of the murder.

141.    This information was false.

142.    The detectives proceeded to 635 Watkins Street with Ramos, but Felipe was not home.

143.    Det. John Califano later created a DD-5 stating that "Mr. Ramos said his friend . . . Felipe Rodriguez, may have information regarding this homicide," and that "Felipe borrowed his car on the night of the incident."

144.    This DD-5 was intentionally misleading, as Ramos only made those statements because he was afraid for his life.

145.    Det. Califano was aware that the statements in the DD-5 were false.

146.    After finding that Felipe was not home, the detectives returned with Ramos to the 104th Precinct, where they continued to threaten and coerce him.

147.    At about 1:00 a.m. on September 10, 1988, Ramos signed an affidavit falsely implicating Pereira in the murder of Maureen Fernandez.

148.   The affidavit was witnessed by Det. John Beisel and Sgt. George Zaroogian, and notarized by Det. Wendel.

149.   The affidavit told a false narrative concocted by the detectives and fed to Ramos: one night "around Thanksgiving" of 1987, Ramos loaned his car to fellow Wyckoff Hospital employee Richard Pereira. Pereira was wearing a black leather jacket, a "multi-colored sweater," "beige pants," and several pieces of jewelry. Pereira promised to return the car by midnight but did not return it until 6:00 a.m. the next morning. Pereira, who appeared intoxicated, apologized for bringing the car back late and explained that "he got into an argument with a low-life bitch that he had met at the hospital." Several hours later, Ramos noticed "a red liquid substance on the front passenger seat, armrest, passenger door and window and floor mat." Ramos then traveled to a store, purchased rug and upholstery cleaner, and cleaned the car out. Several months later, Pereira threatened Ramos with a gun.

150.   The detectives knew they had coerced Ramos to sign this affidavit and that its contents were false.

151.   The detectives purposefully included in it that Pereira had been wearing a "multi-colored sweater" and "beige pants" because Little Liva Bar patron Robert Thompson had described the man with Ms. Fernandez on Thanksgiving eve 1987 as wearing that clothing.

27

152. At some point during the interrogation, Ramos told Sgt. Zaroogian that the story was not true and complained about how he was being treated by the detectives.

153. Det. Beisel fabricated a DD-5 about the September 9-10, 1988, interrogation. Beisel and Sgt. Zaroogian signed the false DD-5.

154. The fabricated DD-5 contained an additional statement, which was not in Ramos's signed affidavit, that Pereira had said to him: "I'm sorry I took so long with it [the car]. This low life bitch [] that I met [at] the hospital – I got into an argument with. I had to do to what I had to do. I had to stab her."

155. Det. Beisel's DD-5 also falsely stated that the morning after the murder, Ramos and his grandfather traveled to a local store to buy cleaner, and together cleaned the blood out of Ramos's car.

156. Beisel and other detectives forwarded the false affidavit and false DD-5 to the Queens District Attorney's Office, but the manner in which detectives coerced Ramos into adopting the affidavit's contents and signing it was not disclosed to the defense.

157. The fact that detectives fed Ramos the information contained in the DD-5 and in the affidavit was not disclosed to the defense.

158. Detectives let Ramos go home only after they had coerced him into signing the affidavit.

159.    Later the same morning, based on the fabricated affidavit, detectives arrested Richard Pereira for the murder of Maureen Fernandez.

160.    At the precinct, Det. Beisel handcuffed Pereira to a chair and interrogated him in an effort to force him to confess. During this interrogation, Beisel smacked Pereira so hard that Pereira and the chair fell to the ground.

161.    However, three witnesses then failed to identify Pereira at a lineup.

162.    Detectives then were compelled to void Pereira's arrest and let him go home.

163.    Detectives submitted cuttings from the white-and-red Oldsmobile to the FBI for serology and early-generation DNA tests.

164.    No blood or trace of blood or other human tissue or body fluid was present on the cuttings.

**H.     Detectives secretly record Ramos admitting that he did not have any information about the murder and that his car was not even operable on Thanksgiving 1987.**

165.    In late September 1988, Det. Beisel, Det. Fennel and Det. Wendel placed a Nagra recording device on Richard Pereira and sent him to confront Javier Ramos at Wyckoff Heights Hospital, where they both worked.

166.    During the recorded conversation, Pereira asked Ramos where his car was on Thanksgiving 1987.

167.    Ramos responded: "my car was parked in front of my mother-in-law's house, because my battery [] was dead . . . I told them all of this. And yet they didn't, they didn't, want to hear that…They wanted me to confess to something."

168.    Pereira asked why Ramos signed the September 10 affidavit accusing Pereira of the murder, and Ramos responded: "Listen to me. When I put down the statement, that's just what they're telling me." Ramos further stated, "I don't know anything about it."

169.    When asked about cleaning blood in his car, Ramos said, "No, I didn't clean blood . . . I cleaned up a red substance, it could have been a juice . . ."

170.    During the taped conversation, both men discussed the abusive interrogation tactics used against them.

171.    Pereira described being "smacked" by police "all night long."

172.    Ramos referred to having gone through "an ordeal" with police.

173.    Ramos told Pereira he was being "chased" and "follow[ed] around" by police, and "is still in shock."

174.    Ramos stated in the recorded conversation: "They said that it's my car, you understand? That is something that it seems they are using, no? To bring, you understand, to ask questions."

### I.    Det. Beisel fabricates a report about an interview with Felipe's wife.

175.    In late September 1988, Det. Beisel and Sgt. Zaroogian interviewed Felipe's wife, Gladys Rodriguez, outside the couple's home at 635 Watkins Street in Brooklyn.

176.    Gladys told the detectives that she and Felipe were home together on Thanksgiving Eve and Thanksgiving Day.

177.    When asked whether Felipe ever wrote the word "LOVE" on his hand, like the man in the bar that Robert Thompson saw with the victim hours before the murder, Gladys said no.

178.    Det. Beisel asked whether Felipe wore glasses (unlike the man in the bar), and Gladys responded that he did.

179.    Det. Beisel asked whether Felipe had a mustache in November 1987 (unlike the man in the bar), and Gladys answered yes, Felipe always had a thick mustache.

180.    Instead of accurately documenting the interview with Gladys, Det. Beisel falsified a DD-5 purporting to memorialize it.

181.    The DD-5 falsely stated that Gladys said she could not remember where Felipe was on Thanksgiving Eve 1987 and the following morning, that Felipe "might have had a slight mustache" in November 1987, and that Felipe "would borrow Javier's car whenever he needed."

182.    The DD-5 omitted Gladys's denial that Felipe ever wrote the word "LOVE" on his hand, nor did it include that Felipe wore glasses and had a mustache, unlike the man at the bar with the victim.

183.    Det. Beisel left Gladys his phone number and asked that Felipe call him back.

**J.      Det. Beisel unsuccessfully attempts to elicit a confession from Felipe, then files a false police report to make Felipe appear guilty.**

184.    On or about September 25, 1988, Felipe received Det. Beisel's number from Gladys and called him.

185.    Det. Beisel asked Felipe if he would speak with him at the 104th Precinct, and Felipe agreed.

186.    During their meeting, Det. Beisel repeatedly asked Felipe whether he knew anything about an incident involving Ramos's car on Thanksgiving Eve, and Felipe denied it.

187.    Felipe explained that he was home with his wife on the previous Thanksgiving Eve.

188.    In an unnumbered DD-5 dated September 25, 1988, Det. Beisel falsely attributed prejudicial statements to Felipe that Felipe never made.

189.    Det. Beisel falsely wrote: "Mr. Rodriguez stated he liked to go to the hospital morgue and look at the dead bodies. He said he liked to look at the

messed up bodies not just the old people that died. He then continued that he liked to look at the homicide victims."

190.    Det. Beisel also falsely wrote: "Mr. Rodriguez stated that he worked for a construction company as a plumber and he was working in the area fixing it up."

191.    Det. Beisel included this false detail because witness Robert Thompson had stated that the man at the bar with Ms. Fernandez said he was a plumber's helper. *See* ¶ 73, *supra*.

## K.    Detectives coerce Javier Ramos into signing a false affidavit accusing Felipe of murder

192.    For approximately six months following the interviews and lineups in September 1988, Det. Beisel visited Javier Ramos multiple times each week at Wyckoff Hospital.

193.    During these visits, Det. Beisel threatened and pressured Ramos to implicate Felipe in the murder of Maureen Fernandez.

194.    Det. Beisel did not document any of these meetings.

195.    Det. Beisel did not document any other action he took on the case during this six-month period between September 1988 and March 1989.

196.   On March 27, 1989, having failed to solve the Fernandez murder for 16 months, Det. Beisel and Det. Sullivan picked up Javier Ramos and drove him to the 104th Precinct.

197.   Det. Beisel and Det. Sullivan brought Ramos into an interrogation room, where Sgt. Zaroogian, Det. Fennel and Det. Wendel were also present.

198.   Ramos was facing the same detectives who, six months earlier, coerced his statement falsely accusing Richard Pereira of the murder.

199.   This time, Ramos was interrogated for approximately seven hours.

200.   To induce Ramos to accuse Felipe, Det. Beisel falsely told Ramos that Felipe had accused Ramos of the murder.

201.   Beisel then falsely stated that Felipe's DNA had been found in Ramos's Oldsmobile and that Felipe's clothing matched the eyewitness description of the apparent murderer.

202.   When Ramos succumbed to the coercive tactics and agreed to provide a statement implicating Felipe, the detectives called ADA David Dikman to the precinct in order to prepare an affidavit for Ramos falsely accusing Felipe of committing the murder.

