SUPREME COURT — STATE OF NEW YORK
CRIMINAL TERM PART K-3   QUEENS COUNTY
125-01 Queens Boulevard  Kew Gardens, N. Y.

PRESENT:
    HON. __RALPH SHERMAN__
                  Justice.

THE PEOPLE OF THE STATE OF NEW YORK

        -against-

FELIPE RODRIQUEZ

                Defendant.

Ind. No. 1568/89

Motion CPL 440 HEARING

Submitted _____ 19
Argued _____ 19
Hearing 3/19 & 6/18/93

The following papers numbered
1 to ____ submitted in this motion

MARTIN LUCENTE, ESQ.
STEVEN SILVERBLATT, ESQ.

For the Motion

ANDREW BAROVICK, A.D.A.
JOHN CASTELLANO, A.D.A.

Opposed

            Papers Numbered

Notice of Motion and Affidavits Annexed _____   _____
Answering and Reply Affidavits _____   _____
Exhibits _____   _____
Minutes _____   _____
Other _____   _____

    Upon the foregoing papers and after a hearing was conducted pursuant to CPL Section 440.30(5), the defendant's motion is denied; see accompanying memorandum.

GRANTED:
Date: __JULY 30, 1993__

                                      RALPH SHERMAN   J.S.C.

MEMORANDUM

# SUPREME COURT, QUEENS COUNTY
# CRIMINAL TERM, PART K-3

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br>—against—<br>FELIPE RODRIQUEZ<br>Defendant. | BY RALPH SHERMAN, J.S.C.     J.<br>DATED JULY 30, 1993     198<br>Ind. No. 1568/89 |

On March 19, 1993, this Court conducted a C.P.L. Section 440.10 hearing based on the defendant's 440 motion alleging that the People failed to produce an audiotape of a conversation between Javier Ramos (a prosecution witness at trial) and Richard Pereira to the defendant at trial. This hearing was ordered for the purpose of making a finding of fact as to whether the subject tape was turned over to the defense at trial. (See decision and order of this Court dated 1/11/93).

At the hearing Jenny Maiolo, Esq. testified on the defendant's behalf. The People presented the testimony of Kenneth Litwack, Esq., Steve Zissou, Esq., and Alan Safran, Esq. at the hearing. Each party submitted a post-hearing memorandum that has been reviewed by the Court; oral argument on the motion was heard on June 18, 1993.

## THE DEFENSE CASE

### TESTIMONY OF JENNY MAIOLO

Ms. Maiolo is a highly regarded attorney who has practiced law for over 30 years. At the time of the trial in April 1990

she had tried between 50 to 100 felony cases, including 10 to 15 homicide cases. She began her representation of the defendant in about November 1989 and she had been preceded by Kenneth Litwack, Esq. She has a "vivid" memory of the case because she believes that the conviction was a "miscarriage of justice."

When the witness took over the defendant's case, Mr. Litwack turned over a duplicate file that consisted primarily of his motions. There was also paperwork concerning a polygraph. Ms. Maiolo said that there were no DD-5's in the file. She spoke with Mr. Litwack several times about the case and he never told her of any audiotape and none of the paperwork in the file referred to any tape. The witness summed up the extent of her communication with Litwack by stating "We had a conversation based on what the file contained at that point, which wasn't a heck of a lot, what the file contained." (p. 42, lines 7-9).

As for the discovery materials that were turned over to her by the prosecution, Ms. Maiolo received more that 200 DD-5's, Grand Jury testimony, hearing testimony, a videotape of prosecution witness Robert Thompson and an accompanying

transcript. She never received an audiotape of the conversation between Ramos and Pereira. The witness stated unequivocally that there was no mention of an audiotape in any of the DD-5's that were turned over. When shown DD-5's numbered 211 and 212 (Court Exhibits (1) and (2), respectively) the two reports that referred to the audiotape, she stated that she was sure that she had not been provided with these two DD-5's at trial. The witness was unsure of the exact number of DD-5's produced, but she estimated that there was "over 200." She kept no records of the numbers of the DD-5's turned over and she generally did not make notations as to when she received discovery material.

The witness read the DD-5's many times and she made copies for the defendant.

