UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FELIPE RODRIGUEZ,

                              Plaintiff,

          - against -                                    21-cv-01649 (AMD) (RLM)

CITY OF NEW YORK, et. al.,

                              Defendants.


**MEMORANDUM OF LAW OPPOSING CITY
DEFENDANTS' MOTION TO DISMISS UNDER
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**


ZMO Law PLLC
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999
zmo@zmolaw.com

Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Floor
New York, NY 10019
(212) 752-7600
jbrudin@rudinlaw.com

*ATTORNEYS FOR PLAINTIFF FELIPE RODRIGUEZ*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................3

   I.   The Complaint adequately pleads state and federal malicious prosecution. ...........4

      A.   Criminal proceedings terminated in a manner indicating Plaintiff's innocence.
         ...................................................................................4

      B.   City Defendants initiated and continued criminal proceedings against Plaintiff.
         ...................................................................................7

   II.   The Complaint adequately alleges that the City Defendants violated Plaintiff's
      constitutional rights by fabricating evidence against him. ...................................10

   III.   City Defendants violated *Brady* because they withheld exculpatory evidence they
      generated and that was generated by LIRR detectives. .......................................11

   IV.   Plaintiff's pretrial detention was excessive because the Defendants hid
      exculpatory information, including the fact that they fabricated Javier Ramos's
      accusations.............................................................................14

   V.   The Complaint adequately alleges that the Defendants conspired to violate
      Plaintiff's constitutional rights by framing him for murder. ................................15

   VI.   Beisel's repeated use of racial epithets and disparate treatment of white suspects
      despite the description of the bar companion are sufficient to support an equal
      protection claim. ....................................................................15

   VII.   Defendant Beisel is personally liable for discrimination under 42 U.S.C. § 1981.
      ...................................................................................17

   VIII. Testimonial immunity does not shield Defendant Beisel from liability because the
      claims are based on his illegal out-of-court conduct. ...........................................17

   IX.   The Complaint plausibly alleges that the NYPD caused Plaintiff's injuries by
      maintaining a policy of deliberate indifference toward detectives' evidence
      fabrication, witness coercion, and withholding *Brady* material. ..........................18

   X.   The Complaint plausibly alleges that QDAO caused Plaintiff's injuries by being
      deliberately indifferent to prosecutors' compliance with *Brady* requirements. ....22

CONCLUSION ..........................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amnesty America v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) ......21

*Anderson v. City of New York*, 817 F. Supp. 2d 77, (E.D.N.Y. 2011) .............................17

*Ariza v. City of New York*, 1996 WL 118535 (E.D.N.Y. Mar. 7, 1996)...........................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)...................................................3, 21

*Bellamy v. City of New York,* 914 F.3d 727, 756-61 (2d Cir. 2019) ................................22

*Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206, 1211

   (1984)..................................................................................................................25

*Breton v. City of New York*, 404 F. Supp. 3d 799, 815 (S.D.N.Y. 2019) ...................10, 20

*Buari v. City of New York*, 2021 WL 1198371 (S.D.N.Y. Mar. 30, 2021) ...............passim

*Cameron v. City of New York*, 598 F.3d 50, 65 (2d Cir. 2010) ......................................6, 8

*Cash v. City of Erie*, 654 F.3d 324, 336 (2d Cir. 2011) ....................................................20

*Castilla v. City of New York*, 2011 WL 4345934 (S.D.N.Y. Aug. 22, 2011)...................21

*Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015) ....................................................18

*Collins v. City of New York*, 923 F.Supp.2d 462, 479 (E.D.N.Y. 2013) ..............19, 22, 23

*Connick v. Thompson*, 563 U.S. 51 (2011)........................................................................18

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007).......................................................................3

*Fiacco v. City of Rensselaer*, 783 F.2d 319, 330-32 (2d Cir. 1986)................................23

*Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir. 1988) .....................................................4

*Frost v. New York City Police Dep't*, 980 F.3d 231, 249 (2d Cir. 2020) .......................10

*Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir.1991)............................20, 23, 25

*Gondola v. City of New York*, 2020 WL 1433874 (E.D.N.Y. Mar. 24, 2020) ...................5

*Greene v. City of New York*, 2017 WL 1030707, at *30 (E.D.N.Y. Mar. 15, 2017)...16, 24

*Herrera-Amador v. New York City Police Dep't*, 2021 WL 3012583, at *4 (E.D.N.Y. July 16, 2021) ..................................................................................................5

*Hincapie v. City of New York*, 434 F. Supp. 3d 61, 72 (S.D.N.Y. 2020) ...................5, 6, 7

*Isaac v. City of New York*, 2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018) ........................20

*Jeanty v. City of Utica*, 2021 WL 149051 (N.D.N.Y. Jan. 14, 2021) ...............................7

*Jovanovic v. City of New York*, 2010 WL 8500283 (S.D.N.Y. Sept. 28, 2010).................6

*Khandhar v. Elfenbein*, 943 F.2d 244, 249 (2d Cir. 1991)...............................................25

*Kogut v. Cty. of Nassau*, 2009 WL 5033937 (E.D.N.Y. Dec. 11, 2009).........................25

*Laskar v. Hurd*, 972 F.3d 1278, 1292 (7th Cir. 2020).......................................................4

*Llerando–Phipps v. City of New York*, 390 F.Supp.2d 372, 382–83 (S.D.N.Y.2005) ........8

*Lopez v. City of New York*, 105 F. Supp. 3d 242, 247 (E.D.N.Y. 2015) ..........................10

*Maldonado v. City of N.Y.*, 2014 WL 787814 (S.D.N.Y. Feb. 26, 2014) ..........................8

*Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) ...............................9

*McCray v. City of New York*, 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007)........15

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).......................18

*Newson v. City of New York*, 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019) ..................14

*Owens v. Treder*, 873 F.2d 604, 607 (2d Cir.1989)........................................................24

*Pal v. Cipolla*, 2020 WL 6881455, (D. Conn. Nov. 23, 2020) .........................................5

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)................................................15

*Pipitone v. City of New York*, 57 F.Supp.3d 173, 189-91 (E.D.N.Y. 2014).....................20

*Quiller v. Nunez*, 2020 WL 4475267 (S.D.N.Y. Aug. 3, 2020) ........................................5

*Rehberg v. Paulk*, 566 U.S. 356, 396, n.1 (2012)...........................................................17

*Reynolds v. Giuliani*, 506 F.2d 183, 192 (2d Cir. 2007) ................................................18

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ..................................12

*Rosario v. City of New York*, 2019 WL 4450685 (S.D.N.Y. Sept. 16, 2019) ...5, 12, 13, 24

*Russo v. City of Bridgeport,* 479 F. 3d. 196, 205 (2d Cir. 2007) ................................14, 15

*Shaw v. City of New York*, 1997 WL 187352 (S.D.N.Y. Apr. 15, 1997) .........................21

*Taylor v. City of New York*, 2021 WL 848966 (E.D.N.Y. Mar. 4, 2021).................14, 15

*Thompson v. Clark*, 794 Fed. Appx. 140 (2d Cir. 2020), *cert. granted* 141 S. Ct. 1682
   (Mar. 11, 2021) (No. 20-659) ...............................................................................4

*Vann v. City of New York*, 72 F.3d 1040, 1050-51 (2d Cir. 1995) ..................................23

*Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008) .......................................16

