UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FELIPE RODRIGUEZ,

Plaintiff,

- against -                                    21-cv-01649 (AMD) (RLM)

CITY OF NEW YORK, et. al.,

Defendants.


**MEMORANDUM OF LAW OPPOSING MTA
DEFENDANTS' MOTION TO DISMISS UNDER
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**


ZMO Law PLLC
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999
zmo@zmolaw.com

Law Offices of Joel B. Rudin, P.C.
152 West 57th Street, 8th Fl.
New York, NY 10019
(212) 752-7600
jbrudin@rudinlaw.com

*ATTORNEYS FOR PLAINTIFF FELIPE RODRIGUEZ*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 4

    I.    Plaintiff plausibly alleges malicious prosecution against the MTA Defendants. .... 4

        A.    Defendants Sullivan and Wendel initiated criminal proceedings against Plaintiff. ........................................................................................................ 5

        B.    The criminal proceedings against Plaintiff terminated in a manner indicating his innocence ................................................................................................. 11

        C.    There was no probable cause to initiate or continue Plaintiff's prosecution. . 14

        D.    Defendants Wendel and Sullivan acted with malice ...................................... 15

        E.    The Complaint adequately pleads *respondeat superior* claims against the LIRR and MTA ............................................................................................. 15

    II.    Plaintiff plausibly alleges excessive pretrial detention. ......................................... 18

    III.    The Complaint adequately alleges that the Defendants conspired to violate Plaintiff's constitutional rights by framing him for murder ................................... 19

    IV.    The MTA/LIRR policy of deliberate indifference caused Plaintiff's wrongful conviction ............................................................................................................. 20

CONCLUSION .................................................................................................................... 23

## **TABLE OF AUTHORITIES**

**Cases**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) .................................... 21

*Anderson v. Long Island R.R.*, 450 N.E.2d 213, 214 (1983) ........................................................ 16

*Ariza v. City of New York*, 1996 WL 118535 (E.D.N.Y. Mar. 7, 1996) ......................................... 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) .................................................................. 4

*Blue v. City of New York*, 2018 WL 2561023 (S.D.N.Y. June 4, 2018) ......................................... 20

*Buari v. City of New York*, 2021 WL 1198371, at \*14 (S.D.N.Y. Mar. 30, 2021) ............... passim

*Byrd v. Metro. Transit Auth.*, 2015 WL 4546718 (E.D.N.Y. July 28, 2015) ............................... 20

*Cash v. Cty. of Erie*, 654 F.3d 324, 336 (2d Cir. 2011) ................................................................ 23

*Collins v. City of New York*, 923 F.Supp.2d 462, 479 (E.D.N.Y. 2013) ....................................... 22

*Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ............................................................ 15

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ................................................................................. 4

*Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir. 1988) .................................................................. 4

*Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir.1991) ....................................................... 22

*Gondola v. City of New York*, 2020 WL 1433874, at \*5-6 (E.D.N.Y. Mar. 24, 2020) ............... 12

*Herrera-Amador v. New York City Police Dep't*, 2021 WL 3012583 (E.D.N.Y. July 16, 2021). 11

*Hincapie v. City of New York*, 434 F. Supp. 3d 61, 72 (S.D.N.Y. 2020).................... 11, 12, 13, 14

*Jeanty v. City of Utica*, 2021 WL 149051 (N.D.N.Y. Jan. 14, 2021) ........................................... 13

*Jones v. Rivera*, 2015 WL 8362766 (S.D.N.Y. Dec. 7, 2015)........................................................ 8

*Jovanovic v. City of New York*, No. 04-cv-8437 (PAC), 2010 WL 8500283, at \*6 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 486 F. App'x 149 (2d Cir. 2012)...................................................................... 13

*King v. City of New York*, 2013 WL 2285197  (E.D.N.Y. May 23, 2013) ................................... 19

King v. City of New York, 2014 WL 4954621 (E.D.N.Y. Sept. 30, 2014) ................................... 19

*Lanning v. City of Glen Falls*, 908 F.3d 19 (2d Cir. 2018).......................................... 5, 11, 13, 14

i

*Laskar v. Hurd*, 972 F.3d 1278, 1292 (7th Cir. 2020) .................................................... 5

*Lindo v. Brett*, 149 A.D.3d 459, 463–64 (2d Dept. 2017) ............................................... 17

*Llerando–Phipps v. City of New York*, 390 F.Supp.2d 372, 382–83 (S.D.N.Y.2005) .................. 5

*Maldonado v. City of N.Y.*, 2014 WL 787814 (S.D.N.Y. Feb. 26, 2014) ...................................... 6

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ............................ 4, 5, 14, 15

*McCray v. City of New York*, 2007 WL 4352748 (S.D.N.Y. Dec. 11, 2007) ............................... 20

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ........................ 20, 22, 23

*Newson v. City of New York*, 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019) .................... 6, 18, 19

*Noonan v. Long Island R.R.*, 158 A.D.2d 392, 393 (1st Dep't 1990) ........................................... 17

*Pal v. Cipolla*, 2020 WL 6881455 (D. Conn. Nov. 23, 2020) ...................................................... 12

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ............................................................. 19

*Pappalardo v. Long Island R. Co.*, 11 Misc. 3d 744, 750, (King Ct. Sup. Ct. 2006), *aff'd*, 36 A.D.3d 878, (2007) ................................................................................................................ 16, 17

*Pipitone v. City of New York*, 57 F.Supp.3d 173, 191 (E.D.N.Y. 2014) ........................................ 22

*Quintero v. Long Island R. R.*, 55 Misc.2d 813, 820 (Kings Sup. Ct. 1968), *aff'd*, 31 A.D.2d 844 (1969) ...................................................................................................................................... 16

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ....................................... 10, 14

*Robinson v. Fischer*, 2014 WL 1289611 (N.D.N.Y. 2014) ............................................................. 4

*Rosario v. City of New York*, 2019 WL 4450685 (S.D.N.Y. Sept. 16, 2019) ......................... 11, 12

*Russo v. City of Bridgeport,* 479 F.3d 196, 207 (2d Cir. 2007) ............................................... 18, 19

*Shaw v. Long Island R.R. Co.*, 2018 WL 748674 (E.D.N.Y. Feb. 7, 2018) ................................. 16

*Taylor v. City of New York*, 2021 WL 848966 (E.D.N.Y. Mar. 4, 2021) .............................. 18, 19

