```
                                                                    1

           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
   - - - - - - - - - - - - - - - - X
                                    : 21CV1649(AMD)
   FELIPE RODRIGUEZ,                :
                                    :
           Plaintiff,               :
                                    : United States Courthouse
                                    : Brooklyn, New York
      -against-                     :
                                    :
                                    : July 12, 2021
   CITY OF NEW YORK,                : 11:00 a.m.
                                    :
           Defendant.                :
                                    :
   - - - - - - - - - - - - - - - - X

       TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
             BEFORE THE HONORABLE ANN M. DONNELLY
                 UNITED STATES DISTRICT JUDGE

                    A P P E A R A N C E S:

   For the Plaintiff:     ZMO LAW PLLC
                              260 Madison Avenue, 17th Floor
                              New York, NY 10016
                          BY: ZACHARY MARGULIS-OHNUMA, ESQ.
                              BENJAMIN NOTTERMAN, ESQ.

                          LAW OFFICES OF JOEL B. RUDIN
                              Carnegie Hall Tower
                              152 West 57 Street, Eighth Floor
                              New York, NY 10019
                          BY: JOEL B. RUDIN, ESQ.
   For the Defendant:
                          NYC LAW DEPARTMENT
                              100 Church Street
                              New York, NY 10007
                          BY: MARK DAVID ZUCKERMAN, ESQ.
                              HELENE R. HECHTKOPF, ESQ.

   Court Reporter:   SOPHIE NOLAN
                         225 Cadman Plaza East/Brooklyn, NY 11201
                         NolanEDNY@aol.com
   Proceedings recorded by mechanical stenography, transcript
   produced by Computer-Aided Transcription
```

SN          OCR          RPR

```
 1   For the Defendant:    HOGUET NEWMAN REGAL & KENNEY, LLP
                            10 East 40th Street
 2                          New York, NY 10016
                           BY:STEVEN MARK SILVERBERG
 3
```

1               (Via teleconference.)

2          (The Hon. Ann M. Donnelly, presiding.)

3          THE COURTROOM DEPUTY:  This is civil cause for a

4    pre-motion conference, docket number 21-CV-1649; *Rodriguez*

5    *versus The City of New York, et al.*

6          Before asking the parties to state their

7    appearances, I would like to note the following:  Persons

8    granted remote access to proceedings are reminded of the

9    general prohibition against photographing, recording and

10   rebroadcasting of court proceedings.  Violation of these

11   prohibitions may result in sanctions including removal of

12   court-issued media credentials, restricted entry to future

13   hearings, denial of entry to future hearings, or any other

14   sanctions deemed necessary by the Court.

15         MR. MARGULIS-OHNUMA:  Good morning, Your Honor.

16   This is Zachary Margulis-Ohnuma.

17         I'm joined by my associate, Benjamin Notterman and

18   our co-counsel, Joel Rudin.

19         THE COURT:  Good morning.  Counsel, are you going to

20   be making most of the arguments?

21         MR. MARGULIS-OHNUMA:  I will be, yes.

22         THE COURT:  Great, thanks.

23         How about for the defense, who is appearing?

24         MR. SILVERBERG:  Good morning, Your Honor.  This is

25   Steven Silverberg from the firm of Hoguet Newman Regal &

1  Kenney, LLP.  My partner, Helene Hechtkopf, is with me and we
2  represent the MTA defendants which are the Metropolitan
3  Transportation Authority, Long Island Railroad and Retired
4  Detectives Thomas Sullivan and Charles Wendel (phonetic).
5              THE COURT:  Good morning.
6              MR. ZUCKERMAN:  Good morning, Your Honor.  Mark
7  Zuckerman for defendants City of New York, John Beisel, Jerry
8  Fennell, John Califano, John Wilde, George Zaroogian, Office
9  of the Corporation Counsel.  And our summer intern, Tyler
10 Daniels, is present.
11             THE COURT:  Good morning.  So, this is a pre-motion
12 conference on an anticipated motion, which I hope to talk you
13 out of, to dismiss the complaint.
14             I just want to make sure before we get into it; have
15 you all considered trying to settle the case?  Let me start
16 with Mr. Margulis-Ohnuma.
17             MR. MARGULIS-OHNUMA:  We have not issued a
18 settlement demand, Your Honor.
19             THE COURT:  Okay.  A person can dream, I guess.  All
20 right, so I guess we'll start, and I never say never, but I
21 really don't think that a motion to dismiss is likely to
22 succeed in this case and I don't think it's the best use of
23 our time and I'm not going to hide my cards and tell you that
24 right away.
25             The issue of favorable termination is an interesting

