# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

FELIPE RODRIGUEZ,

                         Plaintiff,

         -against-

THE CITY OF NEW YORK, METROPOLITAN
TRANSPORTATION AUTHORITY, LONG ISLAND
RAIL ROAD COMPANY, JOHN BEISEL, in his
individual and official capacities; THOMAS SULLIVAN,
in his individual and official capacities; CHARLES
WENDEL, in his individual and official capacities; JERRY
FENNEL, in his individual and official capacities; JOHN
CALIFANO, in his individual and official capacities;
JOHN WILDE, in his individual and official capacities;
GEORGE ZAROOGIAN, in his individual and official
capacities; and OTHER AS-YET-UNKNOWN POLICE
OFFICERS & SUPERVISORS JOHN and JANE DOES #
1–10

                         Defendants.

---

**PLAINTIFF'S FIRST
SET OF
INTERROGATORIES
AND REQUESTS FOR
THE PRODUCTION OF
DOCUMENTS**

21-cv-1649 (AMD)(RLM)

---

         Pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, and Local

Rule 26.3, Plaintiff Felipe Rodriguez ("Plaintiff") requests that Defendants the City of New

York, John Beisel, Jerry Fennel, John Califano, John Wilde, and George Zaroogian answer

under oath the following Interrogatories and produce for inspection and copying the

documents specified herein, at the offices of ZMO Law PLLC, 260 Madison Ave., Fl. 17,

New York, New York, 10016, except with respect to Request 4, for which Plaintiff requests

physical access to the documents for the purpose of inspection and copying, within 30 days

after service hereof.

## DEFINITIONS AND INSTRUCTIONS

The following definitions and instructions apply to each of the Interrogatories and Requests set forth below and are deemed to be incorporated therein except to the extent a particular Request may contain contrary definitions and instructions.

A.     In answering the following Interrogatories and responding to the following Requests (collectively the "Requests"), you shall furnish all information that is available to you, including information in the possession, custody, or control of your attorneys, accountants, employees, investigators, experts, representatives, or other agents or servants.

B.     All documents that respond, in whole or in part, to any portion of any Request, shall be produced in their entirety, together with all attachments, enclosures, drafts, and non-identical copies.

C.     Questions regarding the interpretation of these Requests should be resolved in favor of the broadest possible construction.

D.     If the answer to all or any part of an Interrogatory is not presently known or available, include a statement to that effect and furnish any information currently known or available as well as an explanation of the information that was once known or available and why it is not now known or available.

E.     These Requests shall be deemed continuing so as to require further and supplemental production by Defendants in the event they discover or obtain additional information or documents between the time of initial production and the time of hearing or trial.

F.     If any information or document is withheld based upon a claim of privilege, state with specificity the information required by Local Rule 26.2.

2

G.      Where any Request calls for the identification or production of electronically stored documents, a complete forensic or forensic-type search is to be performed by an individual with access to all centrally stored electronic data, in addition to any other search performed for such material.

H.      Where any Request calls for documents or information that either never have been, or presently are not, in existence, indicate so in the relevant response.

I.      Plaintiff incorporates by reference the Uniform Definitions in Discovery Requests set forth in Fed. R. Civ. P. 34(a) and Local Rule 26.3.

J.      The term "Incident" refers to the events described in Plaintiff's Complaint.

K.      In the event that a document called for by these Requests has been destroyed, lost, discarded or otherwise disposed of, any such document is to be identified as completely as possible, including, without limitation, the following information: date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

L.      All documents that respond, in whole or in part, to any portion of any Request, shall be produced in their entirety, together with all attachments and enclosures.

M.      These Requests cover all documents in the possession, custody and control of Defendants, whether they are located in Defendants' offices or in the residence or office of any officer, director or agent (including accountants and attorneys) of the individual defendants.

## **INTERROGATORIES**

1.      Identify all witnesses upon whose affidavit or testimony Defendants will rely to controvert any matter alleged in Plaintiff's Complaint, substantiate any matter alleged in

Defendants' Answer, or support any affirmative defenses Defendants have asserted or may assert, and provide each witness's current address and telephone number.

2.      Set forth the present location of all notes made by any defendant regarding the Incident or the subsequent investigation, including all detective notebooks, including, but not limited to, the physical location of the original notebooks containing the entries appended to this set of Interrogatories and Requests for the Production of Documents as Exhibits A through I.