203.   Det. Beisel, Det. Sullivan, ADA Dikman and Sgt. Zaroogian placed a false affidavit in front of Ramos.

204.    The affidavit was almost identical to the September 1988 affidavit accusing Richard Pereira of the murder.

205.    However, knowing they had failed to make a case against Pereira, the detectives now substituted Felipe for Pereira in the affidavit.

206.    The affidavit stated that Felipe called Javier at Wyckoff Heights Hospital on Thanksgiving eve 1987 and asked to borrow the Oldsmobile, and Javier agreed; that Felipe arrived at the hospital in "beige pants" and "a multi-colored sweater;" that Felipe promised to have the car back at the hospital by midnight, but instead returned the car at 6:00 a.m. to Javier's apartment; that Felipe apologized for not bringing the car back on time; and that Felipe admitted to getting into an altercation with a "bitch" and then stabbing her to show her she "was dealing with a man, not some boy."

207.    The detectives knew this affidavit was false in its entirety.

208.    The affidavit was signed by Ramos and Det. Sullivan and notarized by ADA Dikman.

209.    Det. Beisel created a DD-5 falsely stating that Ramos "named Felipe Rodriguez as the person that borrowed his auto [on Thanksgiving eve 1987] and the same person that returned it the following day," when in fact Det. Beisel fed Ramos this story and coerced him into signing the affidavit swearing to it.

35

## L.    Detectives arrest Felipe for a murder they know he did not commit.

210.    On March 27, 1989, ADA Dikman authorized Det. Beisel to arrest Felipe Rodriguez for the murder of Maureen Fernandez.

211.    Det. Beisel, Det. Fennel, and Det. Wendel drove Felipe to the 104th Precinct.

212.    Felipe was wearing glasses, unlike the man last seen with Ms. Fernandez on the night of the murder.

213.    Det. Beisel took Felipe into an interrogation room.

214.    As he had six months earlier, Det. Beisel asked Felipe several times where he was during the early morning hours of Thanksgiving 1987.

215.    As he had six months earlier in September 1988, Felipe told Det. Beisel that he was home with his wife and young son.

216.    This fact had been corroborated by Felipe's wife, Gladys, in September 1988.

217.    Det. Beisel nevertheless demanded several times that Felipe admit to a crime about which Felipe knew nothing.

218.    Felipe asked for a lawyer.

219.    Det. Beisel ignored the request.

220.    No attorney was provided to Felipe.

221.    Det. Beisel said, "I think you're a fucking liar."

222.     Det. Beisel yelled at Felipe: "Listen, one of you spics is going down for this!"

223.     Detective Beisel specifically used the word "spic," which is racist slang for Hispanic.

224.     Felipe knew nothing about the murder, so he stopped answering Det. Beisel's questions.

225.     Det. Beisel handcuffed Felipe and brought him to a holding cell.

226.     Det. Beisel prepared an unnumbered DD-5 of the March 27, 1989, interrogation and arrest of Felipe that falsely states that "Mr. Rodriguez made no statements" on March 27, 1989.

227.     In contrast, Det. Sullivan's LIRR PD memo about the March 27, 1989, interrogation states: "During questioning, [Felipe] gave several negative exculpatory statements and then refused to answer any further questions."

228.     Today, the Queens District Attorney's Office concedes that Det. Sullivan's memo was not disclosed to the defense.

**M.     Detectives fabricate lineup evidence by manipulating Robert Thompson into "identifying" Felipe.**

229.     In the evening of March 27, 1989, Felipe was placed in a lineup at the 104th Precinct.

230.     The lineup was conducted by Det. Beisel and supervised by Sgt. Zaroogian.

231.     The three lineup witnesses were Robert Thompson, Joseph Castillo, and William Perry, each of whom had told police they saw Maureen Fernandez with an unknown male at the Little Liva Bar on the night of the murder, 16 months earlier.

232.     Before conducting the lineup, Det. Beisel walked Felipe, who was handcuffed, past witness Robert Thompson, who saw Felipe.

233.     The other lineup participants (the "fillers") did not look like Felipe.

234.     The fillers were either much thinner, much shorter, had lighter skin, or appeared much older.

235.     Det. Beisel handed Felipe a sign with the number "3."

236.     When the first witness, Robert Thompson, viewed the lineup, Felipe heard Det. Beisel tell Thompson he would ask "three questions," emphasizing the word "three."

237.     Det. Beisel asked Thompson if he recognized anyone in the lineup.

238.     Thompson said yes, "number 3, but he is a lot thinner and his hair is longer now."

239.    Felipe's hair did not appear longer at the time of the lineup than it in fact had been in November 1987.

240.    The second witness, bar patron William Perry, was not able to identify anyone.

241.    The third and final witness, Little Liva bartender Joseph Castillo, identified a filler.

242.    After he was "identified" by Thompson, Felipe was sent to Queens Central Booking and then, after an arraignment, to Rikers Island.

### N.    Felipe is indicted based on fabricated evidence and the suppression of exculpatory evidence.

243.    On March 28, 1989, Det. Beisel signed a criminal complaint alleging that Felipe murdered Maureen Fernandez on November 26, 1987.

244.    The Queens District Attorney's Office assigned ADA Dikman to handle the prosecution.

245.    Det. Beisel and the other detectives forwarded ADA Dikman false and misleading evidence that was highly likely to influence the course of the prosecution.

246.    Based upon such information, ADA Dikman drafted a "prosecution memo" that he submitted to the Queens District Attorney, John

Santucci, summarizing the purported evidence against Felipe in order to obtain the DA's approval to seek an indictment from a grand jury.

247.   The principal evidence on which the memo was based was Javier Ramos's false affidavit claiming that Ramos had loaned Felipe his car on Thanksgiving Eve and that afterwards Felipe "made admissions to him about a stabbing."

248.   The memo also cited the false information, provided by Det. Beisel, that on the Nagra tape was "conversation indicating [Ramos] gave the car to Felipe Rodriguez, the defendant," when in fact Ramos can be heard on the tape saying he knew nothing about the murder and had *not* loaned his car to Felipe on the night of the murder.

249.   The prosecution memo falsely stated that Ramos saw a red substance in the Oldsmobile and "said it was blood," when, to the contrary, Ramos can be heard on the Nagra tape saying the substance was *not* blood.

250.   The memo falsely stated that Ramos painted the roof of the Oldsmobile red *after* the murder even though Ramos told detectives he painted the roof a month *before* the murder and thus the eyewitness description of the car as being all white meant Ramos's car could not have been the vehicle observed leaving the crime scene.

251.    Beisel also misled Dikman into writing in the memo that Felipe's wife Gladys did not provide an alibi, when in fact Gladys had told Beisel and Zaroogian that Felipe was home with her and their son when the murder took place.

252.    The memo stated that bartender Joseph Castillo identified Felipe in a photo array conducted by Det. Beisel, but omitted that, in an earlier photo array, Castillo identified a different suspect, Eddie Ruiz. *See* ¶ 104, *supra*.

253.    The prosecution memo failed to note that Castillo picked out fillers at the lineups of both Richard Pereira and Felipe.

254.    The prosecution memo stated that Robert Thompson picked Felipe out of a lineup as the person he saw at the Little Liva with the victim on Thanksgiving Eve 1987, 16 months earlier.

255.    However, the prosecution memo omitted that the lineup was highly suggestive, that Thompson was extremely intoxicated on Thanksgiving eve 1987, and that Thompson had been paid for his "cooperation" and "ongoing assistance" in the murder investigation.

256.    The prosecution memo failed to note that Felipe did not match the height and age of the suspect seen with the victim hours before her death or that, unlike the suspect, Felipe had a thick mustache and wore glasses.

257.    The prosecution memo failed to note that William Perry specifically told detectives that the person he saw at the bar was "not Hispanic."

258.    Based on the false or misleading contents of the prosecution memo, and the prosecution memo's omission of exculpatory and impeachment evidence, DA Santucci or his delegates approved the case for presentment to a grand jury.

259.    ADA Dikman presented the case to a grand jury on or about March 29, 1989 and on or about March 31, 1989.

260.    ADA Dikman presented the grand jury with fabricated evidence forwarded to him by detectives, including the coerced and fabricated testimony of Javier Ramos. *See* ¶¶ 196-209, *supra*.

261.    At the grand jury, Ramos falsely testified that Felipe borrowed his car on the night of the murder and admitted to the stabbing.

262.    Ramos falsely testified that the car was completely white at the time of the murder, even though he previously told detectives that he had already painted the roof red by that time.

263.    Ramos falsely testified that he found "what appeared to be blood" in the car, even though detectives had surreptitiously recorded Ramos on the Nagra tape stating that the substance was not blood.

264.    Joseph Castillo testified that he identified Felipe in a photo array.

265.     The grand jury was not informed that Castillo failed to identify Felipe at an in-person lineup, or that Castillo identified a different suspect at a prior photo array.

266.     Thompson testified that, at the lineup, he recognized Felipe as the man he saw at the Little Liva Bar with the victim shortly before the murder.

267.     The lineup procedures were suggestive, and Thompson's identification was fabricated. *See* ¶¶ 229-242, *supra*.

268.     The grand jury, having been presented with fabricated evidence and *not* presented with exculpatory evidence, indicted Felipe of murder in the second degree and criminal possession of a weapon in the fourth degree.

269.     On April 27, 1989, Felipe passed a polygraph lie-detector examination administered by Richard Arther, a well-known polygraphist.

270.     During the polygraph interview, Felipe truthfully stated he had no involvement in the murder of Maureen Fernandez.