In about April of 1992, Ms. Maiolo listened to a tape and read a transcript of a conversation between Ramos and Pereira. This was the first occasion that she learned the contents of the tape. The witness testified that if she had the tape at the time of the trial she would have had it translated into English and had a transcript prepared. Also, she would have used it to further impeach Ramos on cross-examination and she would have considered calling Pereira as a defense witness.

Ms. Maiolo also noted that every time she received a tape from the Queens District Attorney's Office, it was accompanied by a transcript.

On cross-examination, Ms. Maiolo was confronted with the fact that the audiotape was discussed in the pre-sentence report on the defendant and she failed to take notice of it. The witness conceded that she failed to pick up on the fact that the audiotape was mentioned. Although she had no independent recollection of reading the report, she said she was sure that she "went through" the report but that she "certainly didn't go through it like I would go through a DD-5." (p. 47, lines 9-11). She explained her failure to notice the discussion of the tape by pointing out that the report was 11-12 pages long, there are always time constraints and as a practical matter, at the time of the sentence the case was "a fait accompli."

## PEOPLE'S CASE

### TESTIMONY OF KENNETH LITWACK, ESQ.

Mr. Litwack represented the defendant from approximately April 1989 until he was replaced by Ms. Maiolo a few months later. During the time he represented the defendant, the witness recalled that he received from A.D.A. Zissou approximately between 40-60 pages of DD-5's that were deemed Brady material by the Assistant District Attorney and a few other documents such as a sketch of the perpetrator and possibly a complaint report. Also during his representation of the defendant, he was informed by the defendant

that he believed that an audiotape had been made of a conversation between Ramos and Pereira and that the tape exculpated Pereira. Mr. Litwack did not recall that there was any mention of the tape in the DD'5's that he received and he did not recall having been given DD-5 number 211.

Mr. Litwack requested all Brady material and all statements by Ramos, but he "did not specifically say give me the tape." He made repeated requests for Brady material and various DD-5's.

When Mr. Litwack was replaced by Ms. Maiolo, he turned over documents pertaining to the case to her and he had a lengthy telephone converston with her about the case. The witness recalled that during this conversation he discussed "his feelings about the case," his "approach" to it, and whatever he believed to be "significant in the case." (p. 58, lines 8-10). When asked about telling Ms. Maiolo about the tape, he responded with "I don't remember the exact details of the conversation with her. I just remember having a lengthy conversation with her where I told her everything I thought was important at the time, at that time." (p. 58, lines 13-16). He then proceeded to testify in great detail as to what he discussed. He recalled telling her about a photographic identification that was taken of the defendant about a day before the murder which did not match a witness' description of the perpetrator. He also recalled telling her that there was a witness who could testify about the defendant's facial hair; that there was a conflicting description of the white car connected to the murder; and that the defendant passed a polygraph test.

When asked if it would have been his practice, in light of his training to "inform the following attorney about something like the existence of that tape," Mr. Litwack responded "It would have been my practice to discuss every detail of the case with her." (p. 60 lines 21-22)

## TESTIMONY OF STEVE ZISSOU

Steve Zissou was employed as a prosecutor with the Queens District Attorney's Office from 1983 to 1990. In 1989, he was assigned to handle the prosecution of the defendant's case. He dealt only with Mr. Litwack and ultimately, the responsibility for the prosecution of the case was turned over to ADA Alan Safran.

Mr. Zissou testified that he had several conservations with Mr. Litwack wherein they had disagreements about what discovery materials defense counsel was entitled to have.

After Mr. Litwack had requested the DD-5's repeatedly, Mr. Zissou turned over all the DD-5's in his possession when the Court asked him to do so. Mr. Zissou recalled that there were approximately 250 DD-5's. He stated that to the best of his recollection, one of the DD-5's mentioned a Nagra tape. Mr. Zissou testified that he discussed the Nagra tape with Mr. Litwack during their discussions about the case. Further, the DD-5 was the only way he could have known about the tape since he never spoke with Detective Beisel. Mr. Zissou was certain that DD-5 No. 211 had been turned over to Mr. Litwach because he turned over "cumulatively numbered DD-5's from single digit numbers up to 250 inclusive." Mr. Zissou never listened to the tape

nor was he ever in possession of it.