*Vineyard v. County of Murray, Georgia,* 990 F.2d 1207, 1212 (11th Cir. 1993) ............23

*Virgil v. City of New York*, 2019 WL 4736982 (E.D.N.Y. Sept. 27, 2019) .......................5

*Walden v. City of Chicago*, 391 F.Supp.2d 660 (N.D. Ill. 2005) .....................................16

*Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ............................11, 12, 18

*Walsh v. City of New York*, 742 F. App'x 557 (2d Cir. 2018) ...........................................8

*Walsh v. Lunsford*, 2017 WL 2895943 (S.D.N.Y. July 7, 2017) ......................................8

*White–Ruiz v. City of New York*, 1996 WL 603983 (S.D.N.Y. Oct. 22, 1996)................20

*Williams v. City of New York*, 690 F.Supp.2d 338, 346 (S.D.N.Y. 2010)........................21

*Wilson v. City of New York*, 161 A.D.3d 1212, 1214, 1216 (2d Dept. 2018)...................24

*Yanez v. City of New York*, 29 F.supp.2d 100 (E.D.N.Y. 1998)........................................21

## Statutes

42 U.S.C § 1983 ...............................................................................................17, 20, 25

42 U.S.C. § 1981 ....................................................................................................1, 19

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 3, 5

Fed. R. Civ. P. 8(a)(2) .................................................................................................3

Fed. R. Civ. P. 8(d)(2) ....................................................................................27

N.Y. Crim. Pro. Law § 440(1)(g) ...............................................................1, 5

N.Y. Crim. Pro. Law § 440(1)(h) ....................................................................2

**Constitutional Provisions**

U.S. Const. amend. IV ................................................................................4, 10

U.S. Const. amend. V ................................................................................4, 10

U.S. Const. amend. VI ...................................................................................10

U.S. Const. amend. VIII .................................................................................10

U.S. Const. amend. XIV .............................................................................4, 10

**Other Authorities**

Corey Kilgannon, *City to Pay $3.5 Million to Wrongfully Imprisoned Queens Man*,

    *available at* https://www.nytimes.com/2008/10/18/nyregion/18settle.html.................23

Report of the Commission to Investigate Allegations of Police Corruption and the Anti-

    Corruption Procedures of the Police Department, *available at*

    https://web.archive.org/web/20110721230958/http://www.parc.info/client_files/Specia

    l%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf (last visited

    Sept. 24, 2021) .........................................................................................19, 20, 21, 22

## PRELIMINARY STATEMENT

On May 2, 1990, a Queens jury wrongfully convicted Felipe Rodriguez of murdering Maureen Fernandez. He was sentenced later that month to a term of twenty-five-years-to-life. At trial, the People's star witness, Javier Ramos, testified that Mr. Rodriguez borrowed his car on the night of the murder, returned with the car covered in blood, and admitted to stabbing a woman. None of this was true: Ramos had been threatened and coerced into implicating Mr. Rodriguez by Defendants, New York City and Long Island Railroad detectives bent on closing the case, whatever the cost.

Almost 27 years later, Mr. Rodriguez was freed by a grant of executive clemency based largely on his actual innocence. For the next two years, the Queens County District Attorney's Office ("QDAO") and Mr. Rodriguez's lawyers reinvestigated the murder. Javier Ramos recanted his trial testimony and explained that detectives coerced him into falsely implicating Mr. Rodriguez.[1] During the reinvestigation, the QDAO identified previously undisclosed documents that would have critically impeached Ramos, two detectives who testified against Mr. Rodriguez, Defendants Beisel and Sullivan, and "the entire investigation." The case against Mr. Rodriguez had been built on lies.

On December 30, 2019, the QDAO joined Mr. Rodriguez's motion to vacate his sentence and dismiss the indictment. ECF 40-1, 40-2. Justice Joseph Zayas of Queens Supreme Court presided over a hearing that day and granted the motion on two grounds: first, the discovery of evidence "of such character as to create a probability . . . [that the trial] verdict would have been more favorable to the defendant," under N.Y. Crim. Pro. Law § 440(1)(g), and second, that the

---

[1] On February 25, 2021, Ramos repeated his recantation under oath in a proceeding brought by Mr. Rodriguez in the New York Court of Claims. FAC ¶ 343.

1

conviction was obtained in violation of the United States and New York Constitutions under N.Y. Crim. Pro. Law § 440(1)(h). ECF No. 40-1, p. 2.

ADA Robert Masters spoke on behalf of the QDAO at Mr. Rodriguez's exoneration hearing. Although he did not explicitly acknowledge Mr. Rodriguez's innocence on the record, Masters conceded that "critical material, information *reflecting on the guilt of the defendant* existed . . . [that] was never provided to the defendant," evidence that was "very favorable" to Mr. Rodriguez, that "would have impeached Mr. Ramos . . . impeached [Det. Sullivan] . . . [and] impeached the entire investigation [.]" ECF No. 40-2, p. 4, 19.[2] Masters stated that the QDAO was moving to dismiss the indictment "in light of the critical witness Javier Ramos's recantation" and that he "could not in good faith attempt to convict the defendant again[.]" ECF No. 40-2, p. 5. Masters referred to "DD-5s[3] not[ing] the enlisting of Lifecodes in an attempt at DNA testing on the car seat covers which yielded nothing." ECF No. 40-2, p. 17. "It should be noted," added Masters, "the defendant ha[s] always maintained his innocence" and "declined to appear before the Parole Board . . . because he could not admit remorse for a crime he claimed he had no involvement in." ECF No. 40-2, p. 7.

Justice Zayas concluded that the withheld evidence identified by the district attorney "likely would have affected the jury's verdict" and that "consequential, monumental" mistakes took place at trial, resulting in a "miscarriage of justice that took way too long to discover." ECF No. 40-2, p. 23. In his order vacating the judgment of conviction and dismissing the indictment, Justice Zayas adopted "the reasons outlined in the parties' submissions and further detailed on the

---

[2] Masters also stated that the newly discovered evidence would have "provided a significant avenue to attack the thoroughness of the investigation and competence of the police work," "lent support for the defense theory of another perpetrator," and that "the most critical portions of the investigation, indeed were the most sparingly documented."  ECF No. 40-2, p. 4, 17, 19.

[3] A DD-5 is a criminal complaint follow-up report, completed by police to document an investigation.

record," and provided that, "[h]aving conducted a multi-year reinvestigation of the matter, [the People] agree with the crux of defendant's claims and consent to the relief he requests . . . [and the People are] no longer able to prosecute this matter, and, consequently, the indictment should be dismissed." ECF No. 40-1, p. 2.

Against this backdrop, Mr. Rodriguez sued the agencies and police who framed him. Defendants City of New York, Beisel, Fennel, Califano, Wilde, and Zaroogian (collectively "City Defendants" or the "City") now move to dismiss all causes of action in Plaintiff's Amended Complaint ("the Complaint"), ECF No. 33. Because the Complaint amply makes out each cause of action alleged, the City Defendants' motion should be DENIED.[4]

## ARGUMENT

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary" as long as the complaint puts the defendant on notice of the claim and the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). To survive a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," a complaint need not provide detailed factual allegations, but must merely be plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As *Twombly* provides, "asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the allegations. *Id.* at 556. Furthermore, "the factual allegations in the

---

[4] The remaining defendants, represented by counsel for the MTA and LIRR, move separately to dismiss some causes of action against them. We address their motion in a separate brief.

complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir. 1988).