*Thompson v. Clark*, 794 Fed. Appx. 140 (2d Cir. 2020) ....................................................... passim

*Vineyard v. Cty. of Murray, Ga.*, 990 F.2d 1207, 1212 (11th Cir. 1993) ..................................... 21

*Virgil v. City of New York*, 2019 WL 4736982 (E.D.N.Y. Sept. 27, 2019) ................................... 12

*Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) .......................................................... 21

*Walsh v. City of New York*, 742 F. App'x 557 (2d Cir. 2018) ........................................................ 6

*Walsh v. Lunsford*, 2017 WL 2895943 (S.D.N.Y. July 7, 2017) .................................................. 6

*White–Ruiz v. City of New York*, 1996 WL 603983 (S.D.N.Y. Oct. 22, 1996) ........................... 22

**Statutes**

42 U.S.C. § 1983 ...................................................................................................................... 5, 21, 22

Fed. R. Civ. P. (d)(3) ...................................................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ..................................................................................................... 4, 11, 23

Fed. R. Civ. P. 8(d)(2) .................................................................................................................... 10

Fed. R. Civ. Rule 8(a)(2) ................................................................................................................. 4

N.Y. Crim. Pro. Law § 440(1)(g) ............................................................................................ 2, 11

N.Y. Crim. Pro. Law § 440(1)(h) ................................................................................................... 2

N.Y. Pub. Auth. Law § 1266 ......................................................................................................... 16

N.Y. Pub. Auth. Law § 1276 .............................................................................................. 16, 17, 18

**Constitutional Provisions**

U.S. Const. amend. IV .............................................................................................................. 5, 19

**Other Authorities**

Report of the Commission to Investigate Allegations of Police Corruption and the Anti-
    Corruption Procedures of the Police Department, *available at*
    https://web.archive.org/web/20110721230958/http://www.parc.info/client_files/Special%20R
    eports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf (last visited Sept. 24, 2021) 21

## PRELIMINARY STATEMENT

On May 2, 1990, a Queens jury wrongfully convicted Felipe Rodriguez of murdering Maureen Fernandez. He was sentenced later that month to a term of twenty-five-years-to-life. At trial, the People's star witness, Javier Ramos, testified that Mr. Rodriguez borrowed his car on the night of the murder, returned with the car covered in blood, and admitted to stabbing a woman. None of this was true: Ramos had been threatened and coerced into implicating Mr. Rodriguez by the Defendants, who were Long Island Railroad and New York City detectives bent on closing the case, whatever the cost.

Almost 27 years later, Mr. Rodriguez was freed after a grant of executive clemency based largely on his actual innocence. For the next two years, the Queens County District Attorney's Office ("QDAO") and Mr. Rodriguez's lawyers reinvestigated the murder. Javier Ramos recanted his trial testimony and explained that detectives coerced him into falsely implicating Mr. Rodriguez.[1] During the reinvestigation, the QDAO identified previously undisclosed notes and memoranda by MTA Defendants Thomas Sullivan and Charles Wendel that would have critically impeached the trial testimony given by Ramos, Sullivan, and City Defendant Det. John Beisel, and impeached "the entire investigation." ECF No. 40-2: Exoneration Hearing Minutes at 19 (ADA Robert Masters's statement to court). The case against Mr. Rodriguez had been built on lies.

On December 30, 2019, the QDAO joined Mr. Rodriguez's motion to vacate his sentence and dismiss the indictment. ECF 40-2. Justice Joseph Zayas of Queens Supreme Court presided over a hearing that day and granted the motion on two grounds: first, evidence "of such character as to create a probability . . . [that the trial] verdict would have been more favorable to the

---

[1] On February 25, 2021, Ramos repeated his recantation under oath in a proceeding brought by Mr. Rodriguez in the New York Court of Claims. ECF No. 33: First Amended Complaint ¶ 343 (hereinafter "FAC").

defendant" had been newly discovered, under N.Y. Crim. Pro. Law § 440(1)(g), and second, that the conviction was obtained in violation of the United States and New York Constitutions under N.Y. Crim. Pro. Law § 440(1)(h). ECF No. 40-1: Decision & Order of the Court at 2.

ADA Robert Masters spoke on behalf of the QDAO at Mr. Rodriguez's exoneration hearing. Although he did not acknowledge Mr. Rodriguez's innocence on the record, Masters conceded that "critical material, information *reflecting on the guilt of the defendant* existed . . . [that] was never provided to the defendant," evidence that was "very favorable" to Mr. Rodriguez, that "would have impeached Mr. Ramos . . . impeached [Det. Sullivan] . . . [and] impeached the entire investigation [.]" ECF No. 40-2 at 4, 19.[2] Masters stated that the QDAO was moving to dismiss the indictment "in light of the critical witness Javier Ramos's recantation" and that QDAO "could not in good faith attempt to convict the defendant again[.]" ECF No. 40-2 at 5. Masters referred to police reports "not[ing] the enlisting of Lifecodes in an attempt at DNA testing on the car seat covers which yielded nothing." ECF No. 40-2 at 17. "It should be noted," added Masters, "the defendant ha[s] always maintained his innocence" and "declined to appear before the Parole Board . . . because he could not admit remorse for a crime he claimed he had no involvement in." ECF No. 40-2 at 7.

Justice Zayas concluded that the withheld evidence identified by the district attorney "likely would have affected the jury's verdict" and that "consequential, monumental" mistakes took place at trial, resulting in a "miscarriage of justice that took way too long to discover." ECF No. 40-2 at 23. In his order vacating the judgment of conviction and dismissing the indictment,

---

[2] Masters also stated that the newly discovered evidence would have "provided a significant avenue to attack the thoroughness of the investigation and competence of the police work," "lent support for the defense theory of another perpetrator," and that "the most critical portions of the investigation, indeed were the most sparingly documented."  ECF No. 40-2 at 4, 17, 19.

Justice Zayas adopted "the reasons outlined in the parties' submissions and further detailed on the record," and provided that, "[h]aving conducted a multi-year reinvestigation of the matter, [the People] agree with the crux of defendant's claims and consent to the relief he requests . . . [and the People are] no longer able to prosecute this matter, and, consequently, the indictment should be dismissed." ECF No. 40-1 at 2.