1  one, but I think certainly at the complaint stage the
2  plaintiffs have satisfied the -- has alleged enough to show
3  that the case was terminated in a way that indicated his
4  innocence.  It's not like *Lanning* because in that case the
5  plaintiff didn't say what the grounds were and I know the
6  defendant cited my case in *Gondola* but that was really the
7  same thing.
8           This is much different and in my view the fact that
9  the prosecutor made some statements at the proceeding in front
10 of Judge Zayas in state court, I don't think that that's
11 determinative of whether the circumstances -- whether the
12 plaintiff has established that the case was terminated in a
13 way that was indicative of his innocence.  Like I said, I
14 always keep an open mind, but I don't think that's a winner of
15 an argument.
16          Mr. Zuckerman and Mr. Silverberg, I will certainly
17 hear you on that if you want to be heard, but that's kind of
18 the feeling that I have.
19          MR. ZUCKERMAN:  Your Honor, this is Mark Zuckerman.
20 There is a case out of the Northern District, *Jeanty versus*
21 *City of Utica*, which is very similar to the case here.  There
22 was a Brady violation and eventually a conviction vacated and
23 the indictment dismissed and the Court in that case certainly
24 did consider the prosecutor's statements in finding that there
25 was not a favorable termination.  I think it's important to

note that as is set forth in the transcript that we provided you, Your Honor, that really the only -- even plaintiff's side concedes that the only reason that they were able to get back in court on another 440 motion was the fact that the prosecution was going to join or not oppose the motion. And, you know, from the prosecution's standpoint, it's clear that they were not supporting it based on a claim of actual innocence or on the merits.

Judge Zayas specifically ruled that his decision was based upon the Brady -- the alleged Brady violation only, you know, the prosecution also stated that it was not crediting the recantation of Javier Ramos which is different from the cases cited by plaintiff in his letter and that there was credible evidence to support the prosecution and the underlying conviction.

So, you know, I think that the cases cited by the plaintiff in their opposition to a pre-motion conference letter are certainly distinguishable. And just to address the point Your Honor is making, the *Jeanty* case specifically credited and found important in reaching its decision the fact that the -- that what the prosecution did and did not support in the underlying criminal proceedings.

THE COURT: Well, I mean, you know, there's another case in the Southern District. I think it's *Rosario*, which comes to a different conclusion. And just for purposes of the

1  complaint, the status of the case when -- after the DA's
2  office reinvestigation is that they no longer have a witness
3  because the witness has recanted.  Whether or not that's a
4  credible recantation I guess is an issue, but the status of
5  the case is that there's no case.
6  　　　　　So, if you want to litigate this, I'm not saying you
7  can't do it, but I'm saying I don't find this argument
8  persuasive in terms of favorable termination.  I mean, I do
9  think it's an interesting question in a lot of cases.  I just
10 don't think this one has a lot of those features, but I am
11 certainly.  I certainly don't -- I'm certainly not telling you
12 not to do it.  I'm kind of saying I wish you wouldn't do it
13 but I'm not saying you can't do it.  So that's one question
14 about the favorable termination.
15 　　　　　Just for the plaintiff, I just want to ask, the
16 overarching thing is the plaintiffs aren't limited to what
17 happened in the proceeding in Queens County Supreme Court and
18 they allege additional violations; withholding of evidence and
19 coerced statements, but I want to make sure that I understand
20 the Brady claims.  The way I read this, the crux of or most of
21 the plaintiff's claims are that the defendant's detectives
22 from the Long Island Railroad and from the NYPD didn't turn
23 over evidence to the assistant DA.  Is that correct?
24 　　　　　MR. MARGULIS-OHNUMA:  Judge, the complaint is cited
25 in the alternative.  We, I don't think, can say with certainty