3.      Provide the full name and contact information (including phone number, email, and address) of Louis Vega, NYPD Scientific Research Division, who conducted the polygraph examination of Robert Thompson on or about March 1, 1988.

4.      Identify all homicide investigations in which Det. John Beisel assisted or was assigned as a detective, by providing the name of the victim, the date on which the homicide occurred (or was discovered), the name of the defendant (if any), the NYPD case number, and the court and docket number if a defendant was prosecuted.

5.      Identify the present location of the tape recording of the interview of Robert Thompson by Thomas Sullivan and Charles Wendel on or about March 17, 1988, at the LIRR PD HQS Audio Video Section in Hollis, Queens, New York, concerning the Maureen Fernandez murder investigation.

6.      Identify any and all trials, grand jury proceedings, criminal hearings, or other proceedings in which the Queens County District Attorney's Office or any other instrumentality of the State of New York or City of New York called Robert Thompson as a trial witness by setting forth the date and location of the proceedings, the name and docket number of the case, and the name and full contact information of the assistant district

4

attorney or other New York City employee responsible for presenting the testimony and/or examining Mr. Thompson as a witness.

## SPECIFIC DOCUMENT REQUESTS

1.      The complete file or files of the New York City Police Department ("NYPD") and of the Queens District Attorney's Office ("QDAO") concerning the investigation of the murder of Maureen Fernandez and/or the prosecution of Felipe Rodriguez, from November 26, 1987, through the present, including pre-trial and trial proceedings, sentencing, direct appeal, FOIL requests, response and litigation, CPL 440 motions, and federal habeas corpus proceedings. This Request includes, but is not limited to, the following: notes, notebooks, memo book entries, reports, emails, correspondence, press releases, teletypes, text messages, memoranda, DD5 reports, wanted posters, medical records, oral or video recordings, 911 tapes, SPRINT reports, photographs, drawings, physical evidence of any kind, lab reports, Medical Examiner's reports, subpoenas, receipts, returns on subpoenas, material witness applications and orders, orders to produce, requests for recognition, diary entries, calendar entries and logs, receipts or correspondence regarding *Rosario*, *Brady* or other evidence disclosures, Voluntary Disclosure Form, and other documents.

2.      All documents, including emails, encompassed by the previous Request, in the possession, custody or control of the following individuals or offices:

        A.      Queens County District Attorney's Office;

        B.      New York City Police Department;

        C.      John J. Santucci, Queens County District Attorney (1977 to 1991);

        D.      Robert J. Masters, QDAO;

E.    Alan Safran, QDAO;

F.    David Dikman, QDAO;

G.    Steven Zissou, QDAO;

H.    Robert Alexander, QDAO;

I.    Jerome LoVerdi, QDAO;

J.    John Beisel, NYPD;

K.    Jerry Fennel, NYPD;

L.    George Zaroogian, NYPD;

M.    John Wilde, NYPD;

N.    John Califano, NYPD;

O.    Michael Pafitis, NYPD;

P.    FNU Hickman, NYPD;

Q.    Roy Zinkiewicz, NYPD;

R.    The QDAO's and NYPD's Public Information and press offices.

3.    All documents of or maintained by the NYPD and/or QDAO concerning:

A.    **Javier Ramos**, including, but not limited to (i) his interactions with employees of the NYPD or QDAO from November 1987 through June 1990; (ii) his cooperation with the NYPD and/or QDAO relating to the investigation of Maureen Fernandez murder and/or the prosecution of Felipe Rodriguez; (iii) his cooperation with the NYPD and/or QDAO on any other matter; (iv) material witness applications, orders, returns, and/or court transcripts; (v) documents submitted in connection with his

application to become a member of the NYPD; (vi) documents related
to his service as an auxiliary police officer with the NYPD.

B.  **Richard Pereira**, including, but not limited to, (i) police and QDAO
records related to his arrest on or about September 10, 1988; (ii) police
and QDAO records related to any other arrest or prosecution for
unlawful or criminal behavior; (iii) his cooperation with the NYPD
and/or QDAO relating to the investigation of Maureen Fernandez
murder and/or the prosecution of Felipe Rodriguez; (iv)
communications to or from Pereira and the QDAO and/or police
relating to the prosecution of Felipe Rodriguez and/or the investigation
or reinvestigation of the Maureen Fernandez murder.