271.     As a result of passing the polygraph test, Felipe was ordered released on bail on or about May 19, 1989.

**O.     Felipe is convicted based on fabricated evidence and the suppression of exculpatory evidence.**

272.     Felipe stood trial in Queens Supreme Court before Justice Ralph Sherman from April 23 to May 2, 1990.

273.     In preparation for trial, detectives provided the Queens DA's Office with more than 200 DD-5s.

274.     As described in this Complaint, many of those DD-5s included false information and omitted exculpatory information.

275.     Prior to trial, detectives also forwarded to the Queens District Attorney's office the Nagra tape recording of the conversation between Javier Ramos and Richard Pereira in September 1988.

276.     The Nagra recording established that Ramos's car was unlikely to have been used in the murder of Maureen Fernandez and that Ramos did not loan the car to Felipe on the night of the murder. *See* ¶¶ 165-174, *supra*.

277.     ADA Alan Safran, who tried the case against Felipe, listened to the recording prior to trial.

278.     Safran knew or should have known that the recording would have severely impeached Mr. Ramos's trial testimony, which is described below in paragraphs 284 through 289.

279.     Safran failed to disclose the Nagra tape to Felipe's trial counsel.

280.     The District Attorney had no policy governing the disclosure of tape recordings to the defense.

281.     The recording and the information contained therein was highly favorable to the defense.

282.    The recording and the information contained therein was material to the outcome of the trial at which Felipe was convicted.

283.    ADA Safran's opening statement highlighted the false allegation that detectives coerced from Javier Ramos: "[Felipe] said to his friend, Javier, 'I stabbed the bitch to prove she was dealing with a man, not a boy.'"

284.    After more than a year of threatening Ramos with violence and prosecution, Det. Beisel and John and Jane Doe Police Officers #1 - 9 directed Ramos to provide testimony that the detectives knew was false. That testimony is summarized below.

285.    Ramos falsely testified that Felipe borrowed Ramos's car on Thanksgiving Eve of 1987, then returned the next morning and stated, "I got into an argument . . . with a stupid bitch and I had to stab her to prove to her that I was a man."

286.    Ramos falsely testified that he painted the roof of his car red in mid-December 1987, despite that when he was first interviewed by investigators, Ramos said he painted the roof red in October 1987, a month before the murder.

287.    Ramos falsely testified that he found "a red substance with a foul smell" in the vehicle that was not present the previous day.

288.   Ramos falsely testified that Felipe was "clean shaven" in November 1987.

289.   Ramos falsely testified that Felipe did not wear glasses in November 1987.

290.   Detectives also fed Robert Thompson false, inculpatory information and directed him to repeat that information at trial.

291.   On April 26, 1990, before Thompson testified, Det. Beisel and John Doe Police Officer #10 were overheard in the hallway of the courtroom telling Thompson, "don't forget to say what I told you to say."

292.   Robert Thompson, who had been secretly paid for his "cooperation" and "ongoing assistance," did not forget what to say.

293.   Thompson falsely testified that he recognized Felipe as the man at the Little Liva Bar with the victim on Thanksgiving 1987.

294.   Thompson falsely testified that he saw Felipe at the bar with the word "LOVE" written on his fingers.

295.   Police Officer Thomas Rosa, who supervised Felipe in the auxiliary police force, testified that Felipe did not wear glasses, that, "sometimes, [Felipe] didn't have a mustache," and that Felipe had "markings on both of his hands."

296.   Rosa's testimony described in the preceding paragraph was false.

297.    Rosa made these false statements at trial because Det. Beisel and other police officers coached him to do so.

298.    Wyckoff Heights Hospital worker Patricia Owens falsely testified that she saw Felipe at the hospital with the word "LOVE" written on his hand.

299.    Det. Beisel and other police officers told Owens to make this false statement.

300.    At trial, Det. Beisel repeated many of the lies he wrote in the fabricated DD-5s.

301.    Det. Beisel falsely testified that, during the March 1989 lineup, Felipe chose sign number "3".

302.    In fact, Beisel assigned Felipe that number.

303.    Det. Beisel falsely testified that Felipe told him "he liked to go to the hospital morgue and look at the dead bodies. He said, he liked to look at the messed up bodies, not the old people, that died, he liked to look at the homicide victims."

304.    Det. Beisel falsely testified that he never saw Felipe with glasses.

305.    In addition to the Nagra tape, other exculpatory and impeachment evidence was withheld from the defense, including, without limitation, the evidence described below in paragraphs 306 through 328.

306.     Detective Sullivan created a handwritten note documenting an interview of Javier Ramos.

307.     The note states: "Rodriguez showed up at Ramos' house 6:00 AM Thanksgiving morning with M/B friend, 25 years old, slim dk skinned blk."

308.     This note indicates that Ramos told Sullivan that Felipe showed up at Ramos's home on the day of the murder with a slim, 25-year-old dark-skinned African-American male friend.

309.     The note contradicts Ramos's March 1989 affidavit and his trial testimony that Felipe arrived alone at Ramos's apartment to return the car on Thanksgiving morning of 1987.

310.     On at least two occasions in 1988, Det. Sullivan gave money to Robert Thompson for "cooperation" and "ongoing assistance" in the Fernandez investigation.

311.     Had the payments been disclosed, they would have significantly impeached Thompson's credibility at trial, where he falsely identified Felipe as the man at the Little Liva Bar with Ms. Fernandez.

312.     Another piece of undisclosed evidence was a handwritten note by Det. Wendel stating that bar patron William Perry told Defendants Sullivan and Wendel that man in the bar with Nina was Italian or Irish, "not Hispanic," and had "hazel or green eyes."

313.    This information was exculpatory because Felipe is Hispanic and has brown eyes.

314.    The detectives failed to document this description in a police report.

315.    The defense was never notified that Perry gave this description.

316.    This description would have made William Perry a valuable defense witness at trial.

317.    A separate handwritten note by Det. Sullivan states that bartender Joseph Castillo saw the victim enter and leave the bar with a white male, not a Hispanic male.

318.    This description was not recorded in a police report.

319.    The description was never disclosed to the defense.

320.    The description would have impeached Castillo's false in-court identification of Felipe as the man seen at the bar with the victim.

321.    In addition, according to handwritten notes, Detectives Wendel and Sullivan conducted a photo array with Joseph Castillo on February 11, 1988, during which Castillo identified a different suspect, Edwin Ruiz, as the man he saw at the bar with the victim.

322.    This identification would have been especially useful to the defense because Edwin Ruiz drove a black car that was similar in appearance to

the car seen outside the Little Liva Bar on the night of murder, and because Ruiz more closely matched the physical description of the bar suspect than did Felipe.

323.    The detectives failed to make a police report of Castillo's identification of Ruiz.

324.    The identification was never disclosed to the defense.

325.    This information, too, would have impeached Castillo's false in-court identification of Felipe as the man seen at the bar with the victim.

326.    Defendants Sullivan, Wendel, Beisel, Fennel, Califano, Wilde and Zaroogian knew that the roof of Ramos's Oldsmobile had been painted red before the murder, such that the car could not have been the all-white car allegedly seen leaving the scene of crime. *See* ¶¶ 134-135 *supra*.

327.    Detectives Sullivan and Wendel documented this fact in a police report and in handwritten notes.

328.    However, neither the report nor the notes (or their contents) was disclosed to the defense.

329.    On May 2, 1990, Felipe was convicted of one count of murder in the second degree and one count of criminal possession of a weapon in the fourth degree.

330.    Felipe was remanded into custody that day.

331. On May 25, 1990, Felipe was sentenced to a term of twenty-five-years-to-life imprisonment.

332. At the time of his sentencing, Felipe Rodriguez was 24 years old.

333. His son, Felipe Jr., was three.

334. Felipe filed motions to vacate his conviction in 1992 and 1994, but both motions were denied.

**P.    Felipe is wrongfully imprisoned for almost 27 years before receiving executive clemency from Gov. Andrew Cuomo.**

335. Felipe spent 26 years, eight months and 25 days in custody, in high security state prisons, following his conviction. He spent at least an additional 52 days in jail after his arrest.

336. He was finally released from Otisville Correctional Facility on January 26, 2017, at age 52.

337. Felipe was released pursuant to a rare grant of executive clemency announced by Gov. Andrew Cuomo on December 30, 2016.

338. Under the terms of the grant of clemency, Felipe remained under the supervision of the New York State Division of Parole for a period of one year after his release.

339. He successfully completed this term of supervision on January 26, 2018.

**Q.    Felipe is fully exonerated based on Ramos's recantation and newly discovered evidence released by the Queens District Attorney's office.**

340.    While Felipe was still incarcerated, his attorneys re-investigated his prosecution and conviction.

341.    On December 20, 2017, Javier Ramos recanted his trial testimony to the defense.

342.    Ramos explained that he was coerced by detectives, who fed him the entire story about Felipe borrowing his car and admitting to murder.

343.    In 2021, Ramos repeated this recantation in detail under oath at a deposition in Felipe's wrongful conviction lawsuit against the State of New York.

344.    After Felipe's sentence was commuted, the QDAO also conducted a reinvestigation of the case.

345.    During that reinvestigation, the QDAO discovered that the People failed to disclose exculpatory evidence at trial.

346.    In 2019, Felipe again moved the Supreme Court, Queens County to vacate all counts of his conviction and to dismiss the indictment in its entirety.