## TESTIMONY OF ALAN SAFRAN, ESQ.

Alan Safran was employed as an Assistant District Attorney in Queens County from 1987 until August 1990. The case involving defendant Rodriquez was re-assigned from Assistant District Attorney Zissou to Assistant District Attorney Safran. Safran dealt only with defense counsel Maiolo. The instant case was Safran's first murder case and it was the first of two murder cases he has tried thus far in his career. He "absolutely" remembered the case and testified that "...this case consumed my life for the better part of a year (p. 95, lines 4-5). When asked for the approximate time of the trial, Safran immediately responded that the trial began in the last week of April 1990, concluded during the first few days of May 1990 and that sentencing took place at the end of May 1990.

When asked for specific reasons as to why he remembers the case so clearly, Safran said that not only was it his first murder prosecution, but he found it a "terrifically challenging case in that it was based entirely on circumstantial evidence (p. 93, lines 2-3); he was told by the assigned detective (Detective Beisel) that the case was "one of the bloodiest murders of New York history (p. 93, lines 3-4); Safran recalled that the photographs of the victim were "grotesque" and he said that

he remembered "great amounts of the substantive details of the case." (p. 93, lines 6-7).

Safran testified that he turned over all Rosario material to attorney Maiolo after the jury had been sworn and before his opening statement. This took place in Courtroom Part K-3. Safran turned over all DD-5's and detective reports prepared by Detective Beisel and some LIRR Police Department detectives and a Nagra tape recording involving a conversation between Ramos and Pereira. At that time he also showed several photographs to Maiolo and he recalls that there was some disagreement with Maiolo about the admissibility of the photographs. All of the items were contained in a large accordian-type folder that Safran turned over in the Courtroom. He stated on the record that he was turning over Rosario materials but he did not specifically enumerate each item. Among the DD-5's that were produced were those that mentioned the Nagra tape of the conversation between Pereira and Ramos.

Safran was asked about his recollection of the audiotape. He stated that "the police wired Richard Pereira for sound and he then had a conversation with Javier Ramos. (p. 91, lines 15-16). Safran testified that as a prosecutor, he had never seen that type of activity, where "a man was wired for sound," in a police investigation.

Safran received the tape before trial from Detective Beisel. The detective turned the tape over in Safran's office. Safran listened to the tape, which he estimated to be about 30 minutes in length. Although Safran testified that he had some familiarity with Spanish, he listened to the tape with the aid of a paralegal.

Safran's view of the tenor of the taped conversation was that Ramos sounded frightened of Pereira and also seemed very impatient with him.

Safran found the tape to be "completely uninteresting" and barely intelligible gibberish" that was "non-believable" and not Brady material. (p. 99 lines 7-10).

Safran acknowledged that he was able to discern from listening to the tape that Ramos made statements that contradicted the People's case in that: (1) Ramos said something about not having loaned the car to anyone on Thanksgiving Eve and (2) that the substance in the car was not blood. Safran explained that he did not attach significance to these statements since Ramos had lied in his initial statement to the police when he falsely implicated Pereira.

It was because of this assessment of the tape that Safran did not feel the need to have a transcript prepared. He felt that the tape was not important to the prosecution's case in any substantive way but that there was no question that Ramos' taped statement were <u>Rosario</u> material as Safran intended to call Ramos as a witness at trial.

## FINDINGS OF FACT AND CONCLUSION OF LAW

At a hearing to vacate judgment, pursuant to CPL 440.30(6), "the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion."

Here, we find that the defendant has not met his burden of proving by a preponderance of the evidence that A.D.A. Alan Safran failed to turn the audiotape over to defense counsel Maiolo at trial. Indeed, the cumulative impact of all of the testimony leads to a conclusion that the audiotape in question was turned over to defense counsel Maiolo at trial.

In the instant case, the Court was presented with the testimony of two competent and respected members of the Bar in attorneys Maiolo and Safran, with each taking a diametrically opposed position to the other on the issue of the production of the audiotape. Therefore, in evaluating the testimony presented it was crucial to consider the extent to which Maiolo and Safran each recollected the case. On this issue, the Court not only considered the testimony of Maiolo and Safran but found attorney Litwack's testimony to be extremely helpful.