**I. The Complaint adequately pleads state and federal malicious prosecution.**

Counts I and II make out claims for malicious prosecution under state and federal law by plausibly alleging that Plaintiff's prosecution terminated in his favor and that each individual City Defendant maliciously initiated and continued the prosecution, absent probable cause, in violation of New York common law and the Fourth, Fifth and Fourteenth Amendments. FAC ¶¶ 368-78. The City argues that the allegations in the Complaint are insufficient for two reasons: first, that the prosecution did not end in a manner indicative of innocence as required under *Lanning v. City of Glen Falls*, 908 F.3d 19 (2d Cir. 2018),[5] ECF No. 41: City Defendants' Motion to Dismiss at 3-7 (hereinafter "Mem."), and second, that the individual defendants did not "initiate" the prosecution. Mem. at 9-11. The City is wrong on both counts.

**A. Criminal proceedings terminated in a manner indicating Plaintiff's innocence.**

Plaintiff satisfies the termination-indicative-of-innocence standard and, respectfully, the issue is not close. "At the 12(b)(6) stage, a plaintiff need only plausibly allege that 'the criminal proceedings against him were terminated in a manner *indicating* his innocence.'" *Buari v. City of New York*, No. 18-cv-12299 (MKV) 2021 WL 1198371, at *14 (S.D.N.Y. Mar. 30, 2021) (citations omitted) (emphasis in original). "No single type of disposition is necessary or sufficient, but the termination must be measured in objective terms by examining the totality of the circumstances."

---

[5] Plaintiff respectfully submits that *Lanning* was wrongly decided and that wrongful prosecution claims brought under 42 U.S.C. § 1983 do not require favorable termination indicative of innocence. *See Laskar v. Hurd*, 972 F.3d 1278, 1292 (7th Cir. 2020) (plaintiff need show only "that the criminal proceedings … formally end in a manner not inconsistent with his innocence."). The Supreme Court is expected to resolve this issue in *Thompson v. Clark*, 794 Fed. Appx. 140 (2d Cir. 2020), *cert. granted* 141 S. Ct. 1682 (Mar. 11, 2021) (No. 20-659). We write solely to preserve the issue, but the Court need not reach it because the record plainly establishes a termination indicating that Mr. Rodriguez is innocent.

4

*Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2019 WL 4450685, at \*4 (S.D.N.Y. Sept. 16, 2019) (citations omitted). The totality of the circumstances includes "significant weaknesses in the original case" as alleged in a complaint. *Id.* [6]

In this case, the order vacating Plaintiff's conviction under N.Y. C.P.L. § 440(1)(g), on the ground of newly discovered evidence of *innocence* likely to result in a more favorable verdict, unambiguously indicates innocence. *See Buari*, 2021 WL 1198371, at \*13 (holding *Lanning* satisfied by § 440(1)(g) finding; *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 72 (S.D.N.Y. 2020) (same).

Moreover, the QDAO *conceded* it could not prove Plaintiff's guilt beyond a reasonable doubt after the conviction was vacated, which courts have held satisfies *Lanning. Virgil v. City of New York*, No. 17-cv-5100 (PKC) (SMG), 2019 WL 4736982, at \*7 (E.D.N.Y. Sept. 27, 2019). *See also Pal v. Cipolla*, No. 3:18-cv-616 (MPS), 2020 WL 6881455, at \*17 (D. Conn. Nov. 23, 2020); *Buari*, 2021 WL 1198371, at \*13; *Quiller v. Nunez*, No. 16 CIV. 3202 (ER), 2020 WL 4475267, at \*10 (S.D.N.Y. Aug. 3, 2020); *Hincapie*, 434 F. Supp. 3d at 72; *Rosario*, 2019 WL 4450685, at \*4. In contrast is *Lanning* itself, where the plaintiff introduced no evidence to show the reason for dismissal, 908 F.3d at 19, 28, and *Gondola v. City of New York*, No. 16-cv-369 (AMD) (SJB), 2020 WL 1433874, at \*5-6 (E.D.N.Y. Mar. 24, 2020) (same).

In addition, the Complaint alleges "significant weaknesses in the original case." *See, e.g.*, *Rosario*, 2019 WL 4450685, at \*4. Key witness Javier Ramos recanted his testimony and explained that detectives coerced him into falsely implicating Plaintiff. FAC ¶¶ 341-43. No physical evidence

---

[6] Were there unresolved questions of fact as to favorable termination (there are not), Plaintiff would still be entitled to discovery. *See, e.g.*, *Herrera-Amador v. New York City Police Dep't*, No. 16-cv-5915(NGG)(VMS), 2021 WL 3012583, at \*4, n.3 (E.D.N.Y. July 16, 2021) ("[W]here questions remain as to the reason for the termination, this becomes an issue of fact for the jury.").

ever tied Plaintiff to the crime. *Id.* ¶ 45. Plaintiff did not match the description of the person last seen with the victim at a Queens bar hours before the murder. *Id.* ¶ 256. Of three witnesses from the bar who viewed Plaintiff in a lineup, only one—Robert Thompson, admittedly drunk and high when he saw the victim at the bar sixteen months earlier—claimed to recognize Plaintiff, and only after seeing Plaintiff in handcuffs just prior to the lineup.[7] *Id.* ¶¶ 232, 240-41. Finally, compelling circumstantial evidence pointed to alternative suspects whom detectives failed to pursue. *Id.* ¶¶ 83-113. These allegations all indicate innocence. *See, e.g.*, *Hincapie*, 434 F. Supp. 3d. at 61, 73 (complaint sufficiently alleged favorable termination in light of the "the lack of physical evidence, the problematic nature of the lineup identification of [plaintiff], and [plaintiff's] alleged coerced confession.").

Despite this clear record and dispositive caselaw, the City argues that ADA Robert Masters, while admitting that "discovery violations" likely influenced the jury's guilty verdict, did not acknowledge on the record that his office wrongfully imprisoned an innocent man for almost 27 years. Defendants emphasize that Masters professed not to believe Ramos's recantation, but the unwillingness of this executive to conclude that his colleagues had imprisoned an innocent man for so many years is not relevant. *See, e.g.*, *Hincapie*, 434 F. Supp.3d at 73 (quoting *Jovanovic v. City of New York*, No. 04-cv-8437 (PAC), 2010 WL 8500283, at *6 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 486 F. App'x 149 (2d Cir. 2012)) ("subjective beliefs of the members of the [DA's] office . . . are of no consequence in determining whether [Hincapie] received a favorable termination . . ."). *Cf. Cameron v. City of New York*, 598 F.3d 50, 65 (2d Cir. 2010) ("prosecutors' opinions as to probable cause and complaining officers' credibility are irrelevant …").

---

[7] Robert Thompson had also been paid by detectives for his "assistance" and "cooperation," further eroding his credibility. FAC ¶ 255. Those payments were not disclosed to Plaintiff's trial attorney. *Id.* ¶ 310-11.

Defendants argue that Justice Zayas "did not rule on whether plaintiff was guilty or innocent," such that "[the] issue was left unanswered." Mem. at 5. But the issue of actual innocence was not before Justice Zayas and, in any event, "[t]he test for a favorable termination does not require that actual innocence be established." *Hincapie*, 434 F. Supp.3d at 73. Indeed, a plaintiff may satisfy favorable termination under *Lanning* even where the state court affirmatively ruled that he or she failed under § 440.10 to prove actual innocence. *Buari*, 2021 WL 1198371, at *14.