Mr. Rodriguez filed this lawsuit against the agencies and police who framed him. The MTA Defendants now move to dismiss five of the seven claims against them.[3] Their argument is as simple as it is misguided: blame the NYPD, it was their investigation. But the MTA ignores the facts pleaded in the Complaint—that the LIRR PD and NYPD *jointly* investigated the Fernandez homicide, and Sullivan and Wendel were involved in every stage of the investigation, from the discovery of the body in November 1987 to Mr. Rodriguez's wrongful arrest in March 1989. As detectives for a public agency investigating a homicide, Sullivan and Wendel were bound by the constitutional rules that govern all law enforcement officers. Instead of upholding their oath to uphold the Constitution, they maliciously prosecuted Plaintiff (Counts I and II), subjected him to excessive pretrial detention (Count V), and conspired with the individual City Defendants to violate his constitutional rights (Count VI), all while the MTA and LIRR maintained a policy of deliberate indifference by sanctioning such misconduct (Count X).

Because the Amended Complaint (hereinafter the "Complaint" or "FAC") amply makes out each cause of action, the MTA Defendants' motion should be DENIED.[4]

---

[3] The MTA defendants did not move to dismiss Counts III and IV, which allege due process and fair trial violations against all individual defendants arising from evidence fabrication and *Brady* violations.

[4] The remaining defendants, represented by Corporation Counsel for the City of New York, separately moved to dismiss the causes of action against them. We address their motion in a separate brief.

## **ARGUMENT**

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary" as long as the complaint puts the defendant on notice of the claim and the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *accord Robinson v. Fischer*, 2014 WL 1289611, *3 n. 4 (N.D.N.Y. 2014). To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted," a complaint need not provide detailed factual allegations, but must merely be plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As stated by the Supreme Court in *Twombly*, "asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the allegations. *Id.* at 556. Furthermore, "the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir. 1988).

**I.  Plaintiff plausibly alleges malicious prosecution against the MTA Defendants.**

"To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). The elements for malicious prosecution under § 1983 are the same, except that under current Second Circuit law, a plaintiff must show that criminal proceedings were

terminated not just in his favor but also in a manner indicative of innocence. *Lanning v. City of Glen Falls*, 908 F.3d 19 (2d Cir. 2018).[5]

Counts I and II plausibly allege malicious prosecution against Wendell, Sullivan, and the individual City Defendants under state and federal law. The principal allegations against Wendel and Sullivan are that they acted in concert with the City Defendants to coerce Javier Ramos into falsely implicating Plaintiff and that they intentionally suppressed exculpatory and impeachment information that would have negated probable cause to prosecute Plaintiff. The MTA challenges Counts I and II as to all four elements of malicious prosecution. We address each below.

### A. Defendants Sullivan and Wendel initiated criminal proceedings against Plaintiff.

An officer initiates or continues a prosecution when he or she "plays an active role in the prosecution, such as [by] giving advice and encouragement," *Buari v. City of New York*, No. 18-cv-12299 (MKV) 2021 WL 1198371, at *11 (S.D.N.Y. Mar. 30, 2021), by signing a criminal complaint knowing that it contains false information, *Llerando–Phipps v. City of New York*, 390 F.Supp.2d 372, 382–83 (S.D.N.Y.2005), or by "create[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors," *Cameron v. City of New York*, 598 F.3d 50, 64 (2d Cir. 2010). Where, as here, an officer fabricates evidence, "there is no requirement that an officer have direct contact with the prosecutor." *Maldonado v. City of N.Y.*,

---

[5] Plaintiff respectfully submits that *Lanning* was wrongly decided and that wrongful prosecution claims brought under 42 U.S.C. § 1983 do not require favorable termination indicative of innocence. *See Laskar v. Hurd*, 972 F.3d 1278, 1292 (7th Cir. 2020) (plaintiff need show only "that the criminal proceedings … formally end in a manner not inconsistent with his innocence."). The Supreme Court is expected to resolve this issue in *Thompson v. Clark*, 794 Fed. Appx. 140 (2d Cir. 2020), *cert. granted* 141 S. Ct. 1682 (Mar. 11, 2021) (No. 20-659). Since a Fourth Amendment claim is made out by proof of the absence of probable cause and a causal relationship to a deprivation of liberty, we also believe that the common law element of malice is not required for the federal constitutional tort either. We write solely to preserve these issues, but the Court need not reach them because the record here plainly establishes a termination indicating that Mr. Rodriguez is innocent and because if, as we allege, there was a lack of probable cause, the element of malice is presumed. *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010).

2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014) (citations omitted); *Walsh v. Lunsford*, No. 14-cv-7108 (AKH), 2017 WL 2895943, at *6 (S.D.N.Y. July 7, 2017), *aff'd sub nom. Walsh v. City of New York*, 742 F. App'x 557 (2d Cir. 2018). *See also Cameron*, 598 F.3d at 63–64 ("[T]he chain of causation [in a malicious prosecution suit] need not be considered broken if [a defendant government agent] ... could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty."). An officer also meets the initiation element by failing to disclose "evidence that would negate probable cause." *Newson v. City of New York*, No.-cv-6773, 2019 WL 3997466, at *9 (E.D.N.Y. Aug. 23, 2019). More than one officer may initiate prosecution, such as when officers act in concert to withhold or fabricate evidence. *See, e.g.*, *Walsh*, 742 F. App'x at 562.

The Complaint alleges in detail how, on March 27, 1989, in the 104th Precinct in Queens, New York, Detectives Wendel and Sullivan, in concert with individual City Defendants, coerced Javier Ramos into falsely accusing Plaintiff of murder. FAC ¶¶ 196-209. When Ramos succumbed to their tactics, the detectives, together with the City Defendants, called ADA David Dikman to prepare Ramos's false affidavit stating that Plaintiff borrowed his car on the night of the murder and confessed to stabbing someone. *Id.* ¶¶ 202-208. Sullivan signed, as a witness, the affidavit based on the false statement he coerced. *Id.* ¶ 208. Locked into this story, Ramos repeated it at the grand jury and at trial. *Id.* ¶¶ 261, 285. The MTA detectives cannot credibly argue that prosecutors made an independent decision to prosecute Plaintiff, MTA Mem. at 14, when that decision was based upon a statement crucial to the decision to prosecute that MTA detectives had contributed to fabricating.