1  whether the -- we -- I think we allege quite clearly that the
2  material was never turned over and I think there's six
3  separate pieces of Brady evidence, any of which, in our view,
4  would be sufficient to undermine the verdict and it would have
5  been enough.
6      But the one that the DA focused on really was a
7  piece of paper that the lead detective from the LIRR said was
8  in his handwriting and no one could ever remember anything
9  having been done with it.  So the conclusion was made he never
10 turned it over to the DA, in which case the cause of the
11 Plaintiff's injuries would lie at the feet really of that
12 individual actor and the MTA for failing to train with respect
13 to Brady.
14     But if they were start pointing fingers and show
15 that it was sent to the Queens DA office, if they were to come
16 up with evidence of that, we would still have a claim against
17 the Queens DA's office for failing to turn it over to the
18 defendant.
19     THE COURT:  Right.
20     MR. MARGULIS-OHNUMA:  As another Brady claim against
21 the office.
22     THE COURT:  The other question I had --
23     MR. MARGULIS-OHNUMA:  There's not just one -- I'm
24 sorry.
25     THE COURT:  Right.  I think one of them was the Pete

Proceedings                                                    9

Binagra (phonetic) tape?  That's something you allege that the prosecutor had and didn't turn over; correct?

    MR. MARGULIS-OHNUMA:  That's correct.  The prosecutors admitted under oath that they had that.  So we had no reason to question that.

    THE COURT:  Okay.  And then the other -- just in terms of possibly narrowing your complaint, there are a couple of things that seem to me you might want to consider just so we can focus on what really is the case.  For example, there are two defendants named Califano and Wilde.

    MR. MARGULIS-OHNUMA:  Yes.

    THE COURT:  The allegations against them are kind of thin, I think.  How are they involved in the conspiracy?

    MR. MARGULIS-OHNUMA:  Well, they were present on the paperwork, the coerced -- the quasi-confession, but allegations by Javier Ramos that set the entire set of allegations against Filipe Rodriguez in process.  So if the key thing with Detective Califano is an allegation that Javier Ramos made under oath that detectives that night or shortly thereafter drove him around, questioned him and threatened him with death if he did not admit that his car had been used and none of his friends committed the crime.  He thinks it was the Wilde that did that.  We think it's Califano based on the paperwork.

    We understand the paperwork is not as clear against

Califano and Wilde as it is against the other defendants, but I think that's something discovery will help flesh out.

THE COURT:  Okay --

MR. MARGULIS-OHNUMA:  It may be that there's no clear answer, but it may be enough to get to a jury as to who made those death threats.

THE COURT:  Okay.  The other question that I had for you was this question of there's a claim of -- I'm going to find it here.  There is a claim, an equal protection claim, against Detective Beisel which I don't -- I don't think is -- I know it's based on the fact that he used racially charged language, but I don't think there's any comparator alleged in the complaint and I think that one might not survive, but what's your view on that?

MR. MARGULIS-OHNUMA:  Well, I guess on that, I mean, I can see -- I don't -- I think we would take the legal position that it's not a hard and fast speeding rule that a comparator is required and that discovery will help us uncover who would be likely comparators.  He was explicit as to his intentions.  He didn't just say I'm after you because you're a spic -- and excuse my language, but he said; one of you spics is going down for this.

So it was absolutely clear that it was his subjective intent.  He said there were comparators.  They investigated some non-Hispanic people and despite, we think,

fairly compelling evidence, did not pursue those individuals and instead pursued Javier Ramos, Filipe Rodriguez and Richard Pereira, all of whom were Hispanic. So I think the comparators are there.

I guess in the interest of judicial economy is you are suggesting you would dismiss based on the complaints the allegations in the complaint as it stands. We could amend and add a few paragraphs with more specifics about comparators, but our position as a legal matter, if they do file, is that we don't feel that that's a pleading requirement.

THE COURT: So, I like to do things in an efficient way and if there are things that were raised in the defendant's submissions that you think you could tune up in the complaint or if you decide it's not the key to your case, I might consider that if I were you just because it's a big case. There's a lot in it and I don't -- I think it's in everybody's interest, including yours, to not have things that are less helpful, but what I think I might do is just give you a little opportunity to look at that and see what you think, and maybe amend.

If you do amend, I am fairly confident that even if you do that, the Defendants will still oppose it. So my proposal is that you take a look at it, see if there's anything that you either want to omit or if you think they have a valid point, maybe if you want to add some additional

material, that might not be a bad idea.

MR. MARGULIS-OHNUMA: I tend to agree with you on that point and I would appreciate a little time to consult, but I think there's a decent chance that we would be amenable to amending on that -- on the equal protection claim based on what the defendants pointed out.