C.  **Robert Thompson**, including, but not limited to, (i) police and QDAO
records related to his conviction on or about May 3, 1989, including
records related to his arrest and prosecution; (ii) police and QDAO
records related to his conviction on or about September 11, 1989,
including records related to his arrest and prosecution; (iii) police and
QDAO records related to any other conviction or arrest; (iv)
communications with outside agencies concerning his cooperation,
testimony, or release or imprisonment, including, but not limited to, the
New York City Department of Correction, New York State Department
of Correctional Services, New York State Division of Parole, New
York City Department of Probation, or any other corrections agency or
facility in New York City or the State of New York; (v) payments to

7

him or on his behalf or other benefits provided to him by the police or

QDAO; (vi) communications concerning him with his attorney, legal

representative, or any court.

4.      The notebooks and memo books of all NYPD detectives, officers, sergeants,

captains and other NYPD employees or agents who investigated the murder of Maureen

Fernandez or assisted in the investigation, including, but not limited to, the notebooks

containing the entries in Exhibits A through I appended to this set of Interrogatories and

Requests for the Production of Documents.

5.      The video tape recording of the interview of Robert Thompson by Thomas

Sullivan and Charles Wendel on or about March 17, 1988, at the LIRR PD HQS Audio

Video Section in Hollis, Queens, New York, concerning the Maureen Fernandez murder

investigation.

6.      The NYPD and QDAO "informant" files for Robert Thompson, Javier

Ramos, and Richard Pereira.

7.      All subpoenas, material witness orders, *Damiani* orders, requests in lieu of

subpoenas, orders to produce, *ex parte* orders (including supporting applications for such

subpoenas and orders), concerning the investigation of the murder of Maureen Fernandez,

and the investigation and/or prosecution of Plaintiff.

8.      The full and complete NYPD and QDAO files concerning murder

investigations for which Jack Beisel was assigned as a detective, in which either (a) a

defendant gave a confession, (b) an out-of-court identification procedure took place, or (c) a

witness gave a statement accusing a defendant of murder, including pre-trial and trial

proceedings, sentencing, direct appeal, FOIL requests, response and litigation, CPL 440

motions, and federal habeas corpus proceedings. This Request includes, but is not limited to, the following: detective notes, memo book entries, reports, e-mails, correspondence, press releases, teletypes, text messages, memoranda, DD5 reports, wanted posters, medical records, oral or video recordings, drawings, diary entries, calendar entries and logs, receipts or correspondence regarding *Rosario*, *Brady* or other evidence disclosures, Voluntary Disclosure Form, and other documents.

9.      All documents and other evidence documenting disclosures that were made to Plaintiff or his defense counsel prior to or during his trial of discovery pursuant to CPL Art. 240, *Rosario* material, and/or *Brady, Giglio* or *Vilardi* material.

10.      The complete personnel files of John Beisel, Jerry Fennel, John Wilde and John Califano, and George Zaroogian.

11.      All allegations, investigations, findings and/or discipline concerning John Beisel, Jerry Fennel, John Wilde, John Califano, and/or George Zaroogian, maintained by the NYPD or any other City agency including, but not limited to, the complete files of the Civilian Complaint Review Board, Central Personnel Index, and Command Discipline, as well as all civil lawsuit complaints and/or documentation of criminal investigations or prosecutions, which concern or contain allegations of false arrest, malicious prosecution, evidence manufacturing or fabrication, perjury, false statement, abuse of process, civil rights violations, coercion of witnesses, excessive force, violations of due process or the right to a fair trial, or otherwise concern their honesty, integrity, or credibility.

12.      All records maintained by the QDAO of allegations, investigations, findings, or discipline concerning Alan Safran and David Dikman, including, but not limited to, allegations of false arrest, malicious prosecution, evidence manufacturing or fabrication,

perjury, false statement, abuse of process, civil rights violations, coercion of witnesses,

violations of due process or the right to a fair trial, or otherwise concern such individual's

honesty, integrity, and/or credibility.

13.   All documentation of any payments made or other benefits provided to any

witness, potential witness, or informant, for any purpose, by Defendant Thomas Sullivan,

including receipts for such for payments, in connection with the Incident and/or Maureen

Fernandez murder investigation.

14.   All statements alleged to have been made by Plaintiff concerning the subject

matter of this lawsuit, including, but not limited to, written statements, or those recorded by

mechanical, electrical, audio, or computerized means, or a transcription of it that recites

substantially verbatim the statement.