347.    The QDAO joined Felipe's 2019 motion.

348.   On December 30, 2019, the Hon. Joseph Zayas granted the motion on the basis of newly discovered evidence that Felipe is innocent and that the judgment was obtained in violation of Felipe's constitutional rights, pursuant to New York State Criminal Procedure Law ("CPL") Sections 440.10(1)(g) and 440.10(1)(h).

349.   At the December 30, 2019, hearing, Assistant District Attorney Robert J. Masters of the QDAO stated in open court that Det. Sullivan's handwritten note, described in ¶¶ 306-309, *supra*, and other exculpatory material was withheld from Felipe at trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the laws of the State of New York.  *See People v. Felipe Rodriguez*, Ind. 1568/89, Transcript of 440.30 Hearing (Dec. 30, 2019).

350.   ADA Masters stated that the withheld documents "would have impeached Mr. Ramos, would have impeached [Det. Sullivan] . . . [and] would have impeached the entire investigation." *Id.* at 19:16-17.

351.   ADA Masters stated that "it would have been a different trial had this piece of paper been made available and no one would have been surprised by a different[] verdict." *Id.* at 19:25-20:2.

352.   ADA Masters also acknowledged on the record that there were irregularities in the police reports documenting the investigation. *Id.* at 17.

353.     ADA Masters noted that many of the most important reports were unnumbered, and there were no DD-5s generated during the six months leading up to Felipe's arrest. *Id.*

354.     "Any objective review of the investigator files [is] concerning," Masters stated. "The most critical positions of the investigation [] were the most sparingly documented." *Id.* at 17:12-14.

## DAMAGES

355.     Felipe Rodriguez is permanently injured by the physical and psychological torture he endured during the 26 years, 10 months and 19 days that he was wrongfully incarcerated for the murder of Maureen Fernandez, a woman he never met.

356.     Felipe suffered adverse health consequences while he was in prison as a direct result of the defendants' wrongful conduct that led to his false conviction.

357.     Felipe suffers from post-traumatic stress disorder and other specific psychological disorders as a direct result of his nearly twenty-seven years in high security prisons in New York State.

358.     Felipe was assaulted on multiple occasions while he was in prison.

359.    One of these assaults took place in 2014, when corrections officers at Fishkill Correctional Facility pushed Felipe down a flight of stairs while Felipe was shackled and in handcuffs and thus could not break his fall.

360.    Some of the same corrections officers, known as the "Beat Up Squad," were later implicated in the deaths of other incarcerated people.

361.    Felipe suffered serious physical injuries to his back, stomach, and knee while incarcerated and as a direct result of his incarceration.

362.    Felipe was traumatized by seeing people killed and maimed in prison.

363.    Every day he woke up in prison, Felipe feared for his life.

364.    In 2014, Felipe spent 51 days in solitary confinement under the pretext of protective custody, causing further mental and emotional injuries.

365.    Felipe lost 26 years, 10 months and 19 days of wages and benefits he would have otherwise earned.

366.    For almost twenty-seven years, Felipe was deprived of the opportunity to raise his son Felipe Rodriguez, Jr., who was only three years old when Felipe was convicted in May 1990.

367.    Felipe suffered the loss of his freedom for almost twenty-seven years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care,

humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## COUNT I

### New York Common Law Malicious Prosecution — All Defendants

368.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

369.    Defendants Beisel, Sullivan, Wendel, Fennel, Califano, Wilde, and Zaroogian (the "Individual Defendants"), individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Plaintiff without probable cause and to cause all of his injuries and damages.

370.    The proceedings terminated in Plaintiff's favor.

371.    The Individual Defendants engaged in these acts within the scope of their employment.

372.    Defendants City of New York, MTA and LIRR are also liable for Plaintiff's malicious prosecution under the principle of *respondeat superior*.

## COUNT II

**42 U.S.C. § 1983 Malicious Prosecution in violation of the Fourth, Fifth, and Fourteenth Amendments — All Individual Defendants**

373.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

374.    The Individual Defendants, individually and in concert, knowingly, willfully, intentionally, and with actual malice caused the initiation and continuation of Plaintiff's prosecution and for his liberty to be curtailed or taken away, without probable cause.

375.    The prosecution terminated in Plaintiff's favor in a manner indicating his innocence.

376.    The Individual Defendants thereby violated or caused the violation of Plaintiff's right not to be deprived of his liberty without probable cause, in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and caused all of his injuries and damages.

377.    Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

378.    Each of the Defendants named in this Count also is liable for unreasonably failing to intervene to prevent such infringement of Plaintiff's constitutional rights.

## COUNT III

**42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments — Fabrication of Evidence — All Individual Defendants**

379.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

380.     The Individual Defendants, acting individually and in concert, knowingly, willfully, intentionally, and/or recklessly created, or caused the creation, of false evidence likely to influence a jury's decision and forwarded that information to prosecutors.

381.     The false evidence they forwarded caused such prosecutors to initiate or continue Plaintiff's criminal prosecution for murder and other crimes, caused Plaintiff to be held in custody in lieu of bail or to have his pretrial liberty otherwise curtailed, caused the grand jury to indict him for such crimes, and ultimately caused a jury at trial to convict him of such crimes, and caused all his injuries and damages before, during and after his trial and to the present.

382.     The Individual Defendants' conduct violated Plaintiff's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution, and they are liable to him for all his injuries and damages pursuant to 42 U.S.C. § 1983.

## COUNT IV

**42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments — *Brady* — All Individual Defendants**

383.   Plaintiff repeats and realleges all the foregoing paragraphs and further alleges as follows:

384.   At all relevant times, Plaintiff had a clearly established right, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, *Brady v. Maryland*, 363 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), other binding case law, and Article 240 of the New York State Criminal Procedure Law, to timely disclosure by the prosecution to the defense of all material information that tended to show Plaintiff's innocence or that impeached the credibility of the prosecution's witnesses against him ("*Brady* material").

385.   This rule created a duty for law enforcement personnel, including the Individual Defendants, to promptly disclose such *Brady* material to the District Attorney's Office so that it could fulfill its disclosure obligation.

386.   However, acting knowingly, willfully, intentionally, recklessly, negligently, or otherwise in violation of law, the Individual Defendants wrongfully withheld numerous pieces of *Brady* material from the District Attorney's Office, thereby causing the Office to fail to disclose such material to the defense.

387.    The *Brady* material that was wrongfully withheld from the District Attorney includes, but is not limited to, the material described in paragraphs 306 through 328.

388.    The information in question, individually and collectively, was material to the outcome of the criminal trial.

389.    The Individual Defendants' failure to disclose the *Brady* material was a substantial cause of Plaintiff's conviction at trial and his resultant damages, and they are therefore liable to him pursuant to 42 U.S.C. § 1983.

## COUNT V

### 42 U.S.C. § 1983 Fourth and Fourteenth Amendment Excessive Pretrial Detention — Individual Defendants

390.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

391.    Plaintiff had a right, pursuant to the Fourth and Fourteenth Amendments to the Constitution, to be free from pretrial detention owing to law enforcement officials' mishandling or suppression of exculpatory evidence.

392.    In violation of that right, the Individual Defendants knowingly, willfully, intentionally, recklessly, negligently and in violation of this right, failed to disclose exculpatory evidence to prosecutors which would have

resulted in Plaintiff's release from detention following his initial Criminal Court arraignment and his subsequent indictment.

393.     The actions of the Individual Defendants were shocking to the conscience.

394.     Therefore, pursuant to 42 U.S.C. § 1983, the Individual Defendants are liable for all his resultant damages.


## COUNT VI

**42 U.S.C. § 1983 Civil Rights Conspiracy — Individual Defendants**

395.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

396.     Defendants Beisel, Sullivan, Wendel, Fennel, Califano, Wilde, and the John and Jane Doe officers and supervisors, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Plaintiff of his clearly established Fourth, Fifth, Sixth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to receive a fair trial.

397.     In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

i)   Defendants Beisel, Fennel, Sullivan, Wendel, Califano, Wilde, and Zaroogian (a) fabricated inculpatory evidence, including preparation of a statement by Javier Ramos falsely accusing Plaintiff of murder; (b) falsified police reports (DD-5s) and other accounts of their investigative activities and the interrogations; (c) failed to document and disclose material exculpatory evidence to prosecutors; and (d) failed to document the investigation at all between September 28, 1988 and March 27, 1989, the sixth months leading up to Plaintiff's arrest.

ii)   Defendants Beisel, Califano and Wilde drove Javier Ramos to Cypress Hill Cemetery and threatened to kill him, thereby overbearing Ramos's will and coercing him into falsely stating that he loaned his former car to Plaintiff on the night of the murder.

iii)   Defendant Beisel and John and Jane Doe Offices regularly visited Javier Ramos at his place of employment (Wyckoff Heights Hospital) between September 1988 and March 1989 to intimidate Ramos into accusing Plaintiff of murder.

iv)   Defendants Beisel, Fennel, Sullivan, Wendel, Califano, Wilde, Zaroogian and the John and Jane Doe officers and supervisors failed to properly investigate alternate suspects, including Carney Fernandez, Jose Perez Rivera, and Eddie Ruiz.

v)   Defendants Beisel and Sullivan deliberately provided perjured testimony against Plaintiff in the grand jury, at pretrial hearings, and at trial, consistent with their out-of-court misrepresentations in documents and reports.

398.   As a direct and proximate result of Defendants' actions, Plaintiff was wrongly convicted and imprisoned for almost twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII

### 42 U.S.C. § 1983 Violation of the Equal Protection Clause of the Fourteenth Amendment — Defendant John Beisel

399.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

400.    Defendant Beisel targeted Felipe Rodriguez, Richard Pereira, and Javier Ramos because they were of Hispanic origin.