Mr. Litwack impressed the Court with his very detailed recollection of the case and in particular, his dealings with Ms. Maiolo. His memory of such specifics as telling Maiolo about a photo on the defendant's identification card, of a witness who could testify regarding the defendant's facial hair, about a conflicting description of the car and of the defendant's lie detector test convinces this Court that Litwack's recollection was extremely reliable. He testified with great certainty that when he represented the defendant, the defendant told him of an audiotape of a conversation between

Ramos and Pereira that exculpated Pereira. Litwack said that when he turned the case over to Maiolo, he informed her in a lengthy telephone conversation of what, in his judgment was "significant in the case." When specifically asked whether he told Maiolo of the tape, Litwack's somewhat evasive answer was "I don't remember the exact details of the conversation with her, I just remember having a lengthy conversation with her where I told her everything I thought was important at the time, at that time." (p. 58, lines 13-16). When asked if it would have been his practice to "inform the following attorney about something like the existence of that tape," Litwack responded "It would have been my practice to discuss every detail of the case with her." (p. 60). These words clearly imply that Litwack recalled telling Maiolo about the tape although there was some reluctance to say that in an outright fashion. If Litwack had any doubts about whether he had in fact told Ms. Maiolo of the tape, he could have chosen to use words that would indicate that doubt. However, he chose to say "It would have been my practice to discuss every detail of the case with her."

We note that in making findings of fact, the Court must consider the evidence and the reasonable inferences to be drawn from that evidence. Here, the testimony of Litwack strongly suggests that he told attorney Maiolo about the tape. Yet, Ms. Maiolo testified that Litwack never told her of the tape. Indeed, while Litwack recalled in detail a variety of important issues he discussed with Maiolo, Ms. Maiolo minimized the extent and import of her

communication with Litwack. When asked on cross-examination whether "...you sought from him (Litwack) what was important about this case and you received significant answers?" (p. 41, lines 24-25), Maiolo replied that Litwack transferred a duplicate of his file to her and "we had a conversation based on what the file contained at that point, which wasn't a heck of a lot, what the file contained. (p. 42 lines 7-9).

There is also a discrepancy between the recollections of Litwack and Maiolo involving the issue of the contents of the file that was turned over by Litwack. Litwack testified that he received approximately 40-60 DD-5's from A.D.A. Zissou and he turned over everything he had to Ms. Maiolo. This contradicts Ms. Maiolo's testimony that she never received any DD-5's from Litwack when he turned his materials over to her.

The variance between Ms. Maiolo's testimony and Mr. Litwack's testimony tends to cast a shadow on the reliability of Ms. Maiolo's recollection of the events involving this case. In giving great credit to Mr. Litwack's testimony, the Court notes that Litwack is likely to feel less personally involved in this matter than either the defense counsel or the prosecutor who ultimately tried the case.

Also, in assessing Ms. Maiolo's testimony that she never received the tape, it is impossible to ignore the fact that Ms. Maiolo did not notice a discussion of the tape that was contained in the defendant's pre-sentence report.

A.D.A. Safran appeared to have a strong recollection of the case, it being his first murder trial. He testified in a forthcoming and thoughtful manner.

Safran had a specific recollection of the circumstances under which he turned over discovery materials. Also, he was very much aware of the existence of the tape. He recalled that Detective Beisel gave him the tape in the District Attorney's Office and Safran listened to the tape with the help of a Spanish-speaking paralegal. Although it was Safran's judgment that the tape was substantively unimportant to his case and was non-Brady material, the Court credits Safran's testimony that there was no question in his mind that the tape was Rosario material as it contained statements of a witness (Ramos) that Safran intended to, and did call to testify at trial.

Despite Safran's assessment that the tape was substantively unimportant, he obviously did listen to the tape as he was able to testify about the apparent attitudes of Ramos and Pereira on the tape, as well as the fact that Ramos made a statement about not loaning out his car on Thanksgiving Eve and that the stain in the car was not blood.

Since Safran was familiar with the tape and knew that it was Rosario material, it is not plausible that he would have failed to turn the tape over to attorney Maiolo. Therefore, we credit his testimony that the tape was turned over to defense counsel at trial.

In view of the finding that the audiotape was turned over and therefore there was no Rosario violation, the Court need not consider the issue of whether an "actual showing of prejudice" or a "per se error" standard applies here in determining whether a new trial is warranted.

Based on all of the foregoing, the defendant's motion for a new trial based on Rosario and Brady violation is denied.

Order entered accordingly.

The Clerk of the Court is directed to forward a copy of this decision and order to counsel for the defendant and the District Attorney

............................
RALPH SHERMAN, J.S.C.