The decision upon which the City principally relies, *Jeanty v. City of Utica*, in fact *supports* a finding of favorable termination in Plaintiff's case. *See* Mem. at 4, 6 (citing *Jeanty v. City of Utica*, 16-cv-00966 (BKS) 2021 WL 149051 (N.D.N.Y. Jan. 14, 2021)). The court in *Jeanty* dismissed a malicious prosecution claim on summary judgment because the record indicated that the plaintiff "could have been convicted on a re-trial" and because plaintiff's conviction was dismissed "in the interest of justice" rather than on the merits. *Id.* at *29-30. The court explicitly distinguished that record from cases where "a state court had 'determined on the merits that [plaintiff] had met his burden of establishing ... that the [newly discovered evidence] would have produced a more favorable verdict at trial,' and the prosecution chose not to retry him 'because it did not believe it could prove the case.'" *Id.* at *30 (citing *Hincapie*, 464 F.Supp.3d at 71-73). Of course, this is *exactly* Plaintiff's case. Moreover, unlike in *Jeanty*, the judge who vacated Plaintiff's conviction did not "explicitly disavow[]" Plaintiff's innocence, *id.*, but acknowledged the "miscarriage of justice" Plaintiff suffered. ECF No. 40-2 at 23.

Because Plaintiff satisfies *Lanning*'s favorable termination requirement, he also satisfies New York's less demanding requirement that termination not be "inconsistent with [] innocence [.]" *See, e.g.*, *Hincapie*, 434 F.Supp.3d at 74, n. 7.

### B.  City Defendants initiated and continued criminal proceedings against Plaintiff.

The City Defendants argue they are not liable for malicious prosecution because they did

not "initiate or continue" criminal proceedings against Plaintiff despite the Complaint's specific allegations that they furnished the evidence, much of it false, upon which the prosecution was based, and withheld evidence that would have negated probable cause. Mem. at 9-10. Once again, they are wrong.

An officer initiates or continues a prosecution when he or she "plays an active role in the prosecution, such as [by] giving advice and encouragement," *Buari*, 2021 WL 1198371, at *11, by signing a criminal complaint knowing that it contains false information, *Llerando–Phipps v. City of New York*, 390 F.Supp.2d 372, 382–83 (S.D.N.Y.2005), or by "create[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors," *Cameron v. City of New York*, 598 F.3d 50, 64 (2d Cir. 2010). Where, as here, an officer fabricates evidence, "there is no requirement that an officer have direct contact with the prosecutor." *Maldonado v. City of N.Y.*, 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014) (citations omitted); *Walsh v. Lunsford*, No. 14-cv-7108 (AKH), 2017 WL 2895943, at *6 (S.D.N.Y. July 7, 2017), *aff'd sub nom. Walsh v. City of New York*, 742 F. App'x 557 (2d Cir. 2018). *See also Cameron*, 598 F.3d at 63–64 ("[T]he chain of causation [in a malicious prosecution suit] need not be considered broken if [a defendant government agent] ... could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty."). An officer also meets the initiation element by failing to disclose "evidence that would negate probable cause." *Newsom v. City of New York*, No.-cv-6773, 2019 WL 3997466, at *9 (E.D.N.Y. Aug. 23, 2019). More than one officer may initiate prosecution, such as when officers act in concert to withhold or fabricate evidence. *See, e.g.*, Walsh, 742 F. App'x at 562.

Plaintiff adequately alleges that each of the individual defendants initiated or continued Plaintiff's prosecution. In September 1988, Beisel, Califano and Wilde drove Ramos by Cypress

Hills Cemetery in Brooklyn, where they threatened to kill Ramos if he did not either admit to the crime or implicate Plaintiff, FAC ¶¶ 138-141; Califano created a false DD-5 about that "interview" in which he stated that Ramos said Plaintiff "may have information about [the] homicide" and that Plaintiff "borrowed [Ramos's] car on the night of the murder." FAC ¶¶ 143-44. In March 1989, Beisel, Zaroogian and Fennel coerced Javier Ramos into signing a false statement implicating Plaintiff in the murder of Maureen Fernandez, then provided that false information to prosecutors. *Id.* ¶¶ 197-208. Later the same day, Beisel and Zaroogian conducted an intentionally suggestive lineup, inducing witness Robert Thompson to falsely identify Plaintiff as the person Thompson saw with the victim at the bar hours before the murder, then provided that manufactured evidence to the prosecution as a basis for arrest. FAC ¶¶ 230-242. After interrogating Plaintiff, Beisel drafted a DD-5 falsely stating that Plaintiff "made no statements."[8] *Cf. Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (upholding judgment in favor of plaintiff where "[defendant's] DD5 on his interrogation of [plaintiff] stated that when he asked [plaintiff] 'if anyone he knows has any problems with' [the victim], '[plaintiff] would not answer.'"). Defendant Beisel signed the felony complaint against Plaintiff despite knowing that no probable cause existed. FAC ¶¶ 243, 269. Further, the City Defendants possessed exculpatory and impeachment evidence that would have negated probable cause, including that they coerced Ramos's statement. *See infra* Point III. Thus, all the individual defendants were personally involved in manufacturing false evidence, or holding back exculpatory information, knowing their conduct would be relied upon by the prosecution, and it was, to initiate and continue the prosecution. Accordingly, the malicious prosecution claims are adequately pleaded against all of the City Defendants.

---

[8] A memo by MTA Defendant Thomas Sullivan regarding the same interrogation—a memo that the QDAO conceded was never disclosed to Plaintiff's trial counsel—admitted that Plaintiff "gave several negative exculpatory statements[.]" FAC ¶¶ 226-27.

**II. The Complaint adequately alleges that the City Defendants violated Plaintiff's constitutional rights by fabricating evidence against him.**

Count III alleges that the City Defendants created false evidence that was used to deprive Mr. Rodriguez of his liberty in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

The City challenges Plaintiff's fabrication-of-evidence claims by insisting that they did not "transmit[] any allegedly false information to prosecutors." Mem. at 10. This argument fails for the same reasons that the City's malicious prosecution argument fails: the Complaint provides specific, plausible allegations demonstrating that each of the City Defendants, individually and in concert with one another and the individual MTA Defendants, fabricated key evidence against Plaintiff and caused that false evidence to be used by prosecutors to detain and prosecute him. *See, e.g.*, *Breton v. City of New York*, 404 F. Supp. 3d 799, 815 (S.D.N.Y. 2019) (rejecting the argument that "there are no individualized allegations against all plaintiffs" where the complaint alleged that "each [defendant] participated in the fabrication of evidence and the creation of police reports that omitted exculpatory evidence . . . [and] that these defendants forwarded the misleading evidence to prosecutors, who then relied on the reports to bring criminal charges."); *Lopez v. City of New York*, 105 F. Supp. 3d 242, 247 (E.D.N.Y. 2015) ("Courts recognize [fabrication of evidence claims] as arising from the coercion by officials of false non-party witness statements."). *See also* Point I.B, *supra*.