Separately, at the time they initiated Plaintiff's prosecution, Wendel and Sullivan possessed exculpatory and impeachment information that negated probable cause to prosecute Plaintiff, but failed to disclose it. That information, according to the Complaint, includes, but is not limited to:

- that Ramos's statement was the product of coercion, FAC ¶ 156;

- that at the time of the murder, Ramos's car was not working and was painted red, unlike the all-white car seen leaving the crime scene, *id.* ¶¶ 165-67, 326;

- Ramos's statement that he did *not* clean blood out of his car, which contradicted his coerced statement and subsequent testimony based upon that statement, *id.* ¶ 169;

- a notebook entry by Sullivan that would have critically impeached Ramos's false statement and testimony, *id.* ¶¶ 307-09;

- witness statements indicating that Plaintiff did not match the description of the person last seen with victim at a Queens bar, *id.* ¶¶ 312-20; and

- receipts showing that Sullivan and Wendel secretly paid money to Robert Thompson, the only person who identified Plaintiff at a lineup, to induce him to provide favorable information to the investigation, *id.* ¶¶ 310-25.

Thus, Wendel and Sullivan were personally involved in manufacturing false evidence and holding back exculpatory information, knowing their conduct would be relied upon by the prosecution, and it was, to initiate and continue the prosecution. Accordingly, the malicious prosecution claims are adequately pleaded against Wendel and Sullivan.

In support of its motion to dismiss the malicious prosecution claims, the MTA offers five DD-5 police reports which the MTA says, incorrectly, contain some of the evidence that Plaintiff alleges was suppressed. MTA Mem. at 13. The MTA does not (and cannot, at this stage of the proceedings) provide any evidence that these DD-5s were actually turned over to the defendant. Moreover, the Court should not, for purposes of this motion, consider these DD-5s, which the MTA cherry-picked from a vast investigative file. The Complaint does not explicitly reference these DD-5s, but alleges that detectives generated reports and documents that they failed to disclose to prosecutors (and thus to the defense) and that did not surface until decades later. FAC

¶ 305. *See Jones v. Rivera*, No. 13-cv-1042 (NSR), 2015 WL 8362766, at *3 (S.D.N.Y. Dec. 7, 2015) (declining to take notice of a police report that was not explicitly referenced in the complaint and not "derived from an unimpeachable source"). In effect, the MTA attempts to curate a record and convert its motion to dismiss into one for summary judgment; meanwhile, the parties have only just begun discovery and Plaintiff has not yet received the entire investigative file.

In any event, the DD-5s that the MTA offers in support of its motion do not, in fact, supply the exculpatory information that the MTA suggests, and indeed were not authored by either Sullivan or Wendel. Specifically:

- The MTA offers what appears to be **DD-5 #34** (Nov. 28, 1987), by Det. Pafitis, purportedly documenting a photo array where bartender Joseph Castillo made no identification with respect to the man Castillo saw with victim at a Queens bar shortly before the murder. ECF 43-2 at 4. In contrast, the Complaint alleges that in February 1988, Wendel and Sullivan conducted a separate photo array where Castillo positively identified a suspect named Eddie Ruiz as the man at the bar. FAC ¶¶ 252, 321-25. This information would have been especially useful to the defense because Ruiz drove a black car resembling one seen outside the bar on the night of the murder and Ruiz fit the physical description of the man with the victim. *Id.* Further, this identification would have impeached Castillo's false in-court identification of Plaintiff. But Wendel and Sullivan did not document the photo array and it was never disclosed to the defense. *Id.*

- The MTA offers what appears to be an **unnumbered DD-5 dated Sept. 29, 1988**, by Defendant Beisel, in which Joseph Castillo falsely identified Plaintiff in a photo array as the man with the victim on the night of the murder. ECF 43-2 at 9. *See* FAC ¶ 252.

This DD-5 merely underscores the significance of Castillo's prior positive identification of Eddie Ruiz, which Sullivan and Wendel suppressed, depriving Plaintiff of an opportunity to impeach Castillo's false in-court identification of Plaintiff.  FAC ¶¶ 252, 321-25.

- The MTA offers what appears to be **DD-5 #12**, by Det. Zinkiewicz. According to the DD-5, Castillo described the man with the victim as "white/Hispanic." ECF 43-2 at 2. In contrast, the Complaint alleges that Castillo told Sullivan and Wendel that the man with the victim was simply "white." FAC ¶¶ 317-20. Castillo's statement, as alleged in the Complaint, would have further impeached Castillo's false in-court identification of Plaintiff. But neither Wendel nor Sullivan created a DD-5 with this information and it was not provided to the defense. *Id*.

- The MTA offers what appears to be **DD-5 #99**, by Det. Pafitis, purportedly documenting a December 1987 interview with bar witness William Perry. ECF 43-2 at 5. One part of the report says Perry described the man with the victim as a "male white" whose "eyes were not dark," but the report then says "M/W or M/H," meaning "male white or male Hispanic." ECF 43-2, pp. 5-6. In contrast, the Complaint alleges that, in February 1988, Perry gave Sullivan and Wendel a more detailed description that was entirely inconsistent with Plaintiff's appearance: "hazel or green eyes" and "Italian or Irish, not Hispanic." FAC ¶¶ 68-70. Plaintiff has dark brown eyes and is Hispanic. *Id.* ¶ 313. Wendel and Sullivan never documented Perry's description in a DD-5 and so it was never disclosed to the defense. *Id.* ¶¶ 314-16. That another detective documented a less exculpatory description given on a different occasion doesn't undercut the importance of the description that Sullivan and Wendel failed to document or disclose.

Notably, the MTA does not address the detectives' suppression of a handwritten note containing information that would have impeached Javier Ramos—a note that contributed to the state court's decision to vacate Plaintiff's conviction.[6] FAC ¶¶ 307-09. Nor does the MTA address the fact that Sullivan and Thompson failed to disclose cash payments to witness Robert Thompson, the only person who identified Plaintiff at the in-person lineup on the day of Plaintiff's arrest. *Id.* ¶¶ 310-11. Finally, the MTA does not address the detectives' failure to disclose evidence that, at the time of the murder, Ramos's car was not working and was painted red, unlike the all-white car seen leaving the crime scene, *id.* ¶¶ 165-67, 326.

The MTA further suggests that Wendel and Sullivan had no *obligation* to provide information to prosecutors, because "the NYPD was the agency in charge of the investigation." MTA Mem. at 11. As a factual matter, that statement is misleading. Wendel and Sullivan were involved in every stage of the LIRR-NYPD joint investigation and Plaintiff's prosecution, up to and including trial. *See* FAC, *passim*. If the MTA's position is that Wendel and Sullivan provided all *Brady* material to the NYPD, the Complaint alleges otherwise. *See* FAC ¶ 483.[7] And, regardless, Wendel and Sullivan had an independent obligation, equal to that of the individual City Defendants, to disclose the information to prosecutors; sharing the information with fellow officers would not be enough. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (officers possessing common information have co-equal obligations to disclose it to prosecutors).