THE COURT: Okay. Like I say, I realize what the defendant's position is on this and I am just telling you candidly what my reaction to it is that I think that the complaint, with a few exceptions, is not subject to dismissal. But also in the interest of efficiency, you know, much as I love deciding motions to dismiss a complaint, I do wonder if that's the best use of our time. But I am surely not telling you that you can't do it.

Perhaps it's premature but I don't know what the parties' position is on trying to work out a disposition here and I know you haven't engaged in any settlement discussions but I -- but I will also tell you candidly just in view of the filing it seems like something that would be a bad idea.

So why don't we do this: How much time would the plaintiff need to consult and consider whether you want to amend the complaint?

MR. MARGULIS-OHNUMA: I think we could certainly let you know within a week and if we're going to amend, you know, take another week to -- to do the amendment. So I think it

1  makes sense to do two weeks to either let you know or file an
2  amendment.
3          THE COURT:  That is fine.  And that takes us to the
4  26th of July.  Just for an update and then once we hear from
5  you one way or the other we'll put up a motion schedule on
6  ECF.  Does that sound like a plan?
7          MR. MARGULIS-OHNUMA:  It does Your Honor.
8          MR. SILVERBERG:  Sure, Your Honor.
9          MR. MARGULIS-OHNUMA:  Your Honor, it omits -- the
10 defendants had both moved to stay discovery.  We obviously
11 think that it's totally inappropriate seeing how it's unlikely
12 that the motions to dismiss will be granted.  If they are
13 amenable to settlement talks, I can see going a little more
14 slowly on that.  Otherwise, we would like to go full steam
15 ahead on discovery.
16         THE COURT:  I am not going to stay discovery under
17 these circumstances.  Who is our magistrate judge?  Is it
18 Judge Mann?
19         MR. ZUCKERMAN:  Yes.  Your Honor, we've also moved
20 to bifurcate Monell discovery.  If discover does go forward,
21 they want to get into virtually everything the police
22 department, the MTA and the Queens DA's office has done for
23 years and years and years and numerous other cases and that
24 would take this case into, you know, a sphere, you know, well
25 beyond anything that's reasonable.  And, you know, all the

1  cases we cited in the letter to Your Honor, there are numerous
2  cases that state that Monell discovery should be bifurcated in
3  most cases and since Your Honor is not going to stay
4  discovery, we would at least request that Monell discovery be
5  stayed.
6            It's just -- the underlying case is substantial
7  enough with numerous witnesses, depositions, documents and all
8  of that, and it just seems like going into Monell discovery
9  would just raise costs and send this case into numerous other
10 cases that just seems wasteful.
11           THE COURT:  Well, I think that the parties certainly
12 have enough to keep them busy with the discovery on the
13 non-Monell claims, so I will grant that motion because I don't
14 think you're going to get to it anyway for a bit.
15           So I will grant the motion to stay the Monell
16 discovery, but there is plenty to keep you busy with the rest
17 of the case.
18           MR. MARGULIS-OHNUMA:  Judge, may I be heard on this
19 briefly?  There's a distinction inn the Monell discovery in
20 this case and it goes to the question that you asked earlier
21 about basically where the fault lies in withholding
22 exculpatory information.  We're not suing because they have
23 absolute immunity any individual district attorneys.  We're
24 suing the Queens County District Attorney's Office which is in
25 the City of New York --

1  THE COURT: Go ahead.
2  MR. MARGULIS-OHNUMA: If it is the fault of the
3  district attorneys, in order to make our case, we have to make
4  a Monell showing. So that Monell discovery is -- really
5  doesn't have the kind of chance that it might be duplicative
6  or cumulative. It really will help us get to the bottom of
7  what went wrong here.
8  And I would suggest that at least as a formal
9  matter, if you're going to stay some discovery, it should just
10  be Monell discovery with respect to the policies and practices
11  of the New York City Police Department and the LIRR Police
12  Department and it shouldn't be with respect to the Queens
13  County District Attorney's office because it goes so
14  thoroughly to the heart of the torts here.
15  THE COURT: I actually read your complaint
16  differently. Obviously you know it better than I do, but
17  almost everything that you are alleging is shortcomings by
18  both different police departments. At this point I'm not
19  saying you can never do it. I'm staying it for now.
20  MR. MARGULIS-OHNUMA: Understood, Your Honor.
21  THE COURT: We will wait to hear from you and then
22  once we do, I will put that schedule up, okay?
23  Thank you, everybody.
24  (Matter adjourned.)
25  - ooOoo -