Dated: New York, New York
         August 11, 2021


ZMO LAW PLLC


BY: _/s/ Zachary Margulis-Ohnuma_
ZACHARY MARGULIS-OHNUMA
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 685-0999

*Attorneys for Plaintiff Felipe Rodriguez*

# Exhibits

would got to clear out th floors - Patients
around 8-830 AM

I.D photo - male with mustach in photo
with Maurer - (Spread)

CARS:
Sold Pete ~~Sierra~~ his car - white
around 2/88 ³/11/88 - All white - painted oldsmobile
top red Oct -1987 - shabby - yellow
Buick -76 - Black - was green 3/11/88 · godd AVE ASY-901

Only heard of incident from Pat
about 3wks ago - Not at all before.

Had common law with Doris Sanchez.
750 Drug Ave - Apt #3 1st floor. - Now in
N.J. Expected March 1988.


Ramos lives with his mother. 1/25/88
went straight home. left work Around
12 m.

has gold ring (on left hand - Red stone
e gold watch.    heavy  Nugget looking    3rd finger

· Ng - on going to White Shield Bar.
Richie Periera MH. Tempe. 5'2" 30yrs,
                short stocky
Ng - weapons.

Painted Roof with spraycan.
Prior to Richie using the cas.
Painted it in October:-

Rio. Registeres cars for insurance
purposes

Grace Cosnaoskas- White Shuttes

Joe Castillo-  Cati au Bar
<mark>Address</mark>

PLAINTIFF'S
EXHIBIT

B

ODA 923

2/4/88

Kathy wanted to go and get something.
Guys said go ahead and take her.
Had no other incidents with Kathy
She was stoned at the time. Doesn't
know where he took her for the drugs.
Never made any passes at Kathy
The Rodriguez — —  2 or 3 cousins
Betty & twin sister

Party was two houses to the left of
their house.

Did go to funeral services. Saw
both Nina & Betty.
Whe he arrived - Not Manhattan - Area when Nina left. Was not there

2/11/88   1418 - 1432   1189 Gates
        Joe Costello - Bartender — viewed
Photo array - Picks out #2 - Photo
of E Ruiz. Places a rating of 6/7 out
of 10 as being the person the deceased
was with the morning of 2/2/88 - Gates
Ave. Bar

PLAINTIFF'S EXHIBIT
C

QDA 961

RODRIGUEZ SHOWED UP AT RAMOS'
HOUSE 6 AM THANKSGIVING MORNING
WITH M/B FRIEND,

ZSYM
SLIM
DK SKINNED BLK

PLAINTIFF'S
EXHIBIT

D

OF MAUREEN FERNANDES SEROLOGY/
TOXICOLOGY REPORT.

SAT. 02/20/88

1010hrs. - 102 COVERT ST. BKLYN. RE-INTER-
VIEWED WILLIAM PERRY. HE SAID
HE IS ALMOST CERTAIN THAT THE
CAR HE SAW WAS A 1977 BLACK MONTE
CARLO - CHROME MAGS - NOT SPOKES
WHITE LETTERING ON TIRES. WINDOWS
WERE DARK TINTED ALL THE WAY AROUND
CAR VERY CLEAN. COULD NOT SEE IN
CAR.
MALE: M/W (NOT HISPANIC) ITALIAN OR
IRISH. EARLY 30'S 5'7" 160 LBS. MED.
BUILD - HAZEL OR GREEN EYES SLIGHT
MUSTACHE. HE DID NOT SPEAK
MUCH BUT APPEARED TO BE A GENTLE-
MAN TO WILLIE. WILLIE SAID THAT NINA
DID ALL THE TALKING - DID NOT LET THE
MALE TALK MUCH. WILLIE FELT THAT
NINA DID NOT KNOW MALE WELL

PLAINTIFF'S
EXHIBIT

E



TUES. 03/01/88

ON TUESDAY MARCH 01, 1988 I
RECEIVED THE SUM OF TEN DOLLARS
($10.00) FROM DETECTIVE T. SULLIVAN
OF THE LIRR POLICE. THIS MONEY
WAS RECEIVED FOR MY COOPERATION
IN THE FERNANDES HOMICIDE
INVESTIGATION. X *Robert Thompson*