401.    On March 27, 1987, Defendant Beisel arrested Plaintiff for murder because, as Beisel told Plaintiff, "one of you spics is going down for this."

402.    Defendant Beisel also called Javier Ramos a "spic" and a "Hispanic prick."

403.    In September 1988, during the investigation, Defendant Beisel was recorded stating he did not want a "spic" in his car.

404.    Defendant Beisel declined to investigate or prosecute or enforce the law against non-Hispanic individuals who were similarly situated to Plaintiff.

405.    For example, Defendant Beisel declined to investigate or prosecute or enforce the law against a white man named Edward Denning. *See supra* ¶¶ 107-113.

406.    Denning matched the composite sketch of the man seen with the victim at the Little Liva bar on the night of the murder; was known to frequent bars and have a violent temper; and called out sick from his job as a police officer in the days leading up to the murder. *See supra* ¶¶ 107-113.

407.    Defendant Beisel also failed to investigate or prosecute or enforce the law against three white security guards who were working at Wykoff Heights Hospital on Thanksgiving eve of 1987, where the victim was present before traveling to the Little Liva bar.

408.    These three individuals, like Denning, were similarly situated to Plaintiff.

409.    Further, Defendant Beisel ignored evidence that the man seen leaving the Little Liva bar with the victim shortly before the murder was white, not Hispanic. *See* ¶¶ 68, 75, 317.

410.    Defendant Beisel selected Plaintiff for arrest and prosecution because Plaintiff is Hispanic.

411.    In doing so, Defendant Beisel treated Plaintiff differently from other similarly situated individuals.

412.    Such differential treatment was based on impermissible considerations such as race, ethnicity, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure Plaintiff.

413.    Defendant Beisel's differential treatment of Plaintiff was further based on animus toward people of Hispanic origin.

414.    Defendant Beisel deliberately fabricated inculpatory evidence, falsified reports and other accounts of his investigative activities and the interrogations of Javier Ramos and Plaintiff, and failed to document and disclose materially exculpatory evidence to prosecutors, all for the purpose of depriving Plaintiff of the equal protection of the law.

415.    As a direct and proximate result of Defendant Beisel's actions, Plaintiff was wrongly convicted and imprisoned for almost twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VIII

### 42 U.S.C. § 1981 Violation of Right to Full and Equal Benefit of the Law - Defendant John Beisel

416.    Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

417.    Pursuant to 42 U.S.C. § 1981, Plaintiff is entitled to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

418.    Plaintiff, who is Hispanic, is a member of a racial minority.

419.    Defendant Beisel intentionally discriminated against Plaintiff on the basis of Plaintiff's race.

420.    The purpose of such discrimination was to deprive Plaintiff of the full and equal benefit of all laws and proceedings for the security of persons and property.

421.    Defendant Beisel arrested and prosecuted Plaintiff because Plaintiff is Hispanic.

422.    Defendant Beisel further discriminated against Plaintiff by deliberately fabricating inculpatory evidence, falsifying reports and other accounts of his investigative activities and the interrogations of Javier Ramos and Plaintiff, and failing to document and disclose materially exculpatory evidence to prosecutors, all for the purpose of depriving Plaintiff of the full and equal benefit of laws and proceedings for the security of persons and property as is enjoyed by white citizens.

423.    As a direct and proximate result of Defendant Beisel's actions, Plaintiff was wrongly convicted and imprisoned for almost twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IX

**42 U.S.C § 1983 *Monell* municipal liability for conduct of police officers relating to withholding exculpatory evidence, fabrication of evidence, and initiating the prosecution without probable cause — Defendant City of New York**

424.    Plaintiff hereby incorporates by reference paragraphs 1 through 367 and further alleges as follows:

425.    The Police Commissioner and police officers employed by the NYPD are agents and employees of Defendant City of New York.

426.    At all times relevant to the Complaint, LIRR PD detectives Sullivan and Wendel were acting in concert with and at the direction of Det. Beisel and Det. Beisel's supervisors.

427.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees and agents of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to requirements governing:

   a. the constitutional obligation not to fabricate evidence, including false or suggestive lineup identifications, false or misleading police reports, and false statements by witnesses, for use against criminal suspects and defendants in criminal trials and other proceedings;

b. the constitutional obligation not to coerce false statements from witnesses for use against criminal suspects and defendants in criminal trials and other proceedings;

c. the constitutional obligation not to give false or misleading testimony;

d. the constitutional obligation not to initiate or continue a prosecution without probable cause;

e. the constitutional obligation to preserve and make timely disclosure to the District Attorney's Office of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence as well as evidence affecting the credibility of prosecution witnesses, and to refrain from making reports that, because they omitted such information, were false or misleading.

f. the constitutional obligation to intervene when other officers, whether employees of the NYPD or another agency, are violating the constitutional obligations listed above in subparagraphs a through e.

428.    During all times material to this Complaint, the City, through its policymaking officials in the NYPD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that would result in the violation of the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

429.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

430.    At the same time as NYPD policymaking officials were deliberately indifferent to constitutional violations by their employees and

68

agents, these officials created substantial incentives for their employees and agents to commit such constitutional violations, by pressuring police officers to "close" cases through arrests, indictments, and convictions.

431.   The aforesaid deliberate or de facto policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for Defendant City of New York—including but not limited to the Police Commissioner—who knew, or should have known:

a. to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

b. that such issues present NYPD employees and agents with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

c. that NYPD employees and agents facing such issues have strong incentives to make the wrong decisions, particularly given the institutional pressure for NYPD employees and agents to make arrests, close cases, and secure indictments and convictions;

d. that the wrong choice by NYPD employees and agents concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

e. that NYPD employees and agents had a history of making wrong choices in such matters.

432.   At the time of Plaintiff's arrest and prosecution, NYPD policymaking officials were on notice of the risk of misconduct by NYPD

employees and agents that would violate the constitutional obligations
identified in ¶ 427, *supra*.

433.    Policymaking officials were on notice based in part on numerous
decisions of the United States Supreme Court and other state and federal courts
discussing the difficult issues that regularly arise for police officers during
criminal investigations, including issues relating to lineup identification,
documenting witness interviews, conducting witness interviews, disclosing
*Brady* material, and other phases of criminal investigations.

434.    Policymaking officials were also on notice based on the inherent
obviousness of the need to train, supervise, and discipline police officers with
respect to their constitutional obligations to counteract the pressure on such
officers to "close" cases and to obtain arrests and convictions.

435.    Policymaking officials were further on notice based on numerous
credible allegations that NYPD officers had manufactured false or unreliable
identification evidence, witness statements, and other evidence, and knowingly
given false or misleading testimony, in violation of the constitutional
obligations identified in ¶ 427, *supra*.

436.    Policy makers were on further notice based on judicial decisions
directly criticizing the NYPD for failing to train and supervise officers in their
*Brady* obligations and for failing to adopt adequate *Brady* disclosure policies,

70

and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to disclose evidence that favors criminal defendants under *Brady*, *see Carter v. Harrison*, 612 F.Supp.749 (E.D.N.Y June 21, 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin).

437.    Many detectives were unaware they had an obligation to make a record of or to otherwise inform prosecutors of information that was favorable to the criminal suspect or defendant.

438.    In addition, the New York City Police Commissioner and his delegates did not discipline police officers found to have been responsible for the violation of criminal suspects' or defendants' right to disclosure of favorable evidence and not to be prosecuted based upon false or misleading evidence.

439.    Police officers thus understood they would suffer no adverse consequence if they withheld *Brady* material from prosecutors or provided prosecutors with fabricated evidence.

440.    Meanwhile, the NYPD put substantial pressure on detectives and agents to close cases by developing probable cause and making arrests.

441.    Prosecutors would not be informed of evidence favorable to a suspect or defendant that was known to police and thus would be unable to comply with their own constitutional obligation to disclose such material to the defense in time to be used at bail hearings, in the grand jury, and at trial, and would unwittingly rely on evidence fabricated by the police.

442.    In addition, relying on false or misleading police reports, prosecutors elicited perjured testimony from prosecution witnesses, who were often coached or forced by police officers to give false testimony.

443.    Many of the NYPD's illegal practices were documented in July of 1994 by the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, (hereinafter the "Mollen Commission Report").[1]

444.    The Mollen Commission Report was the culmination of a twenty-two month investigation, which included interviews with then current and former police officers and supervisors, prosecutors, and civilians. The report discovered that officers engaged in widespread falsification of evidence in the following forms: "[1] testimonial perjury . . . [2] documentary perjury, as when

---

[1] City of New York, Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, Commission Report, July 7, 1994, *available at* https://web.archive.org/web/20110721230958/http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf

an officer swears falsely under oath in an affidavit or criminal complaint; and

[3] falsification of police records, as when an officer falsifies the facts and

circumstances of an arrest in police reports." Mollen Commission Report at 36.

445.    The Commission found that, within the NYPD, "the practice of

police falsification in connection with such arrests is so common in certain

precincts that it has spawned its own word: 'testilying.'" *Id.*

446.    The Commission noted:

> Officers [] commit falsification to serve what they
> perceive to be 'legitimate' law enforcement ends -
> -- and for ends that many honest and corrupt
> officers alike stubbornly defend as correct. In their
> view, regardless of the legality of the arrest, the
> defendant is in fact guilty and ought to be arrested.
> Officers reported a litany of manufactured tales. . . .
> Frustrated by what they perceive to be unrealistic
> rules of law and by their own inability to stem the
> crime in their precincts through legal means,
> officers take the law into their own hands. And
> police falsification is the result.