Here, the Complaint alleges that Defendants' fabrications critically influenced the decision to indict and prosecute Mr. Rodriguez. FAC ¶¶ 245-71, 374-76, 380-81, 386-87. *See, e.g.*, *Frost v. New York City Police Dep't*, 980 F.3d 231, 249 (2d Cir. 2020). Moreover, prosecutors elicited the same false information from Ramos and Thompson at the grand jury and trial, corrupting both

processes. FAC ¶¶ 260-67, 283-295. Accordingly, the fabrication claims are well pleaded, and the City's motion should be denied.

### III. City Defendants violated *Brady* because they withheld exculpatory evidence they generated and that was generated by LIRR detectives.

The volume of *Brady* material withheld in this case is staggering: both the City Defendants and LIRR detectives gathered numerous statements from trial witnesses Javier Ramos, Robert Thompson and Joseph Castillo that would have impeached their testimony, as well as from William Perry, who saw a different person with the victim in the bar hours before the murder. *See* FAC ¶¶ 165-174, 305-328. Each of the defendant police officers, including the City Defendants, were obligated to disclose such exculpatory and impeachment evidence to prosecutors to turn over to the defense. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992). But the material—indicative of Plaintiff's innocence and impeaching the witnesses against him—was never turned over to the defense, denying him a fair trial. Either the individual detectives withheld it from prosecutors or prosecutors failed to turn it over to the defense. The Complaint plausibly alleges both alternative theories, and the issue will need to be resolved by a jury. Fed. R. Civ. P. 8(d)(2)-(3). Either way, the Complaint plausibly alleges *Brady* violations denying Plaintiff a fair trial.

Ignoring inconvenient portions of the Complaint, the City argues that all the *Brady* violations arose from evidence collected by LIRR detectives, MTA Defendants Sullivan and Wendel, FAC ¶¶ 306-328, for which the City disclaims liability. But not only does the Complaint identify other exculpatory material generated and withheld by the individual City Defendants, *see id.* ¶¶ 165-174, 305, 326-328, the City Defendants *are* liable for withholding the evidence collected by Sullivan and Wendel to the extent the City Defendants actually or constructively possessed it, which the Complaint alleges they did. FAC ¶ 467. Note that the City does not, and cannot, argue that the material identified in the Complaint is not, in fact, exculpatory.

11

Officers are civilly liable for violating their *Brady* obligations where they fail to disclose such material to prosecutors, who in turn have the obligation to disclose it to the defense. *Walker*, 974 F.2d at 299. More specifically, officers are liable for eliciting false statements under coercive circumstances and "failing to report and inaccurately describing these circumstances in their reports[,]" where such information "could have impeached a critical [] witness at trial." *Rosario*, 2019 WL 4450685, at *5. An officer also may be liable for failing to disclose *Brady* material shared with him by another officer. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (officers possessing common information have co-equal obligations to disclose it to prosecutors).

The City suggests that Plaintiff's claim is solely that they failed to disclose *Brady* material that was originally in the possession of the LIRR defendants, but this is misleading. The *Brady* material for which the City disclaims liability, FAC ¶¶ 306-328, is only a portion of the exculpatory and impeachment evidence withheld from Plaintiff's trial counsel.[9] Plaintiff separately alleges that in September 1988, City Defendants Califano, Wilde and Beisel coerced Javier Ramos into stating that Plaintiff "borrowed [Ramos's] car on the night of the murder," and Califano prepared a DD-5 incorporating that statement but omitting that it was made under threats of violence. *Id.* ¶¶ 143-45, 386. Ramos also told Califano, Wilde, Fennel, Beisel, and Zaroogian that his car's roof was painted red at the time of the murder (and thus it did not match the all-white vehicle seen driving away from the crime scene), yet none of the defendants informed prosecutors of this critical information. *Id.* ¶¶ 134-35, 386. Also in September 1989, Defendants Beisel and Zaroogian interviewed Plaintiff's wife, Gladys Rodriguez, and Beisel created a false DD-5 omitting critical

---

[9] *See* FAC ¶ 387 ("The *Brady* material that was wrongfully withheld . . . includes, *but is not limited to*, the material described in paragraphs 306 through 328.") (emphasis added).

exculpatory information: that Plaintiff was at home with his wife on the night of the murder, never wrote the word "LOVE" on his hands (diverging from Robert Thompson's description of the man seen with the victim hours before the murder), and always wore glasses and had a mustache, unlike the suspected perpetrator. *Id.* ¶¶ 175-182, 386. On March 27, 1989, City Defendants Beisel, Fennel, and Zaroogian coerced Javier Ramos into signing a fabricated statement implicating Plaintiff in the murder and forwarded the statement to prosecutors. *Id.* ¶¶ 197-208, 386. Beisel created a DD-5 falsely stating that Ramos named Plaintiff as the person who borrowed Ramos's car on the night of the murder, with no mention of the coercive tactics used to elicit the statement. *Id.* ¶ 209, 386. At trial, Ramos, still under pressure from the detectives, repeated the same narrative under oath to a jury, FAC ¶¶ 284-287, yet defense counsel was unaware of the coercive tactics used to elicit the statement and was thus unable to impeach the testimony on those grounds. *See, e.g.*, *Rosario*, 2019 WL 4450685, at *5 (denying judgment on pleadings where defendants failed to disclose suggestive techniques used to induce a false identification, depriving plaintiff's trial attorney of a key avenue of impeachment).

Second, with respect to the withheld evidence collected by Defendants Sullivan and Wendel of the LIRR PD, FAC ¶¶ 306-328, the Complaint permits an inference that such information was in the possession of the individual City Defendants who withheld it from prosecutors. The LIRR PD and NYPD conducted a joint investigation, worked closely together for more than year leading up to Plaintiff's unlawful arrest, and acted in concert to withhold the *Brady* material described in the Complaint. *Id.* ¶¶ 114, 129, 148, 165, 197, 386, 481. That the information was initially gathered by LIRR PD detectives did not absolve the City Defendants of their responsibility to disclose it once it was in their possession. *See, e.g.*, *Ricciuti*, 124 F.3d at 131. Accordingly, the City's motion to dismiss the *Brady* fair trial claims should be denied.

**IV. Plaintiff's pretrial detention was excessive because the Defendants hid exculpatory information, including the fact that they fabricated Javier Ramos's accusations.**

Just as the detectives' mishandling of evidence deprived Plaintiff of a fair trial, it deprived him of the right to be free from excessive pretrial detention from his arrest on March 27, 1989, until his release on bail on or about May 19, 1989. FAC ¶¶ 210, 271. Under *Russo v. City of Bridgeport*, a plaintiff must show: "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." 479 F.3d 196, 205 (2d Cir. 2007) (citation and internal quotations omitted).

The City argues that Plaintiff does not "plausibly allege any conclusive or affirmative evidence establishing plaintiff's innocence that was mishandled by any individual defendant such that it 'shocks the conscience[.]'" Mem. at 21. But the Second Circuit does not require such a showing; rather, to plead excessive pretrial detention, a plaintiff must allege that "the volume of impeachment and exculpatory evidence plaintiff alleges that [detectives] withheld 'shocks the conscience' because it may have resulted in plaintiff's earlier release on bail prior to trial." *Taylor v. City of New York*, No. 18-cv-5500 (KAM)(ST), 2021 WL 848966, at *7 (E.D.N.Y. Mar. 4, 2021) (citing *Newson v. City of New York*, 16-cv-6773 (ILG) (JO), 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019)) (cleaned up).