---

[6] At Plaintiff's exoneration hearing, Robert Masters of the QDAO stated that the evidence Wendel and Sullivan suppressed "would have impeached Mr. Ramos, would have impeached [Det. Sullivan] . . . [and] would have impeached the entire investigation." ECF No. 40-2 at 4, 19.

[7] The Complaint alleges in the alternative that the QDAO or NYPD suppressed the *Brady* material. FAC ¶¶ 305, 387, 467, 483, 490. Plaintiff is entitled to allege alternative theories and take discovery in order to show who suppressed the various pieces of *Brady* material. Fed. R. Civ. P. 8(d)(2), (d)(3).

Regardless of their affiliation, Wendel and Sullivan were obligated not to initiate or continue proceedings against Plaintiff absent probable cause. They violated that duty by withholding exculpatory and impeachment evidence from prosecutors and by fabricating evidence they knew would be used to prosecute Plaintiff.

### B. The criminal proceedings against Plaintiff terminated in a manner indicating his innocence.

Plaintiff satisfies the termination-indicative-of-innocence standard and, respectfully, the issue is not close. "At the 12(b)(6) stage, a plaintiff need only plausibly allege that the criminal proceedings against him were terminated in a manner *indicating* his innocence." *Buari*, 2021 WL 1198371, at *14 (citations omitted) (emphasis in original). "No single type of disposition is necessary or sufficient, but the termination must be measured in objective terms by examining the totality of the circumstances." *Rosario v. City of New York*, No. 18 CIV. 4023 (LGS), 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) (citations omitted). The totality of the circumstances includes "significant weaknesses in the original case" as alleged in a complaint. *Id.* [8]

In this case, the order vacating Plaintiff's conviction under N.Y. C.P.L. § 440(1)(g), on the ground of newly discovered evidence of *innocence* likely to result in a more favorable verdict, unambiguously indicates innocence. *See Buari*, 2021 WL 1198371, at *13) (holding *Lanning* satisfied by § 440(1)(g) finding); *Hincapie v. City of New York*, 434 F. Supp.3d 61, 72 (S.D.N.Y. 2020) (same).

Moreover, the QDAO *conceded* it could not prove Plaintiff's guilt beyond a reasonable doubt after the conviction was vacated, which courts have held satisfies *Lanning. Virgil v. City of*

---

[8] Were there unresolved questions of fact as to favorable termination (there are not), Plaintiff would still be entitled to discovery. *See, e.g.*, *Herrera-Amador v. New York City Police Dep't*, No. 16-cv-5915(NGG)(VMS), 2021 WL 3012583, at *4, n.3 (E.D.N.Y. July 16, 2021) ("[W]here questions remain as to the reason for the termination, this becomes an issue of fact for the jury.").

*New York*, No. 17-cv-5100 (PKC) (SMG), 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019). *See also Pal v. Cipolla*, No. 3:18-cv-616 (MPS), 2020 WL 6881455, at *17 (D. Conn. Nov. 23, 2020); *Buari*, 2021 WL 1198371, at *13; *Quiller v. Nunez*, No. 16 CIV. 3202 (ER), 2020 WL 4475267, at *10 (S.D.N.Y. Aug. 3, 2020); *Hincapie*, 434 F. Supp. 3d at 72; *Rosario*, 2019 WL 4450685, at *4. In contrast is *Lanning* itself, where the plaintiff introduced no evidence to show the reason for dismissal, 908 F.3d at 19, 28, and *Gondola v. City of New York*, No. 16-cv-369 (AMD) (SJB), 2020 WL 1433874, at *5-6 (E.D.N.Y. Mar. 24, 2020) (same).

In addition, the Complaint alleges "significant weaknesses in the original case." *See, e.g.*, *Rosario*, 2019 WL 4450685, at *4. Key witness Javier Ramos recanted his testimony and explained that detectives coerced him into falsely implicating Plaintiff. FAC ¶¶ 341-43. Plaintiff never met the victim and no physical evidence ever tied Plaintiff to the crime. *Id.* ¶ 45. Plaintiff did not match the description of the person last seen with the victim at a Queens bar hours before the murder. *Id.* ¶ 256. Of three witnesses from the bar who viewed Plaintiff in a lineup, only one—Robert Thompson, admittedly drunk and high when he saw the victim at the bar sixteen months earlier— claimed to recognize Plaintiff, and only after seeing Plaintiff in handcuffs just prior to the lineup.[9] *Id.* ¶¶ 232, 240-41. Finally, compelling circumstantial evidence pointed to alternative suspects whom detectives failed to pursue. *Id.* ¶¶ 83-113. These allegations all indicate innocence. *See, e.g.*, *Hincapie*, 434 F. Supp. 3d at 73 (finding that a complaint sufficiently alleged favorable termination in light of the "the lack of physical evidence, the problematic nature of the lineup identification of [plaintiff], and [plaintiff's] alleged coerced confession.").

---

[9] Robert Thompson had also been paid by Sullivan and Wendel for his "assistance" and "cooperation," further eroding his credibility. FAC ¶ 255. Those payments were not disclosed to Plaintiff's trial attorney. *Id.* ¶ 310.

Despite this clear record and dispositive caselaw, the MTA argues that the QDAO, while admitting that "discovery violations" likely influenced the jury's guilty verdict, did not acknowledge on the record that their office wrongfully imprisoned an innocent man for almost 27 years. Defendants allude to the fact that ADA Robert Masters professed not to believe Ramos's recantation, but the unwillingness of this executive to conclude that his colleagues had imprisoned an innocent man for so many years is not relevant. *See Hincapie*, 434 F. Supp.3d at 73 (quoting *Jovanovic v. City of New York*, No. 04-cv-8437 (PAC), 2010 WL 8500283, at *6 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 486 F. App'x 149 (2d Cir. 2012)) (subjective beliefs of the members of the [DA's] office . . . are of no consequence in determining whether [Hincapie] received a favorable termination . . ."). *Cf. Cameron v. City of New York*, 598 F.3d 50, 65 (2d Cir. 2010) ("prosecutors' opinions as to probable cause and complaining officers' credibility are irrelevant …").