PLAINTIFF'S
EXHIBIT

**F**

QDA 3439



03/17/87

On Thursday March 17,1988 at 12:25PM
I was given a total of $10.00 by Det.
T.Sullivan of the LIRR Police Dept.
This $10.00 was given to me for my
ongoing assistance in the Fernandes
Homicide(Re;DD#1650-87).

x _Robert Thompson_





QDA 3440

**The Long Island Rail Road**

**POLICE DEPARTMENT**

INCIDENT NO. #15450-87

REFERENCE DD# 1650-87

TO: ALL TOURS : ALL SUPERVISORS                     Date: 11/26/87

From: Detective Charles Wendel #153 AUTHORITY: CAPTAIN P. LOVERSO

Subject: Special Request For Checks In Area Of 66-35 Otto Rd.,Glendale

It is requested that the 4pm by 12Mid and the 12Mid by
8am tour make checks of the Fresh Pond area in the area
of 66-35 Otto Road: Dubovsky. The checks are requested
due to a F/W homicide victim being found in the rear of
66-35 Otto Road at approx. 0830 hours this date.

It is requested that stop and frisks be made out on anyone
found in and about the area. A special attention to be
given for locating and identifying a white vehicle ,possibly
a Cadilac,Pontiac,Oldsmobile,seen in the area in the past.
The only description of the operator of the vehicle is a
M/W with a mustach.

Special checks should be made of the area between 0300 hours
and 0700 hours.

Any questions concerning this request should be directed to
Detectives Sullivan and Wendel.

NOTE: Exact location of the homicide victim was in the parking area
of the LIRR Fresh Pond Yard in the rear of 66-35 Otto Road.

    A supervisors report or an officers report will be made
identifying all stops made with their locations and time of stops.
This will be forwarded to Detectives Sullivan and Wendel by 8:00
am , 11/27/87

Detective CHarles Wendel

AUTHORITY : P. LOVERSO,CAPTAIN OF POLICE

PLAINTIFF'S
EXHIBIT

G

QDA 806

# ∧ The Long Island Rail Road

## POLICE DEPARTMENT

INCIDENT NO. _____

REFERENCE _____

TO: Capt. P.J.Loverso

Date: Tues. 01/12/88

From: Det. T.F.Sullivan Sh.#134

Subject: Inc.#87-15450,DD#87-1650

    The undersigned Officer and Det.Wendel are currently investigating the murder of a Maureen Fernandes.Victim was found stabbed to death in the Fresh Pond yard,behind Dubovsky's warehouse,on the morning of Thurs. November 26,1987 at about 9:00AM..As of this date the undersigned has accumulated approximately 32 hours overtime and Det.Wendel has accumu- lated approximately 15 hours as a result of this ongoing investigation.

    This investigation is currently centered around a subject that the victim was seen leaving a bar with,Gates Bar located at 1189 Gates Ave. Bklyn.,at approximately 3:30AM on the morning of Thurs.November 26,1987. The Queens Medical Examiner(Dr.Charles)places the victim's time of death between 4:00AM/7:00AM.In addition to this subject the undersigned and Det.Wendel are also investigating the husband of the victim-Carney Fer- nandes.As of this date this investigation of Carney has revealed that he has a violent temper and has been known to assault female companions in the past.Case is active and pending.

Respectfully submitted,

*Det. T.F. Sullw* #134

Det. T.F. Sullivan Sh.#134

QDA 807



**POLICE DEPARTMENT**
**The Long Island**
**Rail Road**

March 30,1988

TO:      Crime Stoppers Unit – New York City Police Department

FROM:    Long Island Railroad Police Department – Detective Div.
         Detectives Thomas Sullivan #134 and Charles Wendel #153

SUBJECT: Information For Release RE: Maureen Fernandes Homicide
         UF-61#15,777-87 LIRRPD Case# 1650-87


        The following is a list of items concerning the
Maureen Fernandes homicide which should be included in the
Crime Stoppers presentation.