*Id.* at 38.

447.    According to the Commission, officers

> falsified documents and may have committed
> testimony perjury to conceal constitutional
> violations . . . Even more troubling, the evidence
> suggests that the unit's commanding officer not
> only tolerated, but encouraged, this unlawful
> practice. . . . Even supposedly well-intended
> falsification, moreover, has devastating
> consequences for the criminal justice system and
> the public. Rather than insuring that the guilty are

> convicted, police falsifications often insure the
> opposite. Unlawful 'shortcuts' at times require
> lying to a grand jury or to a trial jury.

*Id.* at 39.

448.    Because falsification was rampant and unchecked, officers

"quickly realized how easy it was to cross the line and take the law into their

own hands with impunity." *Id.* And officers were rewarded with career

advancement. *Id.* at 37.

449.    The Commission explained how such lawlessness came to pass:

> What breeds this tolerance is a deep-rooted
> perception among many officers of all ranks within
> the Department that nothing is really wrong with
> compromising facts to fight crime in the real world.
> Simply put, despite the devastating consequences of
> police falsifications, there is a persistent belief
> among many officers that it is necessary and
> justified, even if unlawful. As one dedicated officer
> put it, police officers often view falsification as, to
> use his words, "doing God's work" - doing
> whatever it takes to get a suspected criminal off the
> streets. This attitude is so entrenched, especially in
> high-crime precincts, that when investigators
> confronted one recently arrested officer with
> evidence of perjury, he asked in disbelief, "What's
> wrong with that? They're guilty."

*Id.* at 41.

450.    The Commission found:

> the Department's top commanders must share the
> blame . . . For example, supervisors were rarely, if
> ever, held accountable for the falsifications of their

subordinates. We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch . . . Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. The Commission's analysis of Internal Affairs' corruption categories --designed to quantify different kinds of police wrongdoing -- revealed no separate category for perjury or falsification of records. Unlike other corruption categories, Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.

*Id.* at 41-42.

451.  "The consequences of this can be devastating," the Commission noted, "[i]t can mean that defendants are unlawfully arrested and convicted, that inadmissible evidence is admitted at trial." *Id.* at 43.

452.  In addition to widespread evidence falsification, the Commission noted that officers frequently used brutality[2] in order to manufacture false testimony by witnesses. *Id.* at 44. "Threats and violence are carried out in connection with corruption . . . [or] to administer an officer's own brand of

[2] The Mollen Commission defined "brutality" as implicit or explicit threat of physical harm or the actual infliction of physical injury or pain. Mollen Commission Report at 44, n. 4.

vigilante justice[.]" *Id.* at 45. "In addition, the Department's intelligence and official records regarding incidents of brutality have been wholly inadequate in the past." *Id.*

453.    A study by the Commission found that officers who engaged in other forms of corruption, such as falsification, "were more than five times as likely to have five or more unnecessary force allegations filed against them than the officers from the random sample group." *Id.* at 46. "Once the line was crossed without consequences, it was easier to abuse their authority in other ways, including corruption." *Id.* at 47.

454.    The commission noted that:

> officers seem fairly tolerant – both outwardly and inwardly – of occasional police brutality. . . many do not seem to believe that anything is really wrong with a few blows and bruises now and then. Even officers who would never take a free cup of coffee, seem to tolerate what they believe is a little "street justice."

*Id.* at 49.

455.    The Commission found that acts of brutality, like falsification, were insulated by what "[s]cores of officers at every rank [called] the code of silence [that] pervades the Department and influences the vast majority of honest and corrupt officers alike." *Id.* at 51.

456.    One former officer explained why he did not fear that he would be

reported or disciplined:

> Because it was the Blue Wall of Silence. Cops don't
> tell on cops. And if they did tell on them, just say if
> a cop decided to tell on me, his career's ruined. He's
> going to be labeled as a rat. So if he's got fifteen
> more years to go on the job, he's going to be
> miserable because it follows you wherever you go.
> And he could be in a precinct, he's going to have
> nobody to work with. And chances are if it comes
> down to it, they're going to let him get hurt.

*Id.* at 53-54.

457.    Officers "reported that the wall of silence is even stronger when it

comes to brutality. Officers are unwilling to go out on a limb and report

behavior that they believe, while unlawful, is fundamentally correct." *Id.* at 49.

458.    The Commission observed:

> This willful tolerance, or blindness, extends to
> supervisors as well. This is because many
> supervisors share the perception that nothing is
> really wrong with a bit of unnecessary force and
> because they believe that this is the only way to
> fight crime today . . . Before the Commission's
> public hearings, few officers had ever been
> dismissed or even suspended on grounds of
> brutality in the recent past. Nor were supervisors or
> commanding officers typically sanctioned for
> brutality in their commands . . . In past years, the
> Department has refused to recognize brutality as a
> serious occupational hazard and failed to recognize
> its link to corruption. Integrity training inadequately
> addressed issues of brutality or brutality tolerance;
> intelligence-gathering efforts in the brutality area

> were negligible; discipline was lax; command
> accountability was rarely enforced in this area; and
> information on corruption and brutality was rarely
> analyzed together.

*Id.* at 49-50.

459.   Supervisors condoned falsification and brutality; indeed, they

were part of the "wall of silence" shrouding such corruption:

> Our and investigation revealed a widespread
> breakdown in supervision which fueled and
> protected the corruption we observed. In fact, in
> every precinct where we found corruption, we found
> ineffective or sparse supervision -- a willingness by
> certain supervisors to turn a blind eye to corruption
> which they knew or strongly suspected existed. In
> fact, many supervisors did not believe that uprooting
> corruption was part of their responsibilities.

*Id.* at 80.

460.   Finally, the Commission concluded:

> We found a police culture that often tolerates and
> protects corruption. We also found that the
> Department completely abandoned its
> responsibility to transform that culture into one that
> drives out corruption. It made little effort to change
> the attitudes that foster corruption among the rank
> and file, supervisors or commanders; and it made
> little effort to convince anyone that its occasional
> pronouncements on integrity were more than
> obligatory rhetoric. . . The Department also has
> done little to attempt to penetrate the wall of silence,
> although it is one of the major barriers to identifying
> and uncovering corruption.

*Id.* at 107.

461.   The NYPD used brutality— "implicit or explicit threats of physical harm or the actual infliction of physical injury or pain"—to coerce suspects to either confess or falsely accuse another individual of a crime.

462.   A few high-profile examples of the NYPD using brutality to coerce statements include:

a.   In or around 1985, NYPD detectives struck **David McCallum** during an interrogation and threatened to strike him with a chair, inducing him to confess to a carjacking and murder that he did not commit. When he was exonerated in 2014, the office of the Kings County District Attorney stated publicly that his confession and that of a codefendant were "the product of improper suggestion, improper inducement and, perhaps, coercion."

b.   **Raymond Santana Jr.** was one of five Hispanic and African American boys arrested and charged with the rape and horrific assault of the "Central Park Jogger" on April 19, 1989. After keeping him up all night, NYPD detectives threated Raymond that he could be given 20 years in prison if he was found to be lying, yelled at him, physically threatened him by rushing at him, accused him of the rape, fed him details of the rape to bolster the supposed confession, falsely told him that another suspect had accused him of the rape, and falsely told him they did not want to prosecute him for something he did not do. Raymond was exonerated on December 19, 2002, after another, unrelated individual whose DNA matched DNA from the victim came forward to confess to the rape and stated that he committed the rape alone.

c.   In 1992, NYPD detectives coerced **Antonio Yarborough** and **Sharrif Wilson** into falsely accusing each other of murder, by means of lying to Antonio and Sharrif, feeding them non-public facts about the murder, hitting them, threatening them, and depriving them of sleep, all while supervisors looked on.

Both men were convicted and served decades in prison before being exonerated by DNA evidence.

463.    Similarly, NYPD routinely elicited written statements from witnesses by threatening to incarcerate them.

464.    For example:

   a. **Derek Hamilton** was convicted of murder in 1983 and served more than two decades before Brooklyn prosecutors voluntarily vacated his conviction. A key witness, Jewel Smith, said in a sworn affidavit that she identified Hamilton only after an NYPD detective threatened to jail her and cause her children to be taken away if she did not accuse Hamilton.

   b. In 1987, **Valence Cole** was convicted of murder based on the testimony of witness Jeffrey Campbell. In 1994, Campbell said in a sworn statement that an NYPD detective had given him a script on which to base his testimony. Campbell admitted that he gave false testimony because the detective promised to drop charges in exchange.

   c. **Jeffrey Blake** and **Ruben Ortega** were convicted of a 1990 murder and received life sentences based on the testimony of witness Dana Garner. Both convictions were vacated. During civil litigation, Garner testified that an NYPD detective fed him details to be included in Garner's allegations and threatened to charge Garner with crimes if he didn't implicate Blake and Ortega.

465.    Based on the above, NYPD policymaking officials knew or should have known, at the time of Plaintiff's prosecution, that NYPD employees and agents were manufacturing false evidence by fabricating police reports and using force or threats of force and prosecution to coerce false witness statements, as well as failing to disclose *Brady* material, all for the

purpose of creating false grounds for establishing probable cause to arrest and prosecute suspects and to influence juries to return convictions.

466.   With deliberate indifference to such misconduct, NYPD policymaking officials failed to take adequate steps to train, supervise, or discipline NYPD employees to prevent or deter such constitutional violations from occurring.