The Complaint describes a raft of fabricated evidence and *Brady* violations that, if revealed to prosecutors, likely would have led to Plaintiff's release. A reasonable jury could find that the withholding of such powerful evidence, which so obviously had the potential to affect Plaintiff's status as a pretrial detainee, shocks the conscience. In addition to eliciting false statements from Ramos and Thompson, the defendants knew Ramos's car was not the one seen leaving the crime scene and that Plaintiff—unlike the driver of the car or the person last seen with the victim—wore

14

glasses and a thick mustache. FAC ¶¶ 66, 77, 167, 326. *See Taylor*, 2021 WL 848966, at \*7 (plaintiff satisfied *Russo* by alleging that detectives "withheld evidence that the prosecution's only two witnesses identified the shooter as a clean-shaven individual who did not wear glasses, while plaintiff had a beard and wore glasses."). Had this information been available to the trial court, Plaintiff would not have been detained and the QDAO may have abandoned the prosecution, which it did almost thirty years later.

### V. The Complaint adequately alleges that the Defendants conspired to violate Plaintiff's constitutional rights by framing him for murder.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . . (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "[C]onspiracies are by their very nature secretive operations and may have to be proven by circumstantial, rather than direct, evidence." *Id.* (internal citations and quotations omitted).

Drawing all reasonable inferences in Plaintiff's favor, the Complaint amply demonstrates that each individual defendant agreed, explicitly or tacitly, to act in concert to initiate and continue criminal proceedings against Plaintiff and violate his fair trial rights. They worked together to falsify police reports and other accounts of their investigative activities and withhold exculpatory information from prosecutors. FAC ¶¶ 395-98. The pleading standard for a § 1983 conspiracy requires nothing more. *See, e.g., McCray v. City of New York*, No. 03-cv-10080 (DAB), 2007 WL 4352748, at \*23 (S.D.N.Y. Dec. 11, 2007).

### VI. Beisel's repeated use of racial epithets and disparate treatment of white suspects despite the description of the bar companion are sufficient to support an equal protection claim.

Count VII alleges that Defendant Beisel used racial slurs, explicitly stated that he intended to prosecute a Hispanic person, and treated non-Hispanic suspects differently from Plaintiff and

Richard Pereira, who were both falsely arrested based on statements coerced from Javier Ramos. Such conduct makes out a claim for a denial of equal protection of the law under the 14th Amendment.

"To state a race-based claim under the equal protection clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of race." *Greene v. City of New York*, No. 08-cv-00243(AMD) (CLP), 2017 WL 1030707, at *30 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018) (citations and quotations omitted). The plaintiff must have been "treated differently from other similarly situated [individuals.]" *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008). "[W]hether [individuals] are similarly situated is a factual issue that should be submitted to the jury." *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008). A detective's use of racial epithets, while generally insufficient *on its own* to make out an intentional discrimination claim, can be "strong circumstantial evidence of discriminatory animus." *Walden v. City of Chicago*, 391 F.Supp.2d 660 (N.D. Ill. 2005).

Here, the Complaint reveals that Beisel was intent on blaming a Hispanic person for the murder despite strong indications that the person at the bar with the victim, assumed to be the killer, was not Hispanic. FAC ¶¶ 110, 401-410. In fact, detectives identified Edward Denning, a Caucasian suspect who fit the description of the man last seen with the victim, had a violent temper and abused women, frequented bars, and was absent from work on the days before and after the murder—yet, Beisel abandoned this lead without explanation. FAC ¶¶ 405-09. Moreover, the Complaint alleges not merely that Defendant Beisel used the word "spic" on multiple occasions when interviewing Hispanic suspects, but that he told Plaintiff that "one of you spics is going down for this." *Id.* ¶ 222. Together, these facts make out a claim for selective enforcement based on Plaintiff's ethnicity.

16

### VII.   Defendant Beisel is personally liable for discrimination under 42 U.S.C. § 1981.

Beisel is also statutorily liable under 42 U.S.C. § 1981, which ensures that all people, regardless of race, enjoy the "full and equal benefit of all laws[.]" 42 U.S.C. § 1981. Claims under § 1981 may be brought against public actors, including police officers. *E.g.*, *Anderson v. City of New York*, 817 F. Supp. 2d 77, (E.D.N.Y. 2011). A plaintiff must show (1) membership in a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities. *Id.* at 95.

Plaintiff satisfies the first and third elements because he is Hispanic and was deprived of fundamental constitutional rights. To show discriminatory intent, a plaintiff may "rely on the cumulative weight of circumstantial evidence, [for] a defendant is unlikely to leave a smoking gun." *Id.* at 95. Here, Beisel left a smoking gun: "one of you spics is going down for this," FAC ¶ 222. Using the word "spic" on other occasions and declining to investigate white suspects adds circumstantial evidence of discriminatory intent. *See* Point VI, *supra*.

### VIII.   Testimonial immunity does not shield Defendant Beisel from liability because the claims are based on his illegal out-of-court conduct.

Defendant Beisel's assertion of testimonial immunity is a red herring, as the Complaint does not predicate Beisel's liability on grand jury or trial testimony *per se*. The City cites *Rehberg v. Paulk*, 566 U.S. 356 (2012), which extended absolute immunity to defendants' grand jury testimony; but *Rehberg* also held that such immunity does *not* insulate an officer's misconduct outside the courtroom. *Id.* at 370, n.1 As the Second Circuit explained, "[w]hen a police officer claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony. If the claim exists independently of the grand jury testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*." *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir.

17

2015). Plaintiff has alleged all the elements of his § 1983 claims without resorting to Beisel's in-court testimony.

### IX. The Complaint plausibly alleges that the NYPD caused Plaintiff's injuries by maintaining a policy of deliberate indifference toward detectives' evidence fabrication, witness coercion, and withholding *Brady* material.

Municipalities are liable under § 1983 when a municipal policy or custom causes constitutional injuries. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Under *Monell*, the City of New York may be liable for failing to adequately train, supervise, or discipline police officers where such unreasonable failure amounts to deliberate indifference to the rights of those with whom police come into contact. *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992). Courts may infer deliberate indifference where it is obvious, in light of the duties of police officers, that without intervention police will violate constitutional rights. *Id.* at 298-300.[10] Where there is a history of specific types of misconduct—including evidence fabrication, witness coercion, false testimony, and suppression of *Brady* material—the failure to train, supervise or discipline in these areas compels a finding of deliberate indifference. *Buari*, 2021 WL 1198371 at *23, 25 (citing *Reynolds v. Giuliani*, 506 F.2d 183, 192 (2d Cir. 2007)).

At the time Plaintiff was prosecuted, the NYPD engaged in widespread evidence fabrication, perjury, witness coercion, and evidence suppression—the same methods that the defendants used to maliciously prosecute Plaintiff and deprive him of a fair trial. FAC ¶¶ 443-69. Rather than intervene, policymakers condoned and even encouraged such misconduct by failing

---

[10] In describing the standard, the City incorrectly cites *Connick v. Thompson*, 563 U.S. 51 (2011) for the proposition that Plaintiff must show a history of *Brady* violations that put NYPD policymakers on notice of the need to train. Mem. at 21. But *Connick* concerned a claim of failure to train *prosecutors*, who are presumed to know their *Brady* obligations from law school. *Connick*, 563 U.S. at 64. *Connick* did not disturb *Walker*'s holding that a municipality can be liable for failing to train police officers to disclose *Brady* material and not to commit perjury, even absent prior violations, as the need for such training is obvious. *Walker*, 974 F.2d at 298-300. Further, *Connick* concerned the sufficiency of evidence at trial and said nothing about pleading requirements.

to train, supervise or discipline officers engaging in it and by pressuring officers to "close" cases at the expense of individuals' constitutional rights. *Id*. ¶¶ 440, 465-69.