 The MTA argues that Justice Zayas "did not decide whether Plaintiff is innocent." MTA Mem. at 15. But the issue of actual innocence was not before the court and, in any event, "the test for a favorable termination does not require that actual innocence be established." *Hincapie*, 434 F. Supp.3d at 73 (citations omitted).  Indeed, a plaintiff may satisfy favorable termination under *Lanning* even where the state court affirmatively ruled that he or she failed under § 440.10 to prove actual innocence. *Buari*, 2021 WL 1198371, at *14.

The decision upon which the MTA principally relies, *Jeanty v. City of Utica*, in fact *supports* a finding of favorable termination in Plaintiff's case. *See* MTA Mem. at 15 (citing *Jeanty v. City of Utica*, 16-cv-00966 (BKS) 2021 WL 149051 (N.D.N.Y. Jan. 14, 2021)). The court in *Jeanty* dismissed a malicious prosecution claim on summary judgment because the record indicated that the plaintiff "could have been convicted on a re-trial" and because plaintiff's conviction was dismissed "in the interest of justice" rather than on the merits. *Id.* at *29-30. The

13

court explicitly distinguished that record from cases like Plaintiff's, where "a state court had 'determined on the merits that [plaintiff] had met his burden of establishing ... that the [newly discovered evidence] would have produced a more favorable verdict at trial,' and the prosecution chose not to retry him 'because it did not believe it could prove the case.'" *Id.* at *30 (citing *Hincapie*, 464 F.Supp.3d at 71-73). Of course, this is *exactly* Plaintiff's case. Moreover, unlike in *Jeanty*, the judge who vacated Plaintiff's conviction did not "explicitly disavow[]" Plaintiff's innocence, *id.*, but rather acknowledged the "miscarriage of justice" Plaintiff suffered. ECF No. 40-2 at 23.

Because Plaintiff satisfies *Lanning*'s favorable termination requirement, he also satisfies New York's less demanding requirement that termination not be "inconsistent with [] innocence [.]" *See, e.g.*, *Hincapie*, 434 F.Supp.3d at 74, n. 7.

### C.  There was no probable cause to initiate or continue Plaintiff's prosecution.

Probable cause exists if there are "facts sufficient to warrant a prudent person to believe that the suspect had committed . . . an offense." *Ricciuti*, 124 F.3d at 128. An indictment creates a presumption of probable cause, but that presumption is rebutted "where there is some indication" that the indictment "was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010). Here, Plaintiff was arrested, indicted and prosecuted based on fraud, perjury, evidence fabrication, and the suppression of evidence by Sullivan and Wendel, acting in concert with the individual City Defendants. *See supra* I(A). Indeed, the MTA's motion does not even challenge Plaintiff's *Brady* or evidence fabrication claims, which are based upon the evidence Sullivan and Wendel suppressed and the falsified evidence that was presented to the grand jury. At no time did Sullivan and Wendel have probable cause to initiate or continue Plaintiff's prosecution. FAC ¶¶ 369, 374.

14

Nevertheless, the MTA argues that probable cause existed based on Ramos's affidavit implicating Plaintiff and Robert Thompson's "identification" of Plaintiff at a lineup. As already discussed, Wendel and Sullivan knew Ramos's affidavit resulted from police coercion and was false, FAC ¶¶ 206-08, and they knew that, on the night of the murder, Ramos's car was inoperable and had a red roof, unlike the car seen leaving the crime scene. FAC ¶¶ 134-35, 167.

Wendel and Sullivan also knew that Thompson's "identification" of Plaintiff was unreliable. First, Wendel and Sullivan had secretly paid Thompson for his "cooperation" and "assistance." *Id.* ¶ 310. Second, Thompson and the other bar witnesses had provided Sullivan and Wendel with descriptions of the bar suspect that did not resemble Plaintiff. *Id.* ¶¶ 66-77.

Because "circumstances raise doubt as to the [] veracity" of both Ramos and Thompson, their statements did not create probable cause to prosecute Plaintiff. *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

### D. Defendants Wendel and Sullivan acted with malice.

The Complaint plausibly alleges that, when fabricating evidence to inculpate Plaintiff and suppressing evidence that negated probable cause, Defendants Wendel and Sullivan acted with malice to initiate or continue criminal proceedings against Plaintiff. FAC ¶¶ 369, 374. Malice may be presumed based upon the absence of probable cause. *Manganiello*, 612 F.3d at 163. So too, malice may be inferred from the officers' conduct in fabricating incriminating evidence. *Id.* at 165.

### E. The Complaint adequately pleads *respondeat superior* claims against the LIRR and MTA.

Count I of the Complaint alleges that the LIRR and MTA are liable under *respondeat superior* for New York common law malicious prosecution for the actions of Defendants Wendel and Sullivan. The MTA argues that the claim against the LIRR should be dismissed because the Complaint does not allege that Plaintiff made a pre-suit demand under Public Authorities Law

15

("PAL") § 1276 against the LIRR, a wholly owned subsidiary of the MTA which is represented here by the same counsel and which is controlled by the MTA's board of directors. N.Y. Pub. Auth. Law § 1266 (McKinney). In fact, Plaintiff filed a pre-suit demand on the MTA itself in March 2020, which should also operate as a demand on the LIRR. FAC ¶¶ 13-15. *See* Declaration of Benjamin Notterman Ex. 1: Demand. *Cf. Quintero v. Long Island R. R.*, 55 Misc.2d 813, 820 (Kings Sup. Ct. 1968), *aff'd*, 31 A.D.2d 844 (1969) (applying estoppel where the LIRR had actual notice of claims).

Under PAL § 1276(1), a complaint must allege that a notice and demand was served on the MTA 30 days prior to filing of the complaint and that the MTA neglected or refused to make an adjustment or payment thereof. However, the *pleading* requirement of § 1276 is inapplicable in federal court: Plaintiff satisfies PAL § 1276 so long as a demand was, in fact, served. *See Shaw v. Long Island R.R. Co.*, No. 16-CV-6972 (BMC), 2018 WL 748674, at *2 (E.D.N.Y. Feb. 7, 2018).