        1.  Date of occurrence was Thanksgiving
morning , Thursday, November 26,1987,

        2.  The body was discovered at approx. 8:45am
in the rear of Dubovsky's warehouse located at 66-35 Otto Road
in Glendale,New York,. The body was lying in the parking lot of
the Long Island Railroad freight yard which is known as "Pond
Yard",

        3.  The victim was identified as Maureen
Fernandes a female white 35 years of age. She is also kown to
her friends as "Nina".,

        4.  Ms. Fernandes was stabbed to death. She
had in excess of 35 stab wounds about her body,

        5.  Ms. Fernandes is 5'3" tall , 117 lbs.,
had medium length brown hair and hazel eyes. At the time of her
death she was wearing: Beigh jacket , pink tee shirt with the
name "NINA" on the back and the works "THEY MAY BE LITTLE BUT
THEY'RE ALL MINE" PRINTED ON THE FRONT , Bluejeans , sneakers,

        6.  Ms. Fernandes was married and had two
children,

        7.  On Tuesday,November 24,1987 Maureen
Fernandes had brought her daughter to Wyckoff Hospital in
Brooklyn where she was admitted to the pediatrics ward. Maureen
Fernandes stayed with the child at the hospital,

        8.  According to witnesses Maureen left the
hospital sometime around 1:00 - 1:30am the morning of
Thanksgiving - Thursday,November 26,1987-,

        9.  Around 2:00am Maureen arrived at the
"Little Liva Inn" located at 1189 Gates Ave. in Brooklyn, She
arrived with a male white who was unkown to the patrons,

QDA 808

(2)

10. Maureen departed the bar with the same individual. This male is described as:

Male white - 28 - 32 Yrs old - 5'9" Tall - 150 - 160 Lbs - Short Brown or Dark Colored Hair - Well dressed - Described by some patrons as being Italian looking or light skinned Hispanic.

11. It is believed that they arrived and departed in what is described as a Mint condition Black Monte Carlo - 1976 or 1977 - Tinted windows.

12. We are attempting to locate this individual to interview him reguarding to his knowledge of Ms. Fernandes and her whereabouts before they arrived and after they departed the bar,

13. Maureen was a very friendly person but would not hang out with total strangers,

14. Maureen was very family oriented and was loved by her husband,children and family,

15. As far as the family and friends knew she did not have any enemies,

16. Maureen had worked at "Suzette's children clothing store on Fulton Street in Brooklyn,

17. During the investigation an anonymous call was received from a resident of the Glendale area giving some information which was important to the investigation. We are pleading with this person to call again so that as much information as possible can be gained about this murder,

18. ANYONE WITH ANY INFORMATION SHOULD CONTACT TIPPS , THE LONG ISLAND RAILROAD POLICE DEPARTMENT DETECTIVE DIVISION AT 1-718-217-3300 OR 3334 OR THE 104 PCT DETECTIVES AT 1-718-417-2212. ALL CALLS WILL BE KEPT TOTALLY CONFIDENTIAL.

19. Case oficers:
    LIRR-PD    Detective Thomas Sullivan
                Detective Charles Wendel
    104 PDU    Detective Jack Biezel

Detective Thomas Sullivan
LIRR-PD Detective Division

QDA 809

# ⋀ The Long Island Rail Road

## POLICE DEPARTMENT

INCIDENT NO._____

REFERENCE_____

FoR File
Hnau 9/13/88

TO: Capt. P.J.Loverso

From: Det. T.F. Sullivan Sh.#134

Date: Sat.09/10/88

Subject: Fernandes Homicide(DD#1650-87)Case Update


On Friday September 09,1988 this Officer,Detective Wendel along with Detective's Beisel, Fennel of the 104 PDU conducted an interview of Wyckoff Hospital Security Guard Javier-Ramos at the 104 PDU.Mr.Ramos,who resides at ████████████████. Bklyn.,NY had arrived at the precinct to inquire about the impounding of a vehicle that he had sold to a friend of his.

Said vehicle,a 1978 white and red Oldsmobile Toronado,was sold by Ramos to a friend Pete Sierra of 311 Stanhope St.Bklyn.,NY in March of 1988.Ramos informed us that his "friend"Sierra was annoyed that his car had been taken by the police and he wanted to know why the car had been impounded at the 104 Pct.on Wednesday September 07,1988.

It had been ascertained during this investigation that this vehicle may have been used during the commission of the murder of Maureen Fernandes on Thanksgiving morning 87'in that Dubovsky's security guard R.Salony of 58-55 43rd Ave.Woodside,NY had seen a similar vehicle drive past him on Otto Rd.during the early morning hours of Thanksgiving 87'.

Prior investigation had revealed that there were"rumors"circulating about the Wyckoff Hospital that the victim(Fernandes)had been seen leaving the hospital with a security guard from that hospital.Investigation revealed that Ramos was the only security guard at the hospital who in fact owned a white car.