467.   As a result of the City's deliberate or de facto policies, procedures, regulations, practices, customs, and/or inadequate training, detectives, acting deliberately, intentionally, willfully, recklessly and/or out of ignorance of their constitutional obligations, withheld from prosecutors in Plaintiff's case a litany of exculpatory and impeachment evidence, including, without limitation, the evidence described in paragraphs 306 through 328.

468.   As a further result of the City's deliberate or de facto policies, procedures, regulations, practices, customs, and/or inadequate training, detectives knowingly and intentionally fabricated evidence that they forwarded to prosecutors for use in Plaintiff's prosecution.

469.   NYPD policymaker's deliberate indifference to such misconduct directly, foreseeably, proximately, and substantially caused the violations of Plaintiff's federal constitutional rights in this case and his resulting injuries.

## COUNT X

**42 U.S.C § 1983 *Monell* municipal liability for conduct of LIRR PD officers relating to withholding exculpatory evidence, fabrication of evidence, and initiating the prosecution without probable cause — Defendants Metropolitan Transportation Authority and Long Island Rail Road Company**

470.     Plaintiff hereby incorporates by reference paragraphs 1 through 367 and further alleges as follows:

471.     During the investigation and prosecution of Plaintiff, detectives Wendel and Sullivan of the Long Island Rail Road Police Department were employees of Defendant Long Island Railroad Company, a subsidiary of Defendant Metropolitan Transportation Authority.

472.     Under the principles of municipal liability for federal civil rights violations, the LIRR Chief of Police or his authorized delegates, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees and agents of the LIRR PD with respect to the investigation and prosecution of criminal matters, including but not limited to requirements governing:

a.  the constitutional obligation not to fabricate evidence, false or misleading police reports, or false statements by witnesses, for use against criminal suspects and defendants in criminal trials and other proceedings;

b.  the constitutional obligation not to coerce false statements from witnesses for use against criminal suspects and defendants in criminal trials and other proceedings;

    c.  the constitutional obligation not to initiate or continue a prosecution without probable cause;

    d.  the constitutional obligation not to give false or misleading testimony;

    e.  the constitutional obligation to preserve and make timely disclosure to the District Attorney's Office, during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence as well as evidence affecting the credibility of prosecution witnesses;

    f.  the constitutional obligation to intervene when other officers, whether employed by the LIRR PD or another agency, violate the constitutional obligations listed above in subparagraphs a through e.

473.    During all times material to this complaint, the MTA and LIRR, through its policymaking officials in the LIRR PD, owed a duty to the public at large and to Plaintiff to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates that would result in the violation of the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

474.    These policymakers knowingly and intentionally breached, or were deliberately indifferent to, this duty.

475.    At the same time as LIRR PD policymaking officials were deliberately indifferent to constitutional violations by their employees, these officials created substantial incentives for their employees to commit such constitutional violations, by pressuring police officers to "close" cases through arrests, indictments, and convictions.

476.    The aforesaid deliberate or de facto policies, procedures, regulations, practices, and customs (including the failure to properly instruct, train, supervise, and discipline employees) were implemented or tolerated by policymaking officials for Defendants MTA and LIRR—including but not limited to the LIRR PD Chief of Police—who knew, or should have known:

   a.  to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation of criminal cases;

   b.  that such issues present LIRR PD employees and agents with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

   c.  that LIRR PD employees and agents facing such issues have strong incentives to make the wrong decisions, particularly given the institutional pressure for LIRR PD employees and agents to make arrests, close cases, and secure indictments and convictions;

   d.  that the wrong choice by LIRR PD employees and agents concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

   e.  that LIRR PD employees had a history of making wrong choices in such matters.

477.    As a result of inadequate training, many detectives were unaware they had an obligation to make a record of or to otherwise inform prosecutors of information that was favorable to the criminal suspect or defendant.

478.    At the time of Felipe's arrest and prosecution, LIRR PD policymaking officials were on notice of the risk of misconduct by LIRR PD

employees that would violate the constitutional obligations identified in ¶ 472, *supra*.

479.    Policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court and other state and federal courts discussing the difficult issues that regularly arise for police officers during criminal investigations, including issues relating to lineup identification, documenting witness interviews, conducting witness interviews, and other phases of criminal investigations.

480.    Policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to "close" cases and to obtain arrests and convictions.

481.    Policymaking officials were also on notice because the LIRR PD routinely conducted joint investigations with the NYPD; the NYPD was known to implement unconstitutional policies relating to criminal investigations, *see* ¶¶ 425-469, *supra*; and LIRR PD employees participating in joint investigations with the NYPD were carrying out and implementing those very same unconstitutional policies.

482.    With deliberate indifference to such misconduct, LIRR PD policymaking officials failed to take adequate steps to train, supervise, or

discipline LIRR PD employees and agents to prevent or deter such constitutional violations from occurring.

483.    As a result of the MTA's deliberate or de facto policies, procedures, regulations, practices, customs, and/or inadequate training, detectives, acting deliberately, intentionally, willfully, recklessly and/or out of ignorance of their constitutional obligations, withheld from prosecutors in Plaintiff's case a litany of exculpatory and impeachment evidence, including, without limitation, the evidence described in paragraphs 306 through 328.

484.    As a further result of the MTA's deliberate or de facto policies, procedures, regulations, practices, customs, and/or inadequate training, detectives knowingly and intentionally fabricated evidence that they forwarded to prosecutors for use in Plaintiff's prosecution.

485.    The deliberate indifference of LIRR PD policymaking officials to such misconduct directly, foreseeably, proximately, and substantially caused the violations of Felipe's federal constitutional rights in this case and his resulting injuries.

## COUNT XI

**42 U.S.C. § 1983 *Monell* Municipal liability for the Queens District Attorney's Office's Policy of Deliberate Indifference to Fair Trial Violations — Defendant City of New York**

486.    Plaintiff hereby incorporates by reference paragraphs 1 through 367 and further alleges as follows:

487.    At all times relevant to this Complaint, Plaintiff had a federal constitutional right, pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments, to disclosure by the District Attorney's Office of all exculpatory and impeachment evidence and information which, considered in its totality, was likely to influence whether he would be convicted at trial and/or which was material to sentencing.

488.    Under this requirement, known as the *Brady* rule, the assigned prosecutor of Plaintiff had an absolute responsibility to obtain and to disclose to the defense all such information and evidence in the possession, custody, control or knowledge of the NYPD and of the District Attorney's Office and to disclose it to Plaintiff's attorney sufficiently in advance of trial so that she could adequately investigate it and utilize it at trial in her client's defense.

489.    In addition, Plaintiff had a right, under the same constitutional provisions, not to be convicted based upon a prosecutor's knowing use of false or misleading evidence or argument, or failure to correct the same.

490.    In this case, in violation of such rights, and despite Plaintiff's counsel's repeated specific requests for disclosure, the prosecution suppressed exculpatory and impeachment evidence, including, without limitation, the evidence described in paragraphs 306 through 328, which was actually known to the prosecution or which, through deliberate indifference to Plaintiff's constitutional rights, it failed to learn about through reasonable inquiry of police detectives assigned to this case, and presented testimony that, in light of the unrevealed evidence, was false or misleading.

491.    The prosecution also suppressed the Nagra tape recording, which would have critically impeached the testimony of the prosecution's star witness, Javier Ramos. *See* ¶¶ 165-174, 275, *supra*.

492.    These violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens County District Attorney's Office, namely:

a.  the institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices, and/or customs concerning the continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of *Brady v. Maryland*,

373 U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (172), and their progeny; and

b. the District Attorney's deliberate indifference to the need, and his failure, to adequately instruct, train, supervise, and/or discipline his employees with respect to such matters.

493.   The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City of New York, including, but not limited to, the District Attorney of Queens County and his delegates.

494.   At all relevant times, the District Attorney of Queens County and his delegates knew to a moral certainty that prosecutors would acquire material exculpatory evidence and information, including evidence impeaching witnesses, or were responsible to make reasonable inquiry of law enforcement officials to acquire such evidence and information.

495.   At all relevant times, the District Attorney of Queens County and his delegates knew to a moral certainty that failing to adequately train, supervise and discipline prosecutors to acquire and to disclose material exculpatory evidence, including impeachment evidence, would result in prosecutors failing to disclose material exculpatory evidence and would thus cause the violation of citizens' constitutional rights.

496.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraphs based upon:

a. numerous credible allegations, many substantiated by judicial decisions, some of which are listed in paragraph 515, *infra*, that Queens County ADAs had failed to disclose, or failed to disclose on a timely basis, information favorable to the defense that was required to be disclosed by the Constitutions and the law of the United States and of the State of New York;

b. the inherent obviousness of the need to train, supervise and discipline ADAs on their aforementioned constitutional obligations to counteract pressure that the Queens County District Attorney applied to prosecutors to obtain convictions;

c. numerous federal and state judicial opinions emphasizing the critical importance of *Brady* compliance by state prosecutors.

497.     At the time of Plaintiff's trial, the Queens County District Attorney's indifference to his office's noncompliance with *Brady* was evidenced by his failure to conduct internal disciplinary investigations, or to discipline, the prosecutors known to engage in such noncompliance, including but not limited to the prosecutors responsible for the misconduct found in the judicial decisions listed in paragraph 515, *infra*, or to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees.

498.     Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at

trial and their productivity in trying a high volume of cases and extracting guilty pleas even in weak cases.

499.    Although supervisors were supposed to monitor members of their bureau closely enough to prevent constitutional violations, executives in the Office would not follow up with supervisors to find out why *Brady* violations or other misconduct found by a court had occurred.