Plaintiff plausibly alleges deliberate indifference because the need to train, supervise and discipline officers was obvious given that "basic aspects of a police officer's job" include interviewing witnesses, disclosing exculpatory and impeachment evidence, and documenting an investigation. *Buari*, 2021 WL 1198371, at *25. Further, the Complaint incorporates the Mollen Commission's findings that, throughout the 1980s and 1990s, NYPD policymakers sanctioned witness coercion, falsification of documents (including police reports), police perjury, and manufacturing probable cause. FAC ¶¶ 443-61.[11] The report cast blame on the NYPD's "top commanders" for failing to hold supervisors accountable for the misconduct of their subordinates and for permitting the "widespread breakdown in supervision which fueled and protected [] corruption[.]" *Id.* ¶¶ 450, 459. Officers, emboldened by their supervisors' indifference, engaged "in their own brand of vigilante justice." *Id.* ¶ 452.

Courts, relying on the Mollen Report's findings as evidence of deliberate indifference, have denied motions to dismiss claims that the NYPD failed to train officers not to engage in the types of misconduct that caused Plaintiff's constitutional injuries. *See, e.g.*, *Collins v. City of New York*, 923 F.Supp.2d 462, 479 (E.D.N.Y. 2013) (witness coercion and *Brady* violations "endemic" to the NYPD); *Buari*, 2021 WL 1198371, at *21-26 (Mollen Report showed a *de facto* policy of engaging in fabrication, coercion, and withholding evidence *and* policymakers' deliberate indifference to such conduct); *White–Ruiz v. City of New York*, No. 93–cv–7233, 1996 WL 603983, at *8–10

---

[11] Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, (hereinafter the "Mollen Report"), *available at* https://web.archive.org/web/20110721230958/http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf (last visited Sept. 24, 2021).

(S.D.N.Y. Oct. 22, 1996) (Dolinger, M.J.) (Mollen Report provided evidence of municipal policy of NYPD code of silence). *See also Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir.1991) (report describing police practice of tolerating misbehavior was evidence of municipal policy for *Monell* purposes). Here, in addition to the Mollen Report, the Complaint cites several contemporary examples where officers coerced false statements and confessions that were used to prosecute innocent people, just as the individual defendants coerced Javier Ramos into falsely implicating Plaintiff. FAC ¶¶ 462, 464. *See Cash v. Cty. of Erie*, 654 F.3d 324, 336 (2d Cir. 2011) ("highly publicized incidents" provide notice of need for additional training or supervision).

The City argues the Mollen Report was published five years after Plaintiff's arrest. Mem. at 17.[12] However, the Mollen Report addressed longstanding patterns of police misconduct and drew mainly from events of the 1980s, when Plaintiff was investigated and prosecuted; the misconduct giving rise to Plaintiff's claims epitomizes the systemic corruption of that era. *See Pipitone v. City of New York*, 57 F.Supp.3d 173, 189-91 (E.D.N.Y. 2014) (Dearie, D.J.); (finding that the Mollen Report established policymakers' deliberate indifference during the mid-1980s); *Ariza v. City of New York*, No. 93–cv-5287, 1996 WL 118535, at *2, 5-6 (E.D.N.Y. Mar. 7, 1996) (Sifton, D.J.) (the Mollen Report supported finding of failure to train relating to misconduct between 1988 and 1992).[13] "For at least the last decade," the Report reads, "the system designed to protect the [Police] Department from corruption minimized the likelihood of uncovering it."

---

[12] Although the murder took place in November 1987, Plaintiff was arrested in 1989 and convicted in 1990. FAC ¶¶ 329, 401. The Mollen Report was published on July 7, 1994. The Mollen Commission was appointed by an executive order issued by Mayor David Dinkins on July 24 1992. *See* Mollen Report.

[13] *Compare with Breton v. City of New York*, 404 F. Supp. 3d 799, 817 ("the plaintiff was arrested twenty-two years after the issuance of [the report]"); *Isaac v. City of New York*, No. 16-CV-4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, No. 16-cv-4729 (KAM)(RLM), 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018) (finding the Mollen Report "unavailing" for claims arising from misconduct in 2008).

Mollen Report at 3.

The City argues the Mollen Report is not "sufficiently connected" to allegations in the Complaint. Mem. at 18 (citing *Yanez v. City of New York*, 29 F.supp.2d 100 (E.D.N.Y. 1998) and *Shaw v. City of New York*, No. 95-cv-9325 (AJP), 1997 WL 187352 (S.D.N.Y. Apr. 15, 1997)). But those cases are inapplicable. *Yanez* disposed of a negligent-hiring *Monell* claim at summary judgment where, after discovery, it was clear that the plaintiff's allegations, unlike here, bore no resemblance to the misconduct described in the Mollen Report. 29 F.Supp.2d at 112. *Shaw* considered the *admissibility* of the Mollen Report at a trial that, unlike here, did not involve *Monell* claims. 1997 WL 187352, at *8.

Defendants also argue that Plaintiff has not identified a "specific deficiency in any NYPD training program," Mem. at 20, but the Second Circuit does not require such a showing at the pleading stage—and does not require it at all for claiming failure to *discipline* (as opposed to train). *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004) ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage[.]"). Even after *Iqbal* and *Twombly*, most courts have not required plaintiffs to identify a "specific deficiency" for *Monell* claims based upon a municipality's failure to train, supervise, or discipline employees. *Castilla v. City of New York*, 2011 WL 4345934, at *4 (S.D.N.Y. Aug. 22, 2011) (Stein, D.J.); *Williams v. City of New York*, 690 F.Supp.2d 338, 346 (S.D.N.Y. 2010) (Chin, D.J.). In any event, Plaintiff does plausibly allege a "specific deficiency": that policymakers failed to train officers not to falsify police reports, testify falsely, coerce witness statements, and withhold *Brady* material. *See, e.g.*, *Buari*, 2021 WL 1198371, at *25 (citing *Felix v. City of New York*, 344 F. Supp. 3d 644, 661 (S.D.N.Y. 2018)).

The City's remaining arguments are equally unavailing. Mem. at 21. The Mollen Report is

21

sufficient to allege a "pattern of similar constitutional violations by untrained employees" and to allege that the City ignored "similar incidents." And, again, the Complaint would survive even without incorporating the Mollen Report because the need for training, supervision and discipline was obvious. Finally, Plaintiff has alleged a direct causal link between policymakers' deliberate indifference and his constitutional injuries. FAC ¶ 469.

**X.  The Complaint plausibly alleges that QDAO caused Plaintiff's injuries by being deliberately indifferent to prosecutors' compliance with *Brady* requirements.**

The City of New York is also liable under *Monell* for failing to train, supervise or discipline Queens prosecutors for withholding *Brady* material where a history of such misconduct put policymakers on notice of the need for such training, supervision and discipline. *See Bellamy v. City of New York,* 914 F.3d 727, 756-61 (2d Cir. 2019) (reversing dismissal of claim); *Collins*, 923 F.2d at 477 (upholding claim). Here, as in *Collins*, the rationale for municipal liability is that "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Collins*, 923 F.2d at 476 (citing *Amnesty Am.*, 361 F.3d at 126).