In *Anderson v. Long Island R.R.*, 450 N.E.2d 213, 214 (1983), the Court of Appeals held that subsidiaries of the MTA are also entitled to a pre-suit demand under § 1276(1). In *Anderson*, however, only the LIRR was named as a defendant, so the court did not address whether a timely demand on the LIRR's parent company, the MTA, would satisfy the demand requirement as to the LIRR. Here, Plaintiff timely served a notice of claim on the MTA containing a demand that detailed allegations against two LIRR PD detectives, Defendants Sullivan and Wendel. That should satisfy the demand requirement as to the LIRR, as the two entities share management and the MTA "provides [the LIRR] support in budget, cash management, finance, legal, real estate, treasury, risk management, and other areas." *Pappalardo v. Long Island R. Co.*, 11 Misc. 3d 744, 750, (King Ct. Sup. Ct. 2006), *aff'd*, 36 A.D.3d 878, (2007).

16

Alternatively, in an abundance of caution, Plaintiff served a fresh demand on the LIRR on September 30, 2021, in response to the MTA's motion to dismiss. Notterman Decl. Ex. 2. Accordingly, if the Court construes PAL § 1276 to require separate demands on the MTA and LIRR, Plaintiff requests leave to amend his Complaint 30 days after the September 30th demand in order to satisfy the PAL § 1276 pleading requirement. *Cf. Lindo v. Brett*, 149 A.D.3d 459, 463–64 (2d Dept. 2017) (granting leave to amend complaint with respect to notice and demand where doing so would not prejudice MTA subsidiary).

Defendants also argue that the MTA cannot be liable for "for the torts committed by a subsidiary arising out of the operations of the subsidiary corporation." MTA Mem. at 19 (citing *Noonan v. Long Island R.R.*, 158 A.D.2d 392, 393 (1st Dep't 1990)). *Noonan* concerned a plaintiff who brought a negligence suit after tripping over a railroad spike on LIRR property. The court limited its holding to allegations of negligence relating to "the improper operation, maintenance and control of [] railroad facilities." 158 A.D.2d at 393. In other settings, the MTA has indeed been held liable for activities which it claims are carried out exclusively by the LIRR. *See Pappalardo*, 11 Misc. 3d at 751. In any event, Plaintiff has plausibly alleged that MTA has assumed liability for torts committed by officers working for the Long Island Railroad police force, which merged into the MTA PD in 1998. FAC ¶ 20-21. To the extent defendants dispute this, further factual development would be needed.[10]

---

[10] Rather than waste time and resources with needless depositions and document discovery on this point, Plaintiff is willing to dismiss Count I of the Complaint against one of the entities so long as the other concedes it can be held liable under *respondeat superior* for torts committed by Sullivan and Wendel within the scope of their employment.

## II. Plaintiff plausibly alleges excessive pretrial detention.

Just as the detectives' mishandling of evidence deprived Plaintiff of a fair trial, it deprived him of the right to be free from excessive pretrial detention from his arrest on March 27, 1989, until his release on bail on or about May 19, 1989. FAC ¶¶ 210, 271.

The Fourth Amendment secures the right to "to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Russo v. City of Bridgeport,* 479 F.3d 196, 207 (2d Cir. 2007). Under *Russo*, a plaintiff must show: "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." *Id.* at 205 (citation and internal quotations omitted). As Judge Matsumoto recently held, a *Russo* plaintiff must allege that "the volume of impeachment and exculpatory evidence plaintiff alleges that [detectives] withheld 'shocks the conscience' because it *may have resulted in plaintiff's earlier release on bail prior to trial*." *Taylor v. City of New York*, No. 18-cv-5500 (KAM)(ST), 2021 WL 848966, at *7 (E.D.N.Y. Mar. 4, 2021) (emphasis added) (citing *Newson v. City of New York*, 16-cv-6773 (ILG) (JO), 2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019)) (cleaned up).

The Complaint describes a raft of fabricated evidence and *Brady* violations that, if revealed to prosecutors, likely would have led to Plaintiff's release. A reasonable jury could find that the withholding of such powerful evidence, which so obviously had the potential to affect Plaintiff's status as a pretrial detainee, shocks the conscience. In addition to eliciting false statements from Ramos, the defendants knew Ramos's car was not the one seen leaving the crime scene and that Plaintiff—unlike the driver of the car or the person last seen with the victim—wore glasses and a thick mustache. FAC ¶¶ 49, 77, 134, 167, 250. *See Taylor*, 2021 WL 848966, at *7 (plaintiff satisfied *Russo* by alleging that detectives "withheld evidence that the

18

prosecution's only two witnesses identified the shooter as a clean-shaven individual who did not wear glasses, while plaintiff had a beard and wore glasses."). Had this information been available to the trial court, Plaintiff likely would not have been detained and the QDAO might have abandoned the prosecution, just as it did almost 30 years later when exculpatory information was uncovered.

The MTA argues that *Russo* requires the withholding of evidence that "conclusively or affirmatively established Plaintiff's innocence," but it cites no persuasive authority. MTA Mem. at 20. Instead, the MTA cites *King v. City of New York*, where the district court  merely held that a magistrate judge was not "clearly erroneous" in applying that standard. No. 12-CV-2344 (NGG) (RER), 2014 WL 4954621, at *29 (E.D.N.Y. Sept. 30, 2014) adopting report and recommendation *King v. City of New York*, No. 12-cv-2344 (NGG) (RER), 2013 WL 2285197, at *1 (E.D.N.Y. May 23, 2013). The Court should follow the more recent, authoritative decisions in *Taylor* and *Newson* holding that a plaintiff need only show that the withheld evidence affected his or her right to pretrial release. Nevertheless, the Complaint suffices even under the more stringent standard in *King* because the exculpatory evidence in this case *did* conclusively establish Plaintiff's innocence.

### III. The Complaint adequately alleges that the Defendants conspired to violate Plaintiff's constitutional rights by framing him for murder.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . .  (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "[C]onspiracies are by their very nature secretive operations and may have to be proven by circumstantial, rather than direct, evidence." *Id.* (internal citations and quotations omitted).

19

Drawing all reasonable inferences in Plaintiff's favor, the Complaint amply demonstrates that Wendel, Sullivan and the individual City Defendants agreed, explicitly or tacitly, to act in concert to initiate and continue criminal proceedings against Plaintiff and violate his fair trial rights. They worked together to falsify police reports and other accounts of their investigative activities and withhold exculpatory information from prosecutors. FAC ¶¶ 395-98. The pleading standard for a ¶ 1983 conspiracy requires nothing more. *See, e.g., McCray v. City of New York*, No. 03-cv-10080 (DAB), 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007).