On Thursday August 25,1988 this Officer and Detective Groteke escorted security guard R.Salony to the area where the subject vehicle was parked on the street at Wyckoff Ave. & Stanhope St.Bklyn..Subsequently Salony informed the undersigned that the vehicle he had seen on the morning of Thanksgiving 87'was all white and that this did not appear to be the car(subject vehicle had a red landau roof and red door molding).I then asked Salony that if this vehicle had an all white roof and white door moldings would it be possible if this might be the car.On a scale of 1to10,10 being positive,he scored the car an 08 as possibly being the car.

The in depth interview of Javier Ramos this date revealed the following;

That on Wednesday November 25,1987 he was working at the Wyckoff hospital on a 4X12 tour.At approximately 8:30PM he received a call from a fellow security of his who he identified as a Richard Pereira.Pereira had asked Ramos if he could borrow his car(subject vehicle)for about 02 hours and said it would be OK.Soon afterwards he, Pereira,came to the hospital and picked up the car.Ramos went on to state that he did not see Pereira or his car until Thanksgiving morning at 6:00AM when his car was returned to him by Pereira.Said car was returned to him at his residence at 528 Knickerbocker Ave..

Pereira told Ramos at this time that he was sorry that he had kept his car so long

(1)

QDA 805

# Ⱥ The Long Island Rail Road

INCIDENT NO. _____

## POLICE DEPARTMENT

REFERENCE _____

TO: Capt. P.J.Loverso

*Date:* Sat.09/10/88

*From:* Det. T.F. Sullivan Sh.#134

*Subject:* Fernandes Homicide(DD#1650-87)Case Update

Details Continued:

and that he would make it up to him.He also told Ramos that he had a fight with a wom-
en and that he had to stab the bitch,she was a low life and that he had to do it.A
conversation ensued about the incident at which point Pereira left Ramos'house.In a
reinterview of Ramos at this time he recanted some portions of his statements.For
additional information see the attached typed statement that was signed by Ramos.

As a result of the preceeding information Richard Pereira was picked up in front
of his residence at 151 Moffat St.Bklyn.and transported to the 104 PDU where 03
seperate line-ups were eventually conducted.Said pickup was made at about 1740hrs.
Friday 09,1988.

Line-ups were viewed by the following persons;

        #1.William Perry M/B yrs **DOB** ▮
        **Address**
        (patron of Little Liva Bar)

        #2.Joseph Castillo M/B
        **Address**
        (Bartender of Little Liva Bar)

        #3.Grace Cesnauskas F/W
        **Address**
        (Barmaid of White Shutter Bar)

All 03 line-ups were met with negative results though Castillo stated that subject#02
(Pereira)looked somewhat like the male he had seen Fernandes with at the bar on 11/26/88.

As a result of the above subject,Pereira,was relaesed from police custody.Prior to his
release Pereira was interviewed and he denied having any knowledge of the victim or the
incident itself.Pereira went on to state that he felt that Ramos was trying to frame
him for something that he did not do and it seemed to him that Ramos was trying to
hide something.

**Note:It was ascertained that Ramos had painted his Landau roof and door moldings red
       sometime in November or December of 87'.

Case Active:

Respectfully Submitted,
*T.F. Sulli____*
Detective T.Sullivan Sh.#134

**QDA 804**

(2)

**The Long Island Rail Road**

**POLICE DEPARTMENT**

INCIDENT NO. _____

REFERENCE _____

TO: Det.Sgt.D.Urquhart Sh.#245

Date: Tues.03/21/89

From: Det.T.F. Sullivan Sh.#134

Subject: Fernandes Homicide(Re:DD#1650-87)

On Saturday March 18,1989 the undersigned Officer received a call from Detective J.Bisel of the NYPD 104 PDU relative to the Fernandes homicide.At this time the Queens Homicide office(ADA D.Dickman) is giving us the go-ahead to make the arrest of suspect Felipe Rodriguez M/H 23yrs.DOB 08/15/65.Rodriguez last resided at 635 Watkins Avenue Bklyn.,NY/or 793 Hart St.Bklyn.,NY..

In addition a second individual ,identified as a Ramos M.Javier M/H 24yrs.DOB ████,is to be brought in as a possible material witness in regards to this investigation.

Detective J.Bisel is requesting that Det.Wendel and the undersigned Officer respond to the 104 PDU on Tuesday March 21,1989 at 1600hrs to assist in the pick-up of the 02 above identified individuals.