500.    Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequence in the unlikely event their misconduct was exposed.

501.    Further encouraging prosecutors to win at any cost was their knowledge that the Office had no employee handbook or other published procedure for disciplining prosecutors who violated rules of behavior for criminal prosecutions.

502.    Policymakers at the Office failed to discipline misconduct affecting defendants' rights, no matter how egregious, despite being aware that failing to take such measures would encourage and result in similar misconduct in the future.

503.    The Office had no written or other officewide policy concerning what material to disclose under *Brady* or when to disclose it.

504.   It had no *Brady* manual or handbook setting forth any policy or guidance in this complicated area for prosecutors to consult.

505.   The office had no policy requiring the inclusion of exculpatory information in "prosecution memos," which influenced the DA's decision to approve the presentment of a case to a grand jury.

506.   Indeed, the Office not only was indifferent to *Brady* disclosure and to violations of this requirement, including the knowing use and failure to correct false testimony, but it adopted procedures for affirmatively discouraging disclosure.

507.   Under District Attorney Santucci, the Office trained line prosecutors in what the Office referred to as a "Chinese Wall" policy, under which trial prosecutors were deliberately shielded from knowledge of sentencing and other consideration given to prosecution witnesses by others in the Office.

508.   Indeed, Santucci's Chief of Trials, Daniel McCarthy, in a notorious murder prosecution in 1989, *People v. Steadman,* deliberately made a deal with the prosecution's main cooperating witness for extraordinary leniency that he kept from the line prosecutors, who in turn, pursuant to the Office's "Chinese Wall" policy, failed to inquire. The result was the witness gave false testimony denying any deal, which the prosecutors failed to correct.

509.     The trial judge expressed its "disgust" with the District Attorney's "shabbily constructed cooperation charade," orchestrated by the Office's top executive overseeing trial practice, and ultimately the New York Court of Appeals reversed the conviction.

510.     Prosecutors' knowledge that the chief of trials, no doubt with the knowledge and approval or at least acquiescence of the District Attorney, was deliberately scheming to violate *Brady,* encouraged other, lower-level prosecutors to do so as well.

511.     Thus, in the prosecution of Shih Wei Su for an attempted murder that occurred in January 1991, the trial prosecutor, ADA Linda Rosero, was shielded from knowledge of a deal another prosecutor had made with her star witness, a youth gang member, for no jail time for a robbery by extortion, and then failed to correct the witness's false testimony denying any such deal.

512.     Su spent 12 years in prison as a result, before his conviction was overturned by a federal court of appeals and then his indictment was dismissed.

513.     During Su's civil rights lawsuit claiming indifference by the Queens D.A. to *Brady* violations, former ADA Rosero testified she had been trained under D.A. Santucci in the aforementioned "Chinese Wall" policy, admitted myriad additional *Brady* violations she had committed in the same

case, complained she had received no supervision, and essentially testified that all her Office cared about was winning.

514. Significantly, the trial in Plaintiff's case occurred the year after the Steadman trial.

515. Policymakers were further on notice of the need to adequately train, supervise, and discipline prosecutors who were committing *Brady* violations, including violations similar to those committed in Plaintiff's trial, based upon numerous reported judicial decisions in the years leading up to Plaintiff's trial, including but not limited to the following:

1. *People v. Manzione*, 109 A.D.2d 755 (2d Dept. 1985) (reversing a 1984 robbery conviction where the prosecutor failed to disclose the initial description of the perpetrators given by the complainant).

2. *People v. Robinson*, 133 A.D.2d 859 (2d Dept. 1987) (reversing 1982 convictions for murder and robbery where the prosecutor withheld a witness statement directly implicating persons other than the two defendants as the perpetrators and the materially inconsistent statement of a key prosecution witness).

3. *People v. Nelu*, 157 A.D.2d 864 (2d Dept. 1990) (reversing a 1988 burglary conviction where the prosecutor failed to disclose several prior statements of the People's witnesses).

4. *People v. Munoz*, 161 A.D.2d 807 (2d Dept. 1990) (reversing a 1985 criminal trespass conviction where the prosecutor failed to disclose prior statements of the People's "main witness").

5. *People v. Rivera*, 170 A.D.2d 544 (2d Dept. 1991) (reversing a 1987 rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation).

6. *People v. Gaskins*, 171 A.D.2d 272 (2d Dept. 1991) (reversing a 1988 sodomy conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim).

7. *People v. Delace*, 174 A.D.2d 688 (2d Dept. 1991) (reversing a 1988 robbery conviction where the prosecutor failed to disclose witness statements).

8. *People y. Baba-Ali*, 179 A.D.2d 725 (2d Dept. 1992) (reversing a 1989 rape conviction involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse).

9. *People v. Clausell*, 182 A.D.2d 132 (2d Dept. 1992) (reversing a 1990 narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant).

10. *People v. Banch*, 80 N.Y.2d 610 (1992) (reversing 1988 manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed).

11. *People v. Davis*, 196 A.D.2d 597 (2d Dept. 1993) (reversing a 1989 rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim).

12. *People v. Gaines*, 199 A.D.2d 335 (2d Dept. 1993) (reversing a 1990 manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney).

13. *People y. Baxley*, 84 N.Y.2d 208 (1994) (remitting a CPL 440 motion challenging a 1988 murder conviction for a hearing to determine the truth and materiality of a witness's affidavit that prior to trial he informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, which the Court of Appeals deemed "crucial" to the People's case); Mr. Baxley was killed in prison before the hearing could be held, according to his counsel, Harold Ferguson.

516.    In addition, in the years immediately following Plaintiff's trial, policymakers learned of numerous additional judicial decisions finding that *Brady* violations were committed by prosecutors at the Queens DA's office, including but not limited to the following:

1. *People v. Moustakis*, 226 A.D.2d 401 (2d Dept. 1996) (reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office).

2. *People v. May*, 228 A.D.2d 523 (2d Dept. 1996) (reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness, and failed to correct his false testimony that no such agreement existed).

3. *People v. Croons*, 231 A.D.2d 585 (2d Dept. 1996) (reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant).

4. *People v. Huynh*, 232 A.D.2d 655 (2d Dept. 1996) (reversing robbery conviction where the defense was misidentification, and the prosecutor failed to preserve a 911 tape containing the eomp1ainant's initial description of the robber).

5. *People v. Ying*, 236 A.D.2d 630 (2d Dept. 1997) (reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the term of a cooperation agreement with a People's witness).

6. *People v. Gallman*, 240 A.D.2d 512 (2d Dept. 1997) (granting CPL 440 motion where the prosecutor wrongfully withheld a police interview of the people's main witness).

7. *People v. Burch*, 247 A.D.2d 546 (2d Dept. 1998) (reversing robbery conviction where the defense was misidentification, and the prosecutor failed to preserve a 911 tape containing the initial description of the robber).

8. *People v. Mackey*, 249 A.D.2d 329 (2d Dept. 1998) (reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier).

517.    Notwithstanding the notice that policymakers had of the numerous judicial decisions, before and after Plaintiff's trial, finding *Brady* violations and related misconduct, policymakers, deliberately indifferent to the effect such violations had on the fundamental constitutional right of criminal defendants to

a fair trial, utterly failed to respond with policies, training, supervision and discipline necessary to prevent such constitutional violations from recurring.

518.    The aforementioned policies, procedures, regulations, practices and/or customs of Defendant City of New York were collectively and individually a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his damages.

519.    But for the ADA's misconduct caused by the District Attorney's unlawful or deliberately indifferent policies, customs and practices, Plaintiff would have been acquitted and released from custody, and would not have been incarcerated any further in connection with his murder case.

520.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory or impeachment evidence to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial and trial proceedings.

521.    The Queens County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

522.    The District Attorney of Queens County, at all relevant times, was and is an elected officer of Queens County, one of the constituent counties of Defendant City; the Office was and is funded out of the City's budget; and the Office was and is a New York City agency.

523.    The District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); New York has provided by statute (N.Y. County Law §§ 53, 941) that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, has liability for torts committed by County officers and employees, such as the District Attorney and his assistants, and the City of New York represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

524.    The District Attorney of Queens County personally and/or through his authorized delegates, at all relevant times had final authority, and

constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

525.   During all times material to this Complaint, the City, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

526.   By virtue of the foregoing, the Defendant City of New York is liable to Plaintiff, pursuant to 42 U.S.C. §§ 1983 and 1988, for all his injuries and damages and for his attorneys' fees, costs and expenses in bringing this action.

**WHEREFORE**, FELIPE RODRIGUEZ, demands judgment in a sum to be determined at trial and is further entitled to punitive damages against the individual defendants in an amount to be determined at trial, plus reasonable attorneys' fees, costs, and disbursements of this action.

Dated:      New York, New York
            July 26, 2021

                        ZMO LAW PLLC


                        BY:  Zachary Margulis-Ohnuma
                        ZACHARY MARGULIS-OHNUMA
                        260 Madison Avenue, 17th Floor
                        New York, NY 10016
                        (212) 685-0999


                        BY: Benjamin Notterman
                        BENJAMIN NOTTERMAN
                        260 Madison Avenue, 17th Floor
                        New York, NY 10016
                        (212) 685-0999


                        LAW OFFICES OF JOEL B. RUDIN P.C.

                        BY: Joel B. Rudin
                        JOEL B. RUDIN
                        152 West 57th Street, 8th Floor
                        New York, NY 10019
                        (212) 752-7600

                        *Attorneys for Plaintiff Felipe Rodriguez*