The Complaint alleges a complete failure of QDAO to train prosecutors on *Brady* compliance and alleges that QDAO failed to supervise or discipline prosecutors who withheld exculpatory and impeachment material. FAC ¶¶ 492-520. Indeed, QDAO incentivized prosecutors *not* to satisfy their *Brady* obligations, rewarding them with raises and promotions rather than intervening to rectify or prevent misconduct. *Id.* ¶¶ 497, 500. The QDAO's indifference is further shown by its lack of any policy or handbook concerning what material to disclose under *Brady* or when to disclose it. *Id*. ¶ 503. And QDAO had no published procedure for disciplining prosecutors

22

who violated ethical standards for criminal prosecutions. *Id.* ¶ 501.[14] Meanwhile, QDAO implemented procedures for affirmatively discouraging disclosures. *Id.* ¶ 507-14.

Plaintiff cites appellate cases leading up to and following his prosecution where Queens convictions were overturned because of *Brady* violations. *Id.* ¶¶ 515-16. These cases show that prosecutors violated *Brady* with impunity.[15] *See Collins*, 923 F.Supp.2d at 477 ("policymaker's response to constitutional violations can support an inference that the violation conformed to a preexisting policy."). They also show that policymakers knew that training and discipline were necessary but declined to act, creating a lawless culture that encouraged prosecutors to secure convictions at the expense of defendants' constitutional rights. *Id.* ¶¶ 501-506.[16] Policymakers' deliberate indifference to *Brady* compliance inevitably deprived defendants—including Plaintiff— of basic constitutional safeguards, and in Plaintiff's case led to his wrongful conviction and incarceration for almost 27 years. *Id.* ¶ 517-21.

Faced with QDAO's history of tolerating misconduct, the City instead argues that no underlying *Brady* violation occurred in Plaintiff's case. But Plaintiff describes a stunning amount

---

[14] *See Vann v. City of New York*, 72 F.3d 1040, 1050-51 (2d Cir. 1995) (liability may be based upon inadequate supervisory procedures for problem police officers); *Vineyard v. County of Murray, Georgia,* 990 F.2d 1207, 1212 (11th Cir. 1993) (basing liability on "inadequate procedures for recording and following up complaints . . . [and] no policies and procedures manual"); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 330-32 (2d Cir. 1986) (basing liability on a history of "uninterested and superficial response to complaints").

[15] The Complaint also cites the case of Shih-Wei Su to demonstrate the plausibility of the *Monell* claim. Su won a $3.5 million settlement arising from a *Monell* claim that QDAO systematically withheld *Brady* material around the time of Plaintiff's trial. FAC ¶¶ 510-13. *See* Corey Kilgannon, *City to Pay $3.5 Million to Wrongfully Imprisoned Queens Man*, *available at* https://www.nytimes.com/2008/10/18/nyregion/18settle.html.

[16] *See Gentile* 926 F.2d at 153 ("[A] causal connection between the City's policy of inaction and the arrests and assault might permissibly be implied" from "conduct" "such as inadequate training and supervision or prior instances of [prosecutorial misconduct].").

of *Brady* material withheld from Plaintiff's trial counsel, which the City does not address.[17] Because Plaintiff cannot, without discovery, determine which evidence detectives disclosed to prosecutors—or whether prosecutors met their constitutional obligation to obtain all such evidence from detectives[18]—these pleadings were made in the alternative: either the individual NYPD and MTA Defendants failed to disclose the evidence to prosecutors, or prosecutors failed to obtain the evidence and disclose it to defense counsel. FAC ¶¶ 467, 483, 490. *See* Fed. R. Civ. P. 8(d)(2).

The City does address *one* of Plaintiff's *Brady* claims: ADA Alan Safran's failure to disclose the Nagra tape recording to Plaintiff's trial counsel.[19] The City argues that the claim is procedurally barred because, in 1993, a state court denied Plaintiff's C.P.L. § 440 motion by finding that Safran disclosed the tape to Plaintiff's trial counsel. However, under New York law, which controls, *Owens v. Treder*, 873 F.2d 604, 607 (2d Cir.1989), that decision lost any preclusive effect when the Queens County Supreme Court vacated Plaintiff's conviction. *See, e.g.*, *Rosario*, 2019 WL 4450685, at *6 (citing *Wilson v. City of New York*, 161 A.D.3d 1212, 1214, 1216 (2d Dept. 2018)) ("Regarding collateral estoppel, evidentiary rulings in a later invalidated criminal proceeding do not have preclusive effect under New York law.").

Without citing any caselaw, the City argues that collateral estoppel applies notwithstanding vacatur of Plaintiff's conviction because the prior state court ruling at issue occurred post-conviction. That is not the law. *See Kogut v. Cty. of Nassau*, No. 06-cv-6695 (JS) (WDW), 2009

---

[17] The *Brady* violations alleged by Plaintiff relate not only to the Nagra tape and the information described in ¶¶ 306-328 of the Complaint, but those alleged elsewhere in the Complaint and described in Part III *supra*.

[18] *Strickler v. Greene*, 527 U.S. 263, 281(1999) (citations and quotations omitted) ("In order to comply with *Brady* . . . the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.").

[19] The Nagra tape would have critically impeached star witness Javier Ramos, who can be heard admitting that he did not lend Plaintiff his car on the night of the murder and that he was being pressured and coerced by detectives to implicate Plaintiff. FAC ¶¶ 165-74.

WL 5033937, at *10 (E.D.N.Y. Dec. 11, 2009) (citing *Boston Firefighters Union v. Boston Police Patrolmen's Ass'n*, 468 U.S. 1206, 1211 (1984)) (holding that under New York law an Appellate Division's ruling on the voluntariness of a plaintiff's confession had no preclusive effect in litigation after vacatur). Further, collateral estoppel does not apply because Plaintiff did not have a "fair opportunity to litigate the point," given the litany of exculpatory and impeachment evidence that surfaced decades after the order. *See Khandhar v. Elfenbein*, 943 F.2d 244, 249 (2d Cir. 1991).

The City suggests that Plaintiff does not plausibly allege that QDAO's policies and practices were the "moving force" behind the *Brady* violations in Plaintiff's criminal case. But the Complaint, while not using the words "moving force," clearly alleges that the QDAO's policy of deliberate indifference caused those *Brady* violations. FAC ¶¶ 518-19. Based on QDAO's administrative failures surrounding *Brady* compliance and the amount of critical exculpatory and impeachment material withheld from Plaintiff's trial counsel, "a jury could reasonably infer that the individual conduct in this case was causally connected to the policy[.]" *Gentile*, 926 F.2d at 152.

## CONCLUSION

The City Defendants' motion to dismiss should be DENIED in full.

Respectfully submitted,

| | |
|---|---|
| /s/ | /s/ |
| ZMO LAW PLLC | LAW OFFICES OF JOEL B. RUDIN, P.C. |
| Zachary Margulis-Ohnuma | Joel B. Rudin |
| Benjamin Notterman | 152 West 57th Street, 8th Floor |
| 260 Madison Avenue, 17th Fl. | New York, NY 10019 |
| New York, NY 10016 | (212) 752-7600 |
| (212) 685-0999 | |

Dated:   New York, New York
          October 5, 2021

*Attorneys for Plaintiff Felipe Rodriguez*