The MTA argues that the intracorporate conspiracy doctrine bars Plaintiff's conspiracy claims, though the Second Circuit has not adopted that doctrine. *Blue v. City of New York*, No. 16-CV-9990 (VSB), 2018 WL 2561023, at *9, n.10 (S.D.N.Y. June 4, 2018). In any event, the doctrine does not apply because Wendel and Sullivan conspired with employees of a different agency, the individual City Defendants.

## IV. The MTA/LIRR policy of deliberate indifference caused Plaintiff's wrongful conviction.

In Count X, Plaintiff alleges that policymakers for the LIRR and MTA had a policy of deliberate indifference to the need to train, supervise and discipline officers not to withhold and fabricate evidence. FAC ¶¶ 472-85. This policy caused Defendants Wendel and Sullivan to withhold exculpatory and impeachment evidence from prosecutors and fabricate evidence used to prosecute Plaintiff, leading to Plaintiff's wrongful conviction and incarceration. *Id.* ¶ 485.

Municipalities are liable under § 1983 when a municipal policy or custom causes constitutional injuries. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The MTA and LIRR are municipal entities for the purpose of § 1983. *Byrd v. Metro. Transit Auth.*, No. 15-CV-1364 (JG) (RLM), 2015 WL 4546718, at *2 (E.D.N.Y. July 28, 2015). The MTA and LIRR may be liable for failing to adequately train, supervise, or discipline police officers where

20

such unreasonable failure amounts to deliberate indifference to the rights of the public. *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992). Courts may infer deliberate indifference where it is obvious, in light of the duties of police officers, that without intervention police will violate peoples' constitutional rights. *Id.* at 297-300. Hence, where policymakers know that a job requires employees to make difficult choices of the sort that training or supervision will make less difficult, a plaintiff need not show a history of misconduct. *See  Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[A] single action taken by a municipality is sufficient to expose it to liability"); *Vineyard v. Cty. of Murray, Ga.*, 990 F.2d 1207, 1212 (11th Cir. 1993) (same).[11] A complaint need only "plausibly" allege an unlawful policy to suffice for Rule 12(b)(6) purposes, and this complaint does so.

Here, Plaintiff plausibly alleges deliberate indifference because there was an "obvious" need to train, supervise, and discipline officers on interviewing witnesses, disclosing evidence, and documenting an investigation, as these are "basic aspects of a police officer's job." *Buari*, 2021 WL 1198371, at *25. *See* FAC ¶¶ 478-80. First, the sheer number of *Brady* violations committed by Defendants Wendel and Sullivan in this case suggests a failure in training and supervision. FAC ¶¶ 306-328, 483. *Cf Amnesty*, 361 F.3d at 129 (a single "egregious" incident "by a group of municipal employees may support an inference that the conduct was attributable to inadequate supervision amounting to deliberate indifference."). Second, the Complaint incorporates the Mollen Commission's findings that, throughout the 1980s and 1990s, police officers in New York City engaged in widespread witness coercion, falsification of documents

---

[11] While *Connick v. Thompson*, 563 U.S. 51 (2011), requires proof of a history of misconduct to put a *District Attorney's Office* on notice of a need to train, this is because prosecutors are lawyers who are trained in their ethical responsibilities and are presumed, absent contrary evidence, to know them. *Connick*, however, did not overrule *Walker* with regard to the need to train, supervise and discipline *police officers* with regard to *Brady* violations, falsification of evidence, and subornation of perjury.

(including police reports), police perjury, and manufacturing probable cause—the same practices that caused Plaintiff's constitutional injuries.[12] FAC ¶¶ 443-61. Although the Mollen Report focused on corruption in the NYPD, the LIRR PD and NYPD routinely conducted joint investigations, so it is at least plausible to infer that the same practices were common in the LIRR PD in the context of joint investigations. *Id.* ¶ 481. Courts, relying on the Mollen Report's findings as evidence of deliberate indifference, have denied motions to dismiss *Monell* claims alleging failure to train, supervise, or discipline officers not to engage in the types of misconduct that caused Plaintiff's constitutional injuries. *See Collins v. City of New York*, 923 F.Supp.2d 462, 479 (E.D.N.Y. 2013) (witness coercion and *Brady* violations "endemic" to the NYPD); *Buari*, 2021 WL 1198371, at \*21-26 (Mollen Report showed a *de facto* policy of engaging in fabrication, coercion, and withholding evidence *and* policymakers' deliberate indifference to such conduct); *Pipitone v. City of New York*, 57 F.Supp.3d 173, 191 (E.D.N.Y. 2014) (Dearie, D.J.) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity."); *White–Ruiz v. City of New York*, No. 93–cv–7233, 1996 WL 603983, at \*8–10 (S.D.N.Y. Oct. 22, 1996) (Dolinger, M.J.) (Mollen Report provided evidence of municipal policy of NYPD code of silence); *Ariza v. City of New York*, No. 93–cv5287, 1996 WL 118535, at \*5 (E.D.N.Y. Mar. 7, 1996) (Sifton, D.J.) (same). *See also Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir.1991) (report describing police practice of tolerating misbehavior was evidence of municipal policy for *Monell* purposes). In addition to the Mollen Report, the Complaint cites several contemporary examples where officers coerced

---

[12] Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, (hereinafter the "Mollen Report"), *available at* https://web.archive.org/web/20110721230958/http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf (last visited Sept. 24, 2021).

false statements and confessions that were used to prosecute innocent people, just as the individual defendants here coerced Javier Ramos into falsely implicating Plaintiff. FAC ¶¶ 462, 464. *See Cash v. Cty. of Erie*, 654 F.3d 324, 336 (2d Cir. 2011) ("highly publicized incidents" provide notice of need for additional training or supervision).

Accordingly, for pleading purposes, the Complaint alleges a plausible theory of recovery and discovery should be permitted on Plaintiff's *Monell* claims against the LIRR and MTA.

## **CONCLUSION**

The MTA Defendants' motion to dismiss should be DENIED in full.

Respectfully submitted,

     /s/
_____
ZMO LAW PLLC
Zachary Margulis-Ohnuma
Benjamin Notterman
260 Madison Avenue, 17th Fl.
New York, NY 10016
(212) 685-0999

     /s/
_____
LAW OFFICES OF JOEL B. RUDIN, P.C.
Joel B. Rudin
152 West 57th Street, 8th Fl.
New York, NY, 10019
(212) 752-7600

*Attorneys for Plaintiff Felipe Rodriguez*

Dated:    New York, New York
          October 5, 2021

23