Respectfully submitted

Det.T.F. Sullivan Sh.#134

QDA 800

**The Long Island Rail Road**

INCIDENT NO.

**POLICE DEPARTMENT**

REFERENCE ___ DD# 1650-87

TO:      D. V. Urquhart, Sergeant of Detectives

Date: 03/29/89

From:   Detectives Sullivan and Wendel

Subject: Case Review and Closing

On Monday, 03/27/89, a 16 month investigation into the homicide of Maureen Fernandez culminated in the arrest of Felipe Rodriguez for the homicide.

The investigation was a joint investigation between members of the LIRR Police Department and the 104 PDU. The joint investigation team, on Monday, 03/27/89, had a meeting at the 104 PDU and made final plans for the arrest of Rodriguez. Detectives Sullivan and Beisel responded to the Wyckoff Hospital and picked up security guard Javier Ramos at approximately 1530 hours. He was requested to and did return to the 104th Pct. by Detectives Sullivan and Beisel and a true and complete statement was obtained which detailed Felipe Rodriguez's involvement in the homicide. ADA Dickman was contacted and he responded to the precinct and interviewed Ramos along with Detective Sullivan concerning his knowledge of the homicide. He gave a written statement to ADA Dickman and Sullivan which he signed.

Detectives Wendel and Fennel responded to the 83rd Pct. where the suspect, Felipe Rodriguez, was located in the Auxiliary Police Office. He was requested to return to the 104 Pct. for further questioning and agreed to do so. He was taken to the 104 Pct. where he was given his rights and waived same. He was advised that he was under arrest for murder. During questioning he gave several negative exculpatory statements and then refused to answer any further questions.

The suspect was placed in a lineup and was positively identified as the person the deceased was with in the Gates Avenue Bar on Thursday morning, November 26, 1987. This was the last time the deceased was seen alive before her body, with 37 plus stab wounds, was found in the LIRR Fresh Pond Freight Yard parking area.

ADA Dickman prepared the affidavit, and Rodriguez was processed for the homicide of Maureen Fernandez. He was held for arraignment, and a grand jury is to be convened on Wednesday, 03/29/89, to hear the case.

The above is submitted for your information and review.

TS/eh
0869i

Det. H. Sullivan

Detective Sullivan

QDA 801

9/25/88 1830 hrs

Where were you
on Thanksgiving
Eve — with my
wife

Finish reading read
this + sign it
please if you
agree (rights)

Ok may

Remember your
rights —

PLAINTIFF'S
EXHIBIT

H

QDA 1407

Where were you
I don't remember

Where you were
on That Day?
With my wife
& her family
They have a
house in Rosedale
149-200th Street

Did you remember
about 3 pm
No

QDA 1408

Car did I have
last Thanksgiving
Olds white
with red top

Due you know
who owns the car
now — Yes Pete
the Sgt at WH

Where did he
get th car?

From my step
father

QDA 1409

He brought the
car from him.

Did Péché ever
borrow the car
sure plenty of
times

They are good
friends

Do you use the
car? Many times

QDA 1410

On Thanks Eve
or Day — No

White Shutter Boy?
Yes — many times

Who about the
area of Yates
& Evergreen Can
you discrip it?
on the left side
of Evergreen is
a grocery store
across

QDA 1411

a bar on the
other side need
houses.
Have you ever
been in the
bar? Its called
The Little Eva?

No—
Are you sure?
Never—

No never.
It Black drugs
What

QDA 1412

Richie anything
to help us.

He like girls
all girls in the
hospital Patient
visitors he
wasn't choosy
He go after anybody

I went to the
hosp everyday to
see. That
is when I
would see
Rich

QDA 1413

83 Anx complained
about you? Yes
after a fight
with a guard
over "I" Not
a fight pushing

I like to go to
the morgue to
see the dead
bodies — The ones
from homicides
the messy one's

QDA 1414

I like police
work — I am
going to become
a cop soon.

My Rod was
asked when
Ramos told
him about
the mess in
the car? two
weeks ago.
You are lying!

QDA 1415

Mr. R asked if
he could call
James + ask
him. He call
& was told
James was on
med. but ask if
he could talk
to J before
answering the
questions +
he was told
ok.

QDA 1416

This ended the
inter.
My Rod was
driven home
at this time

QDA 1417



PLAINTIFF'S
EXHIBIT

I



0212

*State*

*State*

*for murder a*

0213

0214

