UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                         :

**FELIPE RODRIGUEZ**,
                         :

              Plaintiff,     :

                         :    **MEMORANDUM DECISION AND ORDER**

       – against –       :

                         :    21-CV-1649 (AMD) (RLM)

**THE CITY OF NEW YORK,**
**METROPOLITAN TRANSPORTATION**
**AUTHORITY, LONG ISLAND RAIL ROAD**
**COMPANY, JOHN BEISEL,** *in his individual*
*and official capacities*, **THOMAS SULLIVAN,** *in*
*his individual and official capacities*, **CHARLES**
**WENDEL,** *in his individual and official capacities*;
**JERRY FENNEL,** *in his individual and official*
*capacities*; **JOHN CALIFANO,** *in his individual*
*and official capacities*, **JOHN WILDE,** *in his*
*individual and official capacities*, **GEORGE**
**ZAROOGIAN***, in his individual and official*
*capacities*, **AND OTHER AS-YET-UNKNOWN**
**POLICE OFFICERS & SUPERVISORS JOHN**
**AND JANE DOES #1-10**,
                         :

             Defendants.   :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

      The plaintiff brings claims pursuant to 42 U.S.C. §§ 1981 and 1983, and also makes state

law claims.  In 1990, the plaintiff was convicted after a jury trial of murder in the second degree,

and was sentenced to an indeterminate prison term of 25 years to life.  (ECF No. 33 ¶¶ 329, 331.)

After the plaintiff served 27 years in prison, former Governor Andrew Cuomo granted him

clemency on December 30, 2016, and the Honorable Joseph Zayas of New York Supreme Court,

Queens County, vacated the conviction on December 30, 2019.  (*Id.* ¶¶ 337, 348.)  The plaintiff

alleges that the police officers who investigated the murder—former detectives of the New York

Police Department ("NYPD") and the Long Island Rail Road Police Department ("LIRR PD")—

as well as the agencies themselves violated his civil rights.[1]  Before the Court are the defendants'

partial motions to dismiss the amended complaint.  (ECF Nos. 39, 42.)  For the reasons that

follow, the motions are denied in part and granted in part.

## BACKGROUND[2]

On the morning of November 26, 1987, Thanksgiving Day, a security guard found the

body of 35-year-old Maureen Fernandez in an industrial lot in Glendale, Queens.  (ECF No. 33

¶¶ 39-41.)  The LIRR PD assisted the NYPD in investigating the case, because Ms. Fernandez's

body was on land belonging to the Long Island Rail Road.  (*Id.* ¶ 51.)  The next day, a warehouse

security guard told the police that a white man in his 20s with a thin mustache and short dark hair

drove a "1980-81 2 [door] white Cadillac" out of the lot between 3:00 a.m. and 4:00 a.m. on

November 26, 1987.[3]  (*Id.* ¶¶ 48-49.)

The investigation revealed that Ms. Fernandez spent much of November 25, 1987 at

Wyckoff Heights Hospital in Brooklyn, where her daughter was being treated.  (*Id.* ¶ 52.)  At

around 1:00 a.m. on November 26, 1987, she argued with her husband over the phone, and went

to Little Liva Bar in Brooklyn.  (*Id.* ¶¶ 54, 56.)  Police officers interviewed people at the bar,

including the bartender Joseph Castillo and patrons Robert Thompson and William Perry.  (*Id.* ¶¶

64-65.)  Witnesses told the police that Ms. Fernandez and a man arrived at the bar at about 2:00

a.m., in a black, late-1970s Chevrolet Monte Carlo.  (*Id.* ¶¶ 59-60.)  In an initial interview,

---

[1] The LIRR PD merged into the Metropolitan Transportation Authority's police force in 1998.  (ECF No. 33 ¶ 21); *see* N.Y. Pub. Auth. Law § 1266-h(1).

[2] The facts are drawn from the allegations in the plaintiff's amended complaint, documents incorporated by reference into the amended complaint and documents integral to the amended complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  I draw all reasonable inferences in the plaintiff's favor, and accept the factual allegations in the amended complaint as true for purposes of this motion.  *See Town of Babylon v. Fed Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).

[3] The man was not wearing glasses.  (ECF No. 33 ¶¶ 49, 66.)

Thompson told the police that the man with the victim was "bow-legged," was wearing a "multicolored sweater," "beige pants" and a gold ring, and had "reddish brown" hair. (*Id.* ¶ 68.) In a videotape-recorded interview, he told LIRR PD detectives Thomas Sullivan and Charles Wendel that the man also had the word "LOVE" tattooed across his fingers. (*Id.* ¶¶ 71-76.) In February of 1988, Perry told Wendel and Sullivan that the man with Ms. Fernandez was Italian or Irish, "not Hispanic," and had "hazel or green" eyes. Although Wendel wrote a note about Perry's description, the detectives did not prepare a DD-5 investigation report form ("DD-5") following the interview.[4] (*Id.* ¶¶ 68-69, 312.)

During the investigation that followed, the police pursued a number of leads. Within a month of the murder, the police prepared a composite sketch of the suspect. (*Id.* ¶ 98.) Following an anonymous tip that "the male in the [police] sketch . . . live[d] across the street" from the Wyckoff Hospital and had a Monte Carlo, detectives investigated Jose Perez Rivera, who lived next to the hospital and owned a black 1978 Monte Carlo. (*Id.* ¶¶ 98-99.) The police identified Rivera as a person of interest in August of 1988 but, according to the plaintiff, "abandoned their investigation of Rivera after encountering difficulty locating him." (*Id.* ¶ 101.) The police also identified Eddie Ruiz as a suspect; police reports suggested that he might have known Ms. Fernandez and assaulted her female relative. (*Id.* ¶¶ 101, 103.) In February of 1988, Wendel and Sullivan showed Castillo a photo array that included Ruiz's photograph; Castillo identified Ruiz as the man with Ms. Fernandez at the bar. One of the detectives memorialized the identification in a handwritten note, but did not document the identification in a DD-5. (*Id.* ¶¶ 104-05, 321.)

---

[4] The plaintiff alleges that this note was never disclosed to the defense. (ECF No. 33 ¶¶ 70, 315.)

In April of 1988, Detective John Beisel from the NYPD 104th Precinct was assigned to lead the investigation. He shifted the focus from the black Monte Carlo patrons saw at the Little Liva Bar to the white Cadillac the warehouse security guard saw leaving the lot. (*Id.* ¶¶ 114-15.) In August of 1988, the police learned that a Wyckoff Heights Hospital security guard named Pete Sierra owned a white Oldsmobile with a red roof; he allowed the police to voucher the car as evidence. (*Id.* ¶¶ 116-18, 121.) Sierra purchased the Oldsmobile in early 1988 from Javier Ramos, another hospital security guard. (*Id.* ¶ 122.)

On September 9, 1988, Ramos went to the 104th Precinct, and asked why detectives were interested in his former car. (*Id.* ¶ 124.) Beisel took Ramos into a room, and detectives interrogated him for about 13 hours. (*Id.* ¶¶ 126-27.) The plaintiff alleges that "[d]etectives used coercive tactics to get Ramos to either confess to the murder or lead them to another suspect," and that George Zaroogian, John Califano, John Wilde, Jerry Fennel, Sullivan and Wendel "assisted" Beisel in this interrogation. (*Id.* ¶¶ 128-29.) He also alleges that "Beisel pushed Ramos, threatened to maim or kill him, called him a 'spic' and a 'Hispanic prick,' denied him food, water, and the use of a bathroom, and refused his request to leave," and that "[t]he other detectives failed to intervene." (*Id.* ¶¶ 132-33.) Ramos told the detectives that he had previously loaned his car to two friends, Richard Pereira and the plaintiff. Beisel demanded that Ramos take them to the plaintiff's home, and they got into a police car with Califano and Wilde. (*Id.* ¶¶ 137-38.) The plaintiff alleges that Beisel, Califano and Wilde stopped at a cemetery in Brooklyn, and "threatened to kill Ramos if he did not either admit to the murder or implicate" the plaintiff. At that point, Ramos told them that he had loaned his car to the plaintiff and Pereira at the time of Ms. Fernandez's murder. (*Id.* ¶¶ 139-40.) The detectives then took Ramos to the plaintiff's residence, but he was not there. Califano drafted a DD-5 stating that "Mr. Ramos said

his friend . . . Felipe Rodriguez, may have information regarding this homicide," and that "[the plaintiff] borrowed his car on the night of the incident." (*Id.* ¶ 143.)

The detectives took Ramos back to the precinct and continued to interrogate him.  At about 1:00 a.m. on September 10, 1988, Ramos signed an affidavit implicating Pereira in Ms. Fernandez's murder.  (*Id.* ¶¶ 146-47.)  The affidavit included the following statements:  Around Thanksgiving of 1987, Ramos loaned his car to Pereira, who was wearing a multi-colored sweater, beige pants and jewelry.[5]  Pereira promised to return the car by midnight, but returned it at 6:00 a.m. on November 26, 1987.  Pereira apologized, and explained that "he got into an argument with a low-life bitch that he had met at the hospital."  Ramos cleaned the car later that day, after he noticed "a red liquid substance on the front passenger seat, armrest, passenger door and window and floor mat."  Pereira threatened Ramos with a gun several months later.  (*Id.* ¶ 149.)  Beisel and Zaroogian signed the affidavit as witnesses, and Wendel notarized it.  (*Id.* ¶ 148.)  The plaintiff alleges that at some point during the interrogation, Ramos told Zaroogian that the affidavit was false.  (*Id.* ¶ 152.)  In a DD-5, Beisel wrote that Pereira also told Ramos, "I'm sorry I took so long with it [the car].  This low life bitch [] that I met [at] the hospital—I got into an argument with [her].  I had to do [] what I had to do.  I had to stab her."  (*Id.* ¶ 154.)

Beisel and other detectives forwarded the affidavit to the Queens County District Attorney's Office (the "QDAO").  (*Id.* ¶ 156.)  The police arrested Pereira later that day, interrogated him and placed him in a lineup.  The three witnesses who viewed the lineup did not identify him, and he was released.  (*Id.* ¶¶ 159, 161-62.)

In late September of 1988, Beisel, Fennel and Wendel had Pereira wear a recording device and sent him to record a conversation with Ramos at the Wyckoff Heights Hospital.

---

[5] This description was similar to Thompson's description of the man with Ms. Fernandez at the bar.  (ECF No. 33 ¶ 67.)

Ramos told Pereira that on November 26, 1987, "[M]y car was parked in front of my mother-in-law's house, because my battery [] was dead . . . [.]  I told them all of this.  And yet they didn't . . . want to hear that. . . [.]  They wanted me to confess to something."  (*Id.* ¶ 167.)  Ramos also said that he signed the affidavit implicating Pereira only because the detectives told him to do so, and that he cleaned a "red substance," not blood, from his car.  (*Id.* ¶¶ 168-69.)  Pereira and Ramos also discussed the details of the interrogation, and Pereira said that police "smacked" him "all night long."  (*Id.* ¶¶ 170-71.)

On March 27, 1989, almost a year and a half after Ms. Fernandez's murder, Beisel and Sullivan brought Ramos to the precinct, and with Zaroogian, Fennel and Wendel, interrogated him.  During the approximately seven hours that followed, Beisel gave him false information, including that the plaintiff accused Ramos of the murder and that the plaintiff matched witnesses' descriptions of the man with Ms. Fernandez before she was killed.  (*Id.* ¶¶ 196-201.)  An assistant district attorney with the QDAO, David Dikman, prepared an affidavit implicating the plaintiff in Ms. Fernandez's murder.  Dikman, Beisel, Sullivan and Zaroogian gave Ramos the affidavit.  (*Id.* ¶¶ 202-03.)

The affidavit was very similar to the one that Ramos signed in September of 1988 implicating Pereira in the murder.  This affidavit stated, among other things, that on November 25, 1987, Ramos loaned his car to the plaintiff, who was wearing a multi-colored sweater and beige pants.  The plaintiff promised to bring the car back by midnight but returned it at 6:00 a.m. the next day.  He apologized, explained that he got into a fight with a "bitch," and admitted that he stabbed her to show her that she "was dealing with a man, not some boy."  (*Id.* ¶ 206.)  Ramos and Sullivan signed the affidavit, and Dikman notarized it.  (*Id.* ¶ 208.)

Later that day, Beisel, Fennel and Wendel arrested the plaintiff, and drove him to the precinct, where they questioned him.  (*Id.* ¶¶ 210-11.)  The plaintiff denied killing Ms. Fernandez and said that he was at home with his wife and child during the early hours of November 26, 1987.  (*Id.* ¶¶ 213-15.)  The plaintiff alleges that Beisel ignored his request for counsel and yelled, "Listen, one of you spics is going down for this!"  (*Id.* ¶¶ 218-19, 222.) Beisel eventually put the plaintiff in a holding cell.  (*Id.* ¶ 225.)  Beisel wrote in a DD-5 that the plaintiff "made no statements;" however, Sullivan wrote that "[d]uring questioning, [the plaintiff] gave several negative exculpatory statements and then refused to answer any further questions."  (*Id.* ¶¶ 227-28.)

In September of 1988, Beisel and Zaroogian interviewed the plaintiff's wife Gladys Rodriguez outside of their home in Brooklyn.  (*Id.* ¶ 175.)  Ms. Rodriguez told the detectives that she and the plaintiff were at home together on November 25 and 26, 1987, that the plaintiff never wrote "LOVE" on his hand, and that he wore glasses and had a thick mustache in November of 1987.[6]  (*Id.* ¶¶ 176-79.)  Beisel wrote in a DD-5 that Ms. Rodriguez could not remember where the plaintiff was on November 25, 1987 or the next morning, and that she said the plaintiff "might have had a slight mustache" in November of 1987.  (*Id.* ¶ 181.)  Beisel did not include Ms. Rodriguez's statements that the plaintiff never wrote "LOVE" on his hand, or that he wore glasses.  (*Id.* ¶ 182.)

On March 27, 1989, Beisel and Zaroogian placed the plaintiff in a lineup.  The witnesses from the bar—Castillo, Perry and Thompson—viewed the lineup separately.  (*Id.* ¶¶ 229-31.) The plaintiff alleges that before the lineup, Beisel walked the plaintiff, who was handcuffed and wearing a sign with the number "3," past Thompson, and told Thompson that he would ask him

---

[6] This description was different from the warehouse security guard's description of the man who drove out of the lot the morning of November 26, 1987.  (ECF No. 33 ¶ 49.)

three questions, emphasizing the word "three." (*Id.* ¶¶ 232-38.) Thompson then viewed the lineup and identified the plaintiff as the man who arrived at the bar with Ms. Fernandez. Neither Perry nor Castillo identified the plaintiff. (*Id.* ¶¶ 240-41.)

On March 28, 1989, Beisel signed a criminal complaint charging the plaintiff with murdering Ms. Fernandez on November 26, 1987. (*Id.* ¶ 243.) According to the plaintiff, ADA Dikman drafted a prosecution memo to the Queens County District Attorney in which he relied on false information, including Ramos's affidavit, as well as Beisel's report that the plaintiff's wife did not give the plaintiff an alibi, and that Ramos told Pereira in a recorded conversation that he loaned the plaintiff his car. (*Id.* ¶¶ 247-57.) Ramos, Castillo and Thompson testified before a grand jury, which returned an indictment charging the plaintiff with murder in the second degree and criminal possession of a weapon in the fourth degree. (*Id.* ¶¶ 259-68.)

The plaintiff was released on bail on May 19, 1989 after he passed a polygraph test. (*Id.* ¶¶ 269-71.)

The plaintiff went to trial before the Honorable Ralph Sherman and a jury. Ramos, Thompson and Beisel testified, as did Thomas Rosa—the plaintiff's supervisor in the auxiliary police force—and Patrician Owens, a Wyckoff Heights Hospital employee. (*Id.* ¶¶ 285-304.) The plaintiff was convicted on May 2, 1990 of murder in the second degree and criminal possession of a weapon in the fourth degree. (*Id.* ¶ 329.) On May 25, 1990, the trial judge sentenced the plaintiff to an indeterminate prison term of 25 years to life. (*Id.* ¶ 331.) The Appellate Division unanimously affirmed the plaintiff's conviction and sentence on December 12, 1994. *See People v. Rodriguez*, 210 A.D.2d 356, 356 (2d Dep't 1994). On March 3, 1995, the Court of Appeals denied the plaintiff's application for leave to appeal. *People v. Rodriguez*, 85 N.Y.2d 913 (1995). The plaintiff's motions to vacate his conviction, as well as his petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, were denied.  (ECF No. 33 ¶ 331);

*Rodriguez v. Greiner*, No. 97-CV-3563, (E.D.N.Y. May 30, 2003).

Former Governor Cuomo granted him clemency and commuted his sentence on

December 30, 2016.  (*Id.* ¶ 337; ECF No. 40-1 at 1 n.1.)  The plaintiff was released after having

spent approximately 27 years in prison.

On December 20, 2017, Ramos recanted his testimony.  He claimed that detectives

coerced him into saying that the plaintiff borrowed his car and admitted to Ramos that the

plaintiff killed Ms. Fernandez.  (ECF No. 33 ¶¶ 341-42.)  The QDAO reinvestigated the

plaintiff's case.  In 2019, the plaintiff filed another motion to vacate his conviction pursuant to

New York Criminal Procedure Law Sections 440.10(1)(g) and 440.10(1)(h), and the QDAO

joined in the motion.  (*Id.* ¶¶ 344-47.)

In a December 30, 2019 appearance before Justice Zayas, Assistant District Attorney

("ADA") Robert Masters joined in the motion to vacate the plaintiff's conviction.  While he

acknowledged Ramos's recantation, he also said that it was "entirely devoid of logic, adequate

recall and appear[ed] to be motivated in part by intense animus towards the police."  (ECF No.

40-2 at 16.)  Nevertheless, QDAO's reinvestigation of the case uncovered "inconsistencies" in

the LIRR PD defendants' paperwork that were not disclosed to the defense, and that would "have

been the subject of cross-examination" if they had been disclosed.  (*Id.* at 17.)  He said that the

"most troubling and decisive is the discovery of a photocopy of a memo book identified as

having been written by Detective Sullivan of the [LIRR PD]."  (*Id.* at 17-18.)  Masters described

the memo, and acknowledged that Sullivan never shared it with the NYPD officers or the

prosecutors, and that it was never provided to the plaintiff:

The handwritten note states: Rodriguez showed up at Ramos's house 6:oo A.M. Thanksgiving morning with male black friend, 25 years old, slim, dark-skinned black.

Sullivan has no memory of it.  NYPD Detective Beisel never saw it and candidly admits he would have pressed for an identification of the male black.  Concerned that he could have been an additional witness against the defendant but also a potential accomplice to the crime or perhaps even the actual perpetrator.

An examination of the trial record reveals no hint it was in [defense] counsel's possession. . . . I am persuaded these materials were not provided to the defendant. That conclusion was only strengthened by that conversation with former ADAs Dikman and [Alan] Safran who tried the case.  Neither ever saw these materials and both would have taken steps to address their significance and relevance.

(*Id.* at 18.)

It was favorable to the defendant.  Very favorable.  On a number of planes it would have impeached Mr. Ramos.  It would have impeached the detective.  It would have impeached the entire investigation.  It would have lent support for the defense theory of another perpetrator.  Because it was favorable, it was our obligation to get it into the defendant's hands. . . .  [I]t would have been a different trial had this piece of paper been made available[,] and no one would have been surprised by a different verdict.

(*Id.* at 19-20.)

Justice Zayas agreed that the material was exculpatory:

The miscarriage of justice took way too long to discover[,] and it took an act outside of the criminal justice system, . . . Governor Cuomo's commutation of your life sentence and release from prison after 27 years.  Mr. Rodriguez, you deserve better than that. . . .  There were indeed some documents in your case, some *Brady* material, some evidence that was favorable to you which would likely have affected the jury's verdict.

(*Id.* at 24.)  He vacated the plaintiff's conviction and dismissed the underlying indictment.  (*Id.*)

The plaintiff brought this action on March 26, 2021.  (ECF No. 1.)  After a pre-motion conference, the plaintiff filed the amended complaint on July 26, 2021.  (ECF No. 33.)  The defendants filed motions to dismiss the amended complaint on August 26 and September 7, 2021.  (ECF Nos. 39, 42.)

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). Although detailed factual allegations are not required, the pleading standard "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

**DISCUSSION**

The plaintiff asserts state law malicious prosecution claims against all the defendants (Count I). He also asserts against the individual defendants claims under 42 U.S.C. § 1983 for malicious prosecution (Count II), denial of due process relating to fabrication of evidence (Count III) and *Brady* violations (Count IV), excessive pretrial detention (Count V) and civil rights conspiracy (Count VI). The plaintiff asserts Section 1983 and 1981 claims against Beisel, alleging violations of his rights to equal protection and equal benefit of the law (Counts VII and VIII). Finally, he asserts claims for *Monell* liability against the City of New York, the Metropolitan Transportation Authority ("MTA"), the Long Island Rail Road Company ("LIRR") and QDAO (Counts IX, X and XI). Beisel, Califano, Wilde, Fennel and Zaroogian (the "individual NYPD defendants") and the City of New York (collectively, the "City defendants") move to dismiss all individual claims as well as the *Monell* claims against the City and QDAO.

(ECF Nos. 39, 41.)  Sullivan and Wendel (the "individual LIRR PD defendants"), the MTA and

the LIRR (collectively, the "MTA defendants") move to dismiss all claims against Sullivan and

Wendel (Counts I, II, III, IV, V and VI) and the *Monell* claims against the MTA and LIRR.

(ECF Nos. 42, 44.)

**I.      Malicious Prosecution Under State Law and Section 1983**

The City defendants argue that the allegations in the amended complaint are insufficient

because the prosecution did not end in a manner indicative of innocence, and because Zaroogian,

Califano, Wilde and Fennel did not "initiate" the prosecution.  (ECF No. 41 at 12-17, 18-19.)

The MTA defendants argue that the plaintiff has not sufficiently pled any of the elements of a

malicious prosecution claim with respect to Wendel and Sullivan.  (ECF No. 44 at 9.)  They also

argue that the plaintiff's *respondeat superior* claims against the MTA and LIRR should be

dismissed because the MTA is not liable for torts committed by its subsidiaries and because the

plaintiff did not make a pre-suit demand against the LIRR.  (*Id.* at 25-26.)

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a

plaintiff must show a violation of his rights under the Fourth Amendment and must establish the

elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*,

612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  In New York, those elements are: "(1)

the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the

proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and

(4) actual malice as a motivation for defendant's actions." *Id*. at 161 (quoting *Murphy v. Lynn*,

118 F.3d 938, 947 (2d Cir. 1997)).

####    a.    Initiation or Continuation of a Criminal Proceeding Against the Plaintiff

The City defendants argue that the plaintiff has not sufficiently alleged that Zaroogian, Califano, Wilde and Fennel initiated the criminal proceeding against the plaintiff,[7] and claim that the "Complaint is completely devoid of any factual allegations against the defendants Zaroogian, Califano, Wilde and Fennel, that they had any role in the prosecution of plaintiff, . . . communicated with prosecutors in any way . . . or even testified at any hearing or trial."  (ECF No. 41 at 18-19.)  Similarly, the MTA defendants argue that "[t]he criminal charges against Plaintiff were initiated by NYPD Detective John Beisel, not by Sullivan or Wendel," that "there are no allegations that either Sullivan or Wendel furnished any information at all to the prosecutor," "that the information Sullivan and Wendel documented in the investigation file was knowingly false—or that it was false at all," that Sullivan and Wendel "[a]ppropriately [d]ocumented," their investigation, and that the prosecution independently decided to bring charges.  (ECF No. 44 at 16, 17, 19.)

To initiate a prosecution, a defendant "must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'"  *Maldonado v. City of New York*, No. 11-CV-3514, 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014) (quoting *Manganiello*, 612 F.3d at 163).  "In malicious prosecution cases against police officers, plaintiffs have met this first element by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint."  *Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005) (citations omitted).  "In addition, a police officer 'may be held liable for malicious prosecution when [he] creates false information likely to influence a jury's decision and forwards that

---

[7] The City defendants do not make this argument with respect to Beisel.

information to prosecutors.'" *Maldonado*, 2014 WL 787814 at *6 (quoting *Cameron v. City of New York*, 598 F.3d 50, 64 (2d Cir. 2010)).  "Where an officer causes the prosecution to initiate or continue criminal charges without disclosing evidence that would negate probable cause, the officer may be liable for malicious prosecution." *Newson v. City of New York*, No. 16-CV-6773, 2019 WL 3997466, at *9 (E.D.N.Y. Aug. 23, 2019) (citing *Dufort v. City of New York*, 874 F.3d 338, 355 n.7 (2d Cir. 2017)).  "Separately, [] officer[s] may be liable where they impede the prosecution's ability to abide by its own constitutional duty to disclose exculpatory evidence to the defense." *Id.* (citing *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019)) (collecting cases).

"[T]here is no requirement that an officer have direct contact with the prosecutor." *Maldonado*, 2014 WL 787814, at *6 (citations and quotation marks omitted).  "[T]he chain of causation [in a malicious prosecution suit] need not be considered broken if [a defendant government agent] . . . could reasonably foresee that his misconduct [would] contribute to an independent decision that results in a deprivation of liberty." *Cameron*, 598 F.3d at 63-64 (quoting *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)).  "Although there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Id.* at 64 (quoting *Llerando-Phipps*, 390 F.Supp.2d at 383). With respect to Section 1983 malicious prosecution claims, district courts in this circuit have "held that a jury could find an officer liable despite the fact that he did not bring the formal charges or fill out a complaining affidavit, [because] that officer reported the evidence to the complaining officer." *Bryant v. Crowe*, 697 F. Supp. 2d 482, 492-93 (S.D.N.Y. 2010) (citing

*Llerando-Phipps*, 390 F.Supp.2d at 383); *see also Phelps v. City of New York*, No. 04-CV-8570, 2006 WL 1749528, at *4 (S.D.N.Y. June 27, 2006) (holding that because officers' "statements to [the arresting officer] caused [the plaintiff] to be arrested and ultimately charged[,] . . . their actions could be deemed to have initiated the prosecution").

Accordingly, Zaroogian, Califano, Wilde and Fennel did not need to communicate with prosecutors or testify at any hearing to be liable for malicious prosecution.  At the pleading stage, a plaintiff can establish initiation by alleging that a defendant reported false inculpatory evidence that could likely influence a jury's decision, or that a defendant did not report exculpatory evidence that could negate probable cause.  *See Cameron*, 598 F.3d at 64.  The plaintiff's allegations are sufficient.  He claims that Beisel, Califano and Wilde drove Ramos to a cemetery where they threatened to kill him if he did not either admit to the crime or implicate the plaintiff (ECF No. 33 ¶¶ 138-39); that Califano prepared a DD-5 in which he wrote that Ramos said the plaintiff borrowed his car, but which omitted the details about the cemetery encounter (*id.* ¶ 143); that in September of 1988, Beisel, Zaroogian, and Wendel signed Ramos's coerced affidavit implicating Pereira (*id.* ¶¶ 146-50); that in a DD-5, Beisel falsely claimed that the plaintiff's wife could not remember where the plaintiff was during the evening of November 25, 1987 and omitted her statement that he did not have "LOVE" written on his hand like the man whom patrons saw at the bar (*id.* ¶¶ 175-82); that in March 1989, Beisel, Sullivan, Zaroogian, Fennel and Wendel participated in interrogating Ramos, and creating the affidavit implicating the plaintiff (*id.* ¶¶ 197-207); and that Beisel, with Zaroogian's help, improperly induced Thompson's lineup identification of the plaintiff.  (*Id.* ¶¶ 232-38.)  In short, the plaintiff has sufficiently alleged that "all the individual [City] defendants were personally involved in manufacturing false evidence, or holding back exculpatory information, knowing their conduct

would be relied upon by the prosecution, and it was, to initiate and continue the prosecution."
(ECF No. 49 at 15.)

The MTA defendants' arguments fare no better for similar reasons.  As discussed above,
to be liable for malicious prosecution, Sullivan and Wendel did not need to sign the criminal
complaint themselves or directly communicate with the prosecution.  *See Maldonado*, 2014 WL
787814 at *6; *see also Newson*, 2019 WL 3997466, at *9.  The plaintiff alleges that Wendel
assisted in the September 1988 and March 1989 interrogations of Ramos and signed Ramos's
coerced affidavit implicating Pereira, and that Sullivan was present for the March 1989
interrogation and signed Ramos's almost identical affidavit inculpating the plaintiff.  (ECF No.
33 ¶¶ 146-50, 197-208.)  The plaintiff has pled that Wendel and Sullivan either did not report
exculpatory evidence that would have negated probable cause, were involved in creating false
inculpatory evidence, or both.  As the plaintiff argues, the MTA defendants cannot "argue that
prosecutors made an independent decision to prosecute [the] [p]laintiff, when that decision was
based upon [Ramos's] statement crucial to the decision to prosecute that" they allegedly
"contributed to fabricating."  (ECF No. 50 at 11.)

Moreover, during the 2017 hearing on the plaintiff's motion to vacate his conviction, the
prosecution acknowledged that Sullivan's memo was not disclosed either to the prosecutors who
tried the case or to the plaintiff.  (ECF No. 40 at 18 ("Neither [prosecutor] ever saw these
materials and both would have taken steps to address their significance and relevance.")); *cf.*
*Newson*, 2019 WL 3997466, at *9.  Regardless of whether Sullivan intentionally withheld the
memo, the plaintiff has alleged that Sullivan did not disclose exculpatory evidence that would
have negated probable cause or was necessary for the prosecution to abide by its constitutional
duty to share *Brady* material with defense counsel.  *Newson*, 2019 WL 3997466, at *9.

### b.      Termination of the Proceeding in the Plaintiff's Favor

"With respect to the second element, favorable termination, different standards govern a Section 1983 claim and a claim under New York law." *Buari v. City of New York*, 530 F. Supp. 3d 356, 384 (S.D.N.Y. 2021). "New York law does not require a malicious prosecution plaintiff to prove [his] innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004). "Rather, a plaintiff need only demonstrate that 'the circumstances surrounding the termination are not inconsistent with the innocence of the accused.'" *Buari*, 530 F. Supp. 3d at 384 (quoting *Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001)).

"The Section 1983 requirement is more stringent: the plaintiff must 'show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence.'" *Id.* (quoting *Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018)). "This standard requires that 'the prosecution terminated in some manner indicating that the person was not guilty of the offense charged,' based on the 'merits' rather than 'on any number of procedural or jurisdictional grounds.'" *Minus v. City of New York*, 488 F. Supp. 3d 58, 64 (S.D.N.Y. 2020) (quoting *Lanning*, 908 F.3d at 26, 28). "No single type of disposition is necessary or sufficient, but the termination must be 'measured in objective terms by examining the totality of the circumstances.'" *Rosario v. City of New York*, 18-CV-4023, 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) (quoting *Lanning*, 908 F.3d at 28). "[A] dismissal that 'leaves the question of guilt or innocence unanswered . . . cannot provide the favorable termination required . . . .'" *Gondola v. City of New York*, No. 16-CV-369, 2020 WL 1433874, at *6 (E.D.N.Y. Mar. 24, 2020) (last two alterations in original) (quoting *Lanning*, 908 F.3d at 28-29). "A plaintiff who satisfies the Section 1983 standard necessarily satisfies the less-stringent New York standard."

*Buari*, 530 F. Supp. 3d at 384 (citing *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 71-73 (S.D.N.Y. 2020)).

At the outset, this is not a case like *Lanning*, in which the prosecution was not terminated on the merits but on jurisdictional grounds.  *Cf. Lanning*, 908 F.3d at 28 (emphasizing that the plaintiff acknowledged that the dismissal of his charges was based at least in part on lack of jurisdiction and that the state court had explicitly stated that there was no "determination of the merits" upon dismissal); *Isaac v. City of New York*, No. 16-CV-4729, 2020 WL 1694300, at *7 (E.D.N.Y. Apr. 6, 2020) (holding that where the plaintiff was entitled to a new trial but never granted one because he had already served the maximum sentence for the charge, the dismissal did not affirmatively indicate his innocence).  Rather, the prosecution terminated because, as the prosecutor acknowledged, exculpatory evidence was withheld from the plaintiff.

The defendants argue that "Justice Zayas did not rule on whether plaintiff was guilty or innocent, and that issue was left unanswered," and that "[t]aken in the totality of the circumstances, the vacatur of plaintiff's conviction does not affirmatively indicate his innocence."  (ECF No. 41 at 14.)  The record does not support the defendants' interpretation.  Justice Zayas found that the disclosure of evidence "likely would have affected the jury's [guilty] verdict," which means the disclosure would have likely resulted in a verdict of not guilty.  *Cf. Jeanty v. City of Utica*, No. 16-CV-966, 2021 WL 149051, at *29 (N.D.N.Y. Jan. 14, 2021) (observing that the state court judge who vacated the plaintiff's conviction agreed with the prosecution's statements that there was sufficient evidence to support the conviction).  The fact that Justice Zayas did not expressly declare the plaintiff "innocent" does not mean that the prosecution did not terminate in his favor.  The plaintiff need only show that the "the prosecution terminated in some manner indicating that the person was not guilty of the offense charged."  *See*

*Lanning*, 908 F.3d at 26 (citation omitted); *see also Hincapie*, 434 F. Supp. 3d at 73 (observing

that the defendants' argument that "the proceeding was not terminated in Plaintiff's favor

because he did not prove actual innocence . . . fundamentally conflicts with the axiomatic and

elementary principle of the presumption of innocence—once a conviction is erased, the

presumption of innocence is restored"); *Buari*, 530 F. Supp. 3d at 387 (observing that at the

motion to dismiss stage, "the standard for favorable termination does not require a showing of

innocence by clear and convincing evidence").

Indeed, "the totality of circumstances surrounding the dismissal indicate innocence."

*Hincapie*, 434 F. Supp. 3d at 72.  While the prosecutor questioned the truthfulness of Ramos's

recantation, he represented that he could "neither retry the case or let the indictment stand."

(ECF No. 40-2 at 20); *see also Hincapie*, 434 F. Supp. 3d at 72 ("Significantly, the DA's Office

decided not to retry Hincapie because it did not believe it could prove the case."); *Rosario*, 2019

WL 4450685, at *4 ("The DA's Office decided not to retry Plaintiff because it did not believe it

could prove the case.").  The complaint details the problems of proof in the case, including the

lack of physical evidence, Ramos's coerced (and now recanted) statements, the almost identical

affidavits he signed implicating two different people—Pereira and the plaintiff—in the murder,

and Beisel's efforts to suggest to Thompson that he should identify the plaintiff in a lineup.  *See*

*Hincapie*, 434 F. Supp. 3d at 73 ("The Complaint further alleges . . . significant weaknesses in

the case including the testimony of newly discovered witnesses which tended to exonerate

Hincapie, the lack of physical evidence, the problematic nature of the lineup identification of

Hincapie, and Hincapie's alleged coerced confession."); *Rosario*, 2019 WL 4450685, at *4 ("The

Complaint further alleges the significant weaknesses in the original case, including the

suggestive identifications, lack of physical evidence and presence of many alibi witnesses.").  At

the pleading stage, "these allegations are sufficient to support the federal malicious prosecution claim." [8]  *Rosario*, 2019 WL 4450685, at \*4; *see also Hincapie*, 434 F. Supp. 3d at 73 ("These allegations are sufficient to plead favorable termination.").

Because he has satisfied the more stringent Section 1983 standard for favorable termination, the plaintiff necessarily satisfies the New York standard.  *See Hincapie*, 434 F. Supp. 3d at 71-73.

### c.      Lack of Probable Cause

The MTA defendants argue that the plaintiff's malicious prosecution claim fails because there was probable cause to prosecute him for murder.[9]  They contend that the plaintiff's "allegations . . . support a conclusion of probable cause," because he acknowledges that Ramos implicated him, that the prosecutor authorized Beisel to arrest the plaintiff, and that Thompson— the witness from the bar—identified him in a lineup.  (ECF No. 44 at 23.)  The MTA defendants also argue that the "[p]laintiff does not overcome the presumption of probable cause stemming from his indictment."  (*Id.* at 24.)

Probable cause is an absolute defense to a claim of malicious prosecution.  *Buari*, 530 F. Supp. 3d at 384 (citing *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003)).  Probable cause is defined as "such facts and circumstances as would lead a reasonably prudent person to

---

[8] The defendants focus on the prosecutor's statement that the plaintiff's conviction "remains presumptively valid and based on adequate evidence supported by credible circumstantial evidence," as well as his skepticism about Ramos's credibility.  (ECF No. 41 at 15.)  "The subjective beliefs of the members of the District Attorney's office, however, are of no consequence in determining whether [the plaintiff] received a favorable termination."  *Hincapie*, 434 F. Supp. 3d 73 (quoting *Jovanovic v. City of New York*, No. 04-CV-8437, 2010 WL 8500283, at \*6 (S.D.N.Y. Sept. 28, 2010), *aff'd*, 486 F. App'x 149 (2d Cir. 2012)).  In any event, despite the prosecutor's concerns about Ramos's reliability and the reliability of recantations in general, he acknowledged that the disclosure of exculpatory evidence would have affected the jury's verdict.  (ECF No. 40-2 at 24-25 ("[I]t would have been a different had this piece of paper been made available and no one would have been surprised by a different verdict.").)

[9] The City defendants do not make this argument, and appear to concede that the plaintiff has pled the probable cause and actual malice elements of a malicious prosecution claim.

believe the plaintiff guilty." *Boyd*, 336 F.3d at 76 (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (noting that "the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced" (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999))).  "A grand jury indictment creates a presumption of probable cause that 'may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Buari*, 530 F. Supp. 3d at 384 (quoting *Manganiello*, 612 F.3d at 162).  The plaintiff "bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003) (citation omitted).

For purposes of a motion to dismiss, the plaintiff's allegations that the detectives coerced Ramos into signing false affidavits against Pereira and the plaintiff must be accepted as true.[10] *Buari*, 530 F. Supp. 3d at 387.  The plaintiff also alleges—and the prosecution has acknowledged—that Sullivan withheld exculpatory evidence from the trial prosecutors.  (ECF No. 33 at ¶¶ 349-50; ECF No. 40 at 18.)  Accordingly, the plaintiff has overcome the

---

[10] The MTA defendants appear to confuse the standards for a motion to dismiss and motion for summary judgment.  They state that "in order to succeed on a malicious prosecution claim, a plaintiff must show that 'authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest.'"  (ECF No. 44 at 23 (quoting *Nzegwu v. Friedman*, No. 10-CV-2994, 2014 WL 1311428, at *11 (E.D.N.Y. Mar. 31, 2014) (quoting *Johnson v. City of Mount Vernon*, No. 10-CV-70006, 2012 WL 446618, at *5 (S.D.N.Y. Sept. 18, 2012)), *aff'd*, 605 F. App'x 27 (2d Cir. 2015)).)  *Johnson*, on which the *Nzegwu* court relied, was a summary judgment case.  *See Hincapie*, 434 F. Supp. 3d at 74 ("Defendants improperly rely on . . . a case decided on summary judgment to argue that Plaintiff has not met his burden at the motion to dismiss stage to rebut the presumption of probable case.  The relevant burden is not the same."); *see also Buari*, 530 F. Supp. 3d at 388.

presumption of probable cause resulting from the grand jury indictment.[11]  *See Buari*, 530 F.

Supp. 3d at 387 (collecting cases); *see also Bouche v. City of Mount Vernon*, No. 11-CV-5246,

2013 WL 322613, at *6 (S.D.N.Y. Jan. 28, 2013) ("[I]f a defendant knows that witness

statements are false or coerced, this will defeat probable cause."); *Ying Li v. City of New York*,

246 F. Supp. 3d 578, 612 (E.D.N.Y. 2017) (holding that the presumption of probable cause was

rebutted where the plaintiff alleged that police officers "failed to obtain or disclose evidence

inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of

exculpatory evidence, . . . and fabricated oral statements of witnesses"); *Bailey v. City of New

York*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (finding that police officers' alleged coercion of

individuals whose testimony was used to secure an arrest warrant rebutted presumption of

probable cause).

### d.    Actual Malice

Malice requires "that the defendant must have commenced the criminal proceeding due to

a wrong or improper motive, something other than a desire to see the ends of justice served."

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*,

44 N.Y.2d 500, 502-03 (1978)).  "A lack of probable cause generally creates an inference of

malice."  *Boyd*, 336 F.3d at 78 (citation omitted).  "Falsifying evidence is sufficient to show

malice."  *Bailey*, 79 F. Supp. 3d at 451 (collecting cases).

---

[11] The MTA defendants cite *Burgess v. DeJoseph*, 725 F. App'x 36 (2d Cir. 2018), for the proposition that
"[a]ny information that surfaced after Plaintiff's arraignment does not undermine a probable cause
determination."  But the information at issue here—that the detectives allegedly coerced Ramos,
improperly influenced Thompson's lineup identification, and withheld exculpatory evidence (ECF No.
44 at 23)—was by definition known to the detectives, who, according to the complaint, withheld it even
before the plaintiff was arraigned.  In *Burgess*, by contrast, the evidence—exculpatory security video
footage, as well as blood, fingerprint, and DNA tests conducted after the plaintiff was indicted—"came
to light after the initiation of the prosecution."  *Burgess v. DeJoseph*, No. 14-CV-1371, 2017 WL
1066662, at *7 (N.D.N.Y. Mar. 21, 2017).

"Because [the plaintiff's] allegations plausibly rebut the presumption of probable cause created by the grand jury indictment, the Court may reasonably infer malice." *Buari*, 530 F. Supp. 3d at 388 (citing *Lowth*, 82 F.3d at 573). The plaintiff alleges that Sullivan and Wendel manufactured false inculpatory evidence and withheld material exculpatory evidence, which satisfies the malice element. *See Grant v. City of New York*, No. 15-CV-3635, 2019 WL 1099945, at *9 (E.D.N.Y. Mar. 8, 2019) (observing that "the submission of falsified evidence or withholding of material evidence . . . satisfies the element of actual malice" (citing *Torres v. Jones*, 26 N.Y.3d 742, 762 (2016))); *see also Torres*, 26 N.Y.3d at 762 ("[T]he plaintiff may show malice . . . with proof that the defendant falsified evidence in bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause."); *see also Manganiello*, 612 F.3d at 164 (holding that malice "could easily be inferred . . . [from the detective's] willingness to coerce an inculpatory statement from one unwilling person").

The defendants' motions to dismiss the state law and Section 1983 malicious prosecution claims against the individual defendants are denied.

e.    ***Respondeat Superior* Liability**

The MTA defendants also argue that the state law malicious prosecution claim should be dismissed with respect to the MTA because "Sullivan and Wendel[] were employed by the LIRR, not the MTA," and with respect to the LIRR because the plaintiff has not alleged the service of a statutorily required pre-suit demand on the LIRR. (ECF No. 44 at 25-26.) The plaintiff counters that he "filed a pre-suit demand on the MTA itself in March 2020, which should also operate as a demand on the LIRR." (ECF No. 50 at 21.) In the alternative, the plaintiff asserts that he "served a fresh demand on the LIRR on September 30, 2021, in response to the MTA's motion to dismiss," and "if the Court construes [Public Authorities Law] § 1276 to

23

require separate demands on the MTA and LIRR, [he] requests leave to" further amend the complaint.  (*Id.* at 22.)  I consider first whether the plaintiff's *respondeat superior* claim should be pled against the MTA or the LIRR.

"A municipal entity such as the MTA may be liable for the acts of its police officer in violation of state law under a *respondeat superior* theory if the plaintiff can show that the officer was acting in furtherance of the duties he owes to his employer and that the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities." *Kirk v. Metro. Transp. Auth.*, No. 99-CV-3787, 2001 WL 258605, at *7 (S.D.N.Y. Mar. 14, 2001) (quotation marks and citations omitted).  To determine whether a police officer was an employee of the MTA or the LIRR, the Second Circuit has considered whether the conduct giving rise to a complaint occurred before or after the 1998 consolidation of the LIRR police department into the MTA police department.  *See Greene v. Long Island R. Co.*, 280 F.3d 224, 227 (2d Cir. 2002) (finding that, within the context of the Federal Employers Liability Act, "[o]n that date [January 1, 1998] . . . [the police officer] became an MTA employee and was no longer an employee of LIRR"); *see also Greene v. Long Island R. Co.*, 99 F. Supp. 2d 268, 270 (E.D.N.Y. 2000) ("[A]s of March 4, 1998, at the time of the accident forming the basis of Plaintiff's complaint, Plaintiff became an employee of the MTA and was no longer employed by the LIRR."), *aff'd*, 280 F.3d 224 (2d Cir. 2002).

During the relevant events—the investigation into the murder and the plaintiff's trial—Wendel and Sullivan were employees of the LIRR.  The MTA absorbed the LIRR police department about eight years after the plaintiff's conviction and sentencing.  Therefore, the

24

plaintiff's *respondeat superior* claim should be directed at the LIRR, not the MTA.[12]  The question, then, is whether the plaintiff's pre-suit demand on the MTA can serve as a demand on the LIRR.

Public Authorities Law ("PAL") § 1276 is the state statute by which New York, on behalf of the MTA and its subsidiaries including the LIRR, "has conditioned its waiver of sovereign immunity on a plaintiff's compliance with certain notice, pleading, or pre-suit claim requirements."  *Shaw v. Long Island R.R. Co.*, No. 16-CV-6972, 2018 WL 748674, at *1 (E.D.N.Y. Feb. 7, 2018); *see also Metro. Transp. Auth. v. Am. Pen Corp.*, 723 N.E.2d 50, 52 (1999).  Under Section 1276, a plaintiff seeking to sue the MTA or LIRR for damages must first serve the relevant agency with a pre-suit notice.[13]  *See Shaw*, 2018 WL 748674, at *1.  While Section 1276's rule that a plaintiff plead compliance with the statute is inapplicable in federal court, it "still imposes a substantive precondition to suit."  *Id.* at *2 (holding that "because state-law pleading requirements . . . generally do not apply in federal court, . . . [the] plaintiff's failure to *plead* compliance with PAL § 1276(1) was not dispositive of the motion to dismiss," but his "failure to timely provide any evidence of a pre-suit demand meant that he had failed to comply with the requirements of PAL § 1276(1)").  "The MTA is a distinct legal entity from the LIRR

---

[12] The plaintiff asserts that "[i]n any event, [he] has plausibly alleged that [the] MTA has assumed liability for torts committed by officers working for the [LIRR PD]."  (ECF No. 50 (citing ECF No. 33 ¶¶ 20-21).)  In the amended complaint, the plaintiff merely alleges that "[t]he MTA is liable for torts committed by its employees, including torts committed by detectives and officers of the LIRR PD." (ECF No. 33 ¶ 20.)  He cites no authority for the proposition that the MTA retroactively assumed liability for the acts of LIRR PD officers.  The Court is not "bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atl. Corp.*, 550 U.S. at 555.

[13] Section 1276 contains two subsections: "subsection one, the demand provision, [which] applies to every type of action except those for injunctive or other equitable relief," and the "second subsection, the notice-of-claim provision, [which] applies only to actions 'founded on tort.'"  *Shaw*, No. 16-CV-6972, 2018 WL 748674, at *1.  "PAL § 1276 subsections (1) and (2) impose different prerequisites and address different types of cases: subsection (2) requires a formal notice of claim for tort actions, while subsection (1) applies a less stringent demand requirement to all actions, tort or otherwise."  *Id.*

for the purposes of suit." *Stampf v. Metro. Transp. Auth.*, 57 A.D.3d 222, 223, (1st Dep't 2008); *see also Montez v. Metro. Transp. Auth.*, 43 A.D.2d 224, 225 (1st Dep't 1974) (holding that "the notice of claim which was served sole[l]y on the Authority was directed to the wrong party," and was "ineffective as to the [LIRR], which is a distinct legal entity for the purposes of suit").

The plaintiff's March 2020 pre-suit demand on the MTA was directed to the wrong party and cannot serve as a demand on the LIRR for the purposes of Section 1276. *See Stampf*, 57 A.D.3d at 223; *Montez*, 43 A.D.2d at 225. Moreover, as the MTA defendants point out, the plaintiff's malicious prosecution claim accrued on December 30, 2019 when his conviction was vacated, and the one-year statute of limitations period expired on December 30, 2020. *See* N.Y. C.P.L.R. § 215; *Fahlund v. Nassau Cty.*, 265 F. Supp. 3d 247, 256 (E.D.N.Y. 2017) ("A claim for malicious prosecution accrues on the date in which the criminal proceedings in question terminated in the plaintiff's favor." (alteration, citation and quotation marks omitted)); (ECF No. 54 at 10).

Accordingly, the plaintiff's request for leave to amend the complaint is denied, and his state law malicious prosecution claims against the MTA and LIRR under the *respondeat superior* theory are dismissed.

II.     **Denial of a Fair Trial**

The plaintiff asserts two theories for his denial of fair trial claim: that the individual

defendants fabricated evidence (Count III) and committed *Brady* violations by withholding

materially exculpatory evidence (Count IV).  The City defendants move to dismiss both counts.[14]

a.  **Fabrication of Evidence**

With respect to the plaintiff's Section 1983 claims for denial of due process based on

alleged fabrication of evidence, the City defendants argue that the "plaintiff has failed to plead

any facts as to the defendants Zaroogian, Califano[,] Wilde and Fennel that they transmitted any

allegedly false evidence to prosecutors;" they also argue that "the only specific evidence that

[the] plaintiff alleges that the defendant Beisel improperly forwarded to prosecutors was"

Ramos's affidavit implicating Pereira.  (ECF No. 41 at 19-20.)

"When a police officer creates false information likely to influence a jury's decision and

forwards that information to prosecutors, he violates the accused's constitutional right to fair

trial, and the harm occasioned by such an unconscionable action is redressable in an action for

damages under 42 U.S.C. § 1983."  *Ricciuti v. N.Y.C. Transit Auth*., 124 F.3d 123, 130 (2d Cir.

1997) (citations omitted).  To succeed on a Section 1983 claim alleging a fair trial violation, a

plaintiff must prove that "an (1) investigating official (2) fabricated information (3) that is likely

to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff

suffered a deprivation of life, liberty, or property as a result."  *Ross v. City of New York*, No. 17-

CV-3505, 2019 WL 4805147, at *5 (E.D.N.Y. Sept. 30, 2019) (quoting *Garnett v. Undercover*

*Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).  "Whether the proceeding was terminated in a

---

[14] The "[d]efendants Sullivan and Wendel do not move to dismiss the denial of due process and fair trial claims (Counts III and IV) as alleged against them," but "respectfully reserve their right to seek the dismissal of these claims at a later stage of these proceedings."  (ECF No. 44 at 8 n.1.)

manner indicative of innocence . . . is not dispositive in the context of a section 1983 fair-trial claim." *Smalls v. Collins*, No. 20-1099-CV, 2021 WL 3700194, at *138-39 (2d Cir. Aug. 20, 2021). "Where the plaintiff asserts a section 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Id.* at *139 (citing *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019)).

The basis of the City defendants' argument for dismissal seems to be that Zaroogian, Califano, Wilde and Fennel did not personally forward information to prosecutors. They do not cite any authority for this proposition, and at least one court in this circuit has explicitly held to the contrary. *See Bacote v. Riverbay Corp.*, No. 16-CV-1599, 2017 WL 11567934 (S.D.N.Y. Nov. 8, 2017). In *Bacote*, the defendant police officers argued they could not be liable on denial of fair trial claims because "the officers other than [the arresting officer who prepared the arrest paperwork] did not forward information to the prosecution." *Id.* at *21. Rejecting this argument, the Honorable Gregory H. Woods found that "the defendant officers *did* 'otherwise forward information to prosecutors' by conveying information to [the arresting officer responsible for preparing paperwork] and/or speaking with the Assistant District Attorney." *Id.*

Judge Woods's conclusion that a police officer can be liable on a claim for denial of fair trial, even where he did not forward information directly to prosecutors, is consistent with the similar rule in the context of malicious prosecution claims. *See Maldonado*, 2014 WL 787814, at *6 ("[T]here is no requirement that an officer have direct contact with the prosecutor."); *see also Cameron*, 598 F.3d at 63-64. An officer who has fabricated evidence cannot escape liability simply because he relayed the information to prosecutors through an intermediary. As discussed

above, the plaintiff has alleged that Zaroogian, Califano, Wilde and Fennel were involved in fabricating evidence that was eventually forwarded to the prosecutors.  *See supra* Section I.a.

      With respect to Beisel, the City defendants claim that he forwarded only Ramos's affidavit implicating Pereira to the prosecutors, which would not have influenced the jury's verdict.  (ECF No. 41 at 20.)  But the plaintiff alleges that Beisel got Ramos to sign a false affidavit implicating the plaintiff, and that he induced Thompson to identify the plaintiff in a lineup, evidence that influenced the jury's verdict.  (ECF No. 33 ¶¶ 245, 254-55, 266-68; *see also* ECF No. 49 at 16-17 ("[P]rosecutors elicited the same false information from Ramos and Thompson at the grand jury and trial, corrupting both processes.").)  The plaintiff's allegations, taken as true, plausibly allege the elements of a Section 1983 fair trial claim.  *See Buari*, 530 F. Supp. 3d at 389 (collecting cases).

      **b.**    ***Brady* Violations**

      According to the City defendants, the allegedly exculpatory evidence was given to the prosecutors, and to the extent it was not, it was the individual LIRR PD defendants, not the individual NYPD defendants, who withheld it.  (ECF No. 41 at 17-18.)  The plaintiff responds that the City defendants focus only on "a portion of the exculpatory and impeachment evidence withheld," and ignore the plaintiff's allegations regarding, for example, Ramos's coerced affidavit.  (ECF No. 49 at 18.)

      A *Brady* violation contains three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

ensued.'"[15] *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004) (internal quotation marks omitted). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the evidentiary suppression undermines confidence in the outcome of the trial." *Ying*, 246 F. Supp. 3d at 627 (citation omitted). "Materiality is assessed in light of the evidence adduced against the defendant at trial." *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001).

The plaintiff cannot establish a *Brady* claim against the City defendants as to the recorded conversation between Pereira and Ramos. The plaintiff acknowledges that the recording of the conversation was forwarded to the QDAO prior to trial. (ECF No. 33 ¶ 275); *see also Newson*, 2019 WL 3997466, at *9 ("Plaintiff does not expressly allege that the NYPD wrongfully withheld evidence from *prosecutors*. Instead, his only § 1983 claim as it relates to the NYPD is that it withheld favorable material evidence *from the plaintiff and his attorney.*" (quotation marks omitted) (emphasis in original)).

Aside from that claim, the plaintiff has otherwise alleged that the City defendants withheld material exculpatory evidence. As discussed above, *see supra* Section I.a, he claims that Beisel, Califano and Wilde threatened to kill Ramos if he did not admit to the murder or implicate the plaintiff in it (ECF No. 33 ¶¶ 138-39); that in March of 1989, Beisel, Zaroogian and Fennel were a part of the coercive interrogation of Ramos that resulted in him signing an affidavit inculpating the plaintiff (*id.* ¶¶ 197-207); and that Beisel and Zaroogian conducted a

---

[15] Citing the Second Circuit's summary order in *Fappiano v. City of New York*, 640 F. App'x 115 (2d Cir. 2017), the City defendants argue that the "alleged suppression of evidence must, at a minimum, be intentional." (ECF No. 41 at 17.) The Second Circuit has clarified that it did not conclude in *Fappiano* that a plaintiff asserting a *Brady* claim must show that the withholding of evidence was intentional. *See Bellamy*, 914 F.3d at 751 n.23 ("We have suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional."). I consider whether the plaintiff has alleged suppression of evidence that was either willful or inadvertent. *See Rivas*, 377 F.3d at 199; *see also Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021) ("Rulings by summary order lack precedential effect." (quoting 2d Cir. R. 32.1.1(a))), *cert. denied*, 142 S. Ct. 757 (2022).

suggestive lineup, essentially signaling to the witness Thompson that he should identify the plaintiff.  (*Id.* ¶¶ 232-38.)  The City defendants do not contend that they disclosed either the allegedly coercive techniques used to secure Ramos's affidavit or the efforts to influence Thompson's lineup identification.  Withholding this evidence was obviously prejudicial to the plaintiff because it was material.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*'s disclosure] rule."); *see also Rosario*, 2019 WL 4450685, at *5 ("By failing to report and inaccurately describing these circumstances in their reports, and by testifying that they did not employ suggestive techniques, these defendants withheld material information that could have impeached the critical eyewitness at trial."); *Castellanos v. Kirkpatrick*, No. 10-CV-5075, 2017 WL 2817048, at *22 (E.D.N.Y. June 29, 2017) (finding that the state's withholding of documents "related to the allegations against [a detective] for coercing and falsifying confessions was prejudicial" in part because "the [petitioner's] confession was the only evidence that connected" him to the crime).

The plaintiff's *Brady* claim premised on the suppression of the coercive or suggestive circumstances of Ramos's statements and eyewitness identification is sufficiently pleaded.  The defendants' motions to dismiss the Section 1983 fair trial claims against the individual defendants are denied.

## III.  Excessive Pretrial Detention

Both sets of defendants argue that the plaintiff's claim for excessive pretrial detention should be dismissed because he "does not plausibly allege any conclusive or affirmative exculpatory evidence establishing [his] innocence that was mishandled by any individual defendant such that it 'shocks the conscience,' or easily demonstrated [the] plaintiff's innocence."  (ECF No. 41 at 21; *see also* ECF No. 44 at 9 ("The [amended complaint] contains

no plausible allegations that any evidence purportedly suppressed or mishandled by Detectives Sullivan or Wendel conclusively established Plaintiff's innocence.").)  The plaintiff responds that "the Defendants hid exculpatory information, including the fact[s] that they fabricated Javier Ramos's accusations, . . . Ramos's car was not the one seen leaving the crime scene and that Plaintiff—unlike the driver of the car or the person last seen with the victim—wore glasses and a thick mustache."  (ECF No. 49 at 20-21; *see also* ECF No. 50 at 23.)

"Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a Section 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures."  *Ying Li*, 246 F. Supp. 3d at 622 (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 208-09 (2d Cir. 2007)).  "To state such a claim, [a] [p]laintiff must allege that (1) [he] has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct 'shocks the conscience.'"[16]  *Id.* (citing *Russo*, 479 F.3d at 205).  "In *Russo*, the Second Circuit considered the following three factors in determining whether the plaintiff's detention was excessive in violation of the Fourth Amendment: (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior."  *Id.* (citing *Russo*, 479 F.3d at 209).

The plaintiff alleges that the individual defendants hid exculpatory evidence—the methods that they used to coerce Ramos into signing two false affidavits, the first implicating

---

[16] The defendants assert that the exculpatory evidence must have "conclusively or affirmatively" established the plaintiff's innocence.  (ECF No. 41 at 20.)  In *Russo*, a videotape from a security camera established that Russo was innocent, but the Second Circuit did not hold that the exculpatory evidence had to be conclusive.  Rather the court held that a jury need only "find[] that the videotape provided adequate verification of Russo's innocence."  *Russo*, 479 F.3d at 213.

Pereira and the second implicating the plaintiff.  (ECF No. 33 ¶¶ 126-58.)  Specifically, the plaintiff alleges that in September of 1988, Beisel interrogated Ramos and was "assisted in the interrogation by NYPD Sergeant Zaroogian, NYPD detectives John Califano, John Wilde, and Jerry Fennel, and LIRR PD detectives Thomas Sullivan and Charles Wendel."  (*Id.* ¶ 129.)  At the precinct, Beisel "pushed Ramos, threatened to maim or kill him, called him [racial slurs], denied him food, water, and the use of a bathroom, and refused his request to leave."  (*Id.* ¶ 132.)  According to the complaint, Beisel, Califano and Wilde drove Ramos to "Cypress Hill Cemetery in Brooklyn and threatened to kill Ramos if he did not either admit to the murder or implicate [the plaintiff]."  (*Id.* ¶ 139.)  Ramos eventually signed an affidavit implicating Pereira, who was arrested and later released.  Beisel, Sullivan, Zaroogian, Fennel and Wendel interrogated Ramos again on March 27, 1989, and allegedly used "coercive tactics" to get Ramos to sign an affidavit inculpating the plaintiff.  (*Id.* ¶¶ 196-208.)  The affidavit was almost identical to the one that implicated Pereira.  (*Id.* ¶¶ 146, 206.)  The plaintiff was arrested that day, and he alleges that Beisel and Zaroogian improperly influenced Thompson to identify the plaintiff in a lineup conducted the same night.  (*Id.* ¶¶ 229-42.)  The plaintiff was released on bond 52 days later on May 19, 1989.[17]  (*Id.* ¶¶ 271, 335.)

As an initial matter, the plaintiff's claims about the lineup cannot support an excessive pretrial detention claim.  "[S]uch conduct can only support a *due process violation,* not a Fourth Amendment excessive detention claim."  *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 403-04

---

[17] The defendants do not argue that 52 days is not prolonged for the purposes of an excessive pretrial detention claim.  In *Russo*, the Second Circuit held that 68 days' detention was excessive, *Russo*, 479 F.3d at 209 ("The total 217-day detention here, or even the 68-day detention . . . plainly was prolonged rather than short and carried constitutional implications."), and district courts in this circuit have held that four days' detention may be sufficient to withstand a motion to dismiss.  *See Gonzalez*, 2016 WL 7188147, at *5 (denying motion to dismiss and stating that four days was an "arguably" unreasonable amount of time).

(E.D.N.Y. 2014) (emphasis in original) ("[A] police officer's suggestive lineup is not a constitutional violation; the constitutional violation occurs if evidence produced in an unlawful identification procedure is introduced at trial[.]" (citing *Wray v. City of New York,* 490 F.3d 189, 193 (2d Cir. 2007))). The alleged "improper line-up alone is insufficient as a matter of law to support an unreasonable detention verdict." *Id.*

Therefore, I consider whether the defendants mishandled or suppressed exculpatory evidence with respect to Ramos's affidavit, and whether the plaintiff's detention stemmed from that or from Thompson's identification. Accepted as true, the plaintiff's allegations show that the defendants withheld significant impeachment evidence when they did not tell prosecutors about the coercive circumstances of Ramos's interrogation. *See Giglio*, 405 U.S. at 154; *see also Rosario*, 2019 WL 4450685, at *5. Impeachment evidence can be exculpatory evidence, including in cases where the prosecution relies on one or two witnesses. *See Taylor v. City of New York*, No. 18-CV-5500, 2021 WL 848966, at *7 (E.D.N.Y. Mar. 4, 2021) (finding that in the context of an excessive pretrial detention claim, "[t]he volume of suppressed exculpatory and impeachment evidence relating to the prosecution's only two witnesses, as alleged in plaintiff's amended complaint, may reasonably be inferred at this stage to be exculpatory . . .").

Moreover, "[t]he [C]ourt is persuaded that, if the judge in plaintiff's first trial were able to consider the undisclosed impeachment and exculpatory information presented in plaintiff's . . . amended complaint, the judge may have granted a reasonable bail" immediately or dismissed the charge. *Id.* (noting that "'the weight of the evidence against [the plaintiff] in the pending criminal action and any other factor indicating probability or improbability of conviction' was a statutory factor the judge would have considered in deciding whether to grant bail" (quoting

N.Y. Crim. Proc. Law § 510.30 (McKinney 2010))).[18]  Although the evidence also included

Thompson's lineup identification of the plaintiff, Ramos's statement connecting the plaintiff to

the murder was obviously crucial, as evidenced by the prosecutor's statement at the proceeding

before Justice Zayas that they could not retry the case because of Ramos's recantation.  (ECF

No. 40-2 at 20 ("Because Mr. Ramos's current disposition and his version now, I can neither

retry the case or let the indictment stand.").)  "The [C]ourt thus draws a reasonable inference in

plaintiff's favor as required at this stage that, had the impeachment and exculpatory information

been disclosed" at the outset, the plaintiff may have been released—on bail or otherwise—and

not detained.  *Taylor*, 2021 WL 848966, at *7.  The plaintiff's claim satisfies the first two

elements of the *Russo* analysis at the pleading stage.

As for the third *Russo* element, the plaintiff has adequately pleaded conduct that shocks

the conscience, "a standard easily satisfied at the motion to dismiss stage."  *Newson*, 2019 WL

3997466, at *6.  "An official's behavior 'shocks the conscience' within the meaning of *Russo*

when [the official] act[s] with 'deliberate indifference to [an individual's] constitutional rights.'"

*Id.* (quoting *Russo*, 479 F.3d at 210).  It can be reasonably inferred that the defendants actively

hid the allegedly coercive circumstances of Ramos's interrogations.  *Cf. Cambisaca v. Ruhe*, No.

17-CV-87, 2019 WL 2866072, at *11 (S.D.N.Y. July 3, 2019) ("Defendants did not affirmatively

misrepresent the substance of [the witness's] statement, nor did they actively hide [the witness's]

statement from Plaintiff." (alteration, quotation marks, and internal citation omitted)).

The defendants' motions to dismiss the Section 1983 excessive pretrial detention claims

against the individual defendants are denied.

## IV.    Civil Rights Conspiracy

---

[18] The same statutory factor applied in 1989.  *See* N.Y. Crim. Proc. Law § 510.30 (McKinney 1989).

The defendants also argue that the plaintiff's Section 1983 conspiracy claim should be dismissed because he does not allege "any facts supporting a 'meeting of the minds' of defendants to achieve an unlawful objective, and the details, including time and place, of any such alleged agreement."[19]  (ECF No. 41 at 22; *see also* ECF No. 44 at 28.)  The plaintiff responds that at the pleading stage, a conspiracy can be reasonably inferred from his allegations that the defendants "worked together to falsify police reports and other accounts of their investigative activities and withhold exculpatory information from prosecutors."  (ECF No. 49 at 21; *see also* ECF No. 50 at 25.)

"The elements of a § 1983 conspiracy claim for deprivation of civil rights include, (1) an agreement between two or more state actors, or a state actor and a private entity, (2) to act in concert to inflict constitutional injury, [and] (3) an overt act done in furtherance of the goal of causing damages."  *McCray v. City of New York*, No. 03-CV-1008, 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  "In order to survive a motion to dismiss, [a Section 1983 conspiracy claim] must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy."  *Blue*, 2018 WL 2561023, at *9 (citation and

---

[19] The MTA defendants also argue that the intracorporate conspiracy doctrine bars the conspiracy claim. "[U]nder the doctrine of intracorporate conspiracy 'officers, agents and employees of a single corporate entity are legally incapable of conspiring together' and thus cannot be held liable for conspiracy under . . . § 1983." *Blue v. City of New York*, No. 16-CV-9990, 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018) (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)).  While the Second Circuit has not ruled whether the doctrine applies to section 1983 claims, "[c]ourts in this [d]istrict . . . have applied the doctrine to bar conspiracy claims brought pursuant to § 1983." *Id.*  The doctrine does not apply here because the plaintiff has alleged a conspiracy between employees of the NYPD and LIRR PD, separate police departments at different levels of government. *See Blue*, 2018 WL 2561023, at *9 (finding that the doctrine did not apply because "as employees of the New York County District Attorney's Office and the New York City Police Department," the defendants represented different entities and were employees of the state or the city); *see also Dunlop v. City of New York*, No. 06-CV-433, 2008 WL 1970002, at *14 (S.D.N.Y. May 6, 2008).

quotation marks omitted).  "While conclusory allegations of a § 1983 conspiracy are insufficient,

[the Second Circuit] [has] recognized that such conspiracies are by their very nature secretive

operations, and may have to be proven by circumstantial, rather than direct, evidence."

*Pangburn*, 200 F.3d at 72 (citations and quotation marks omitted).

The plaintiff has alleged facts that make a civil rights conspiracy claim plausible.  He

alleges that in September of 1988, Beisel, Califano and Wilde drove Ramos to a cemetery, and

forced him by threats to sign an affidavit implicating Pereira, and that in March of 1989, Beisel,

Sullivan, Zaroogian, Fennel and Wilde made him sign a similar affidavit implicating the

plaintiff.  (ECF No. 33 ¶¶ 138-39, 197.)  The plaintiff alleges that the defendants did not disclose

to prosecutors that they used coercive methods to obtain the affidavits.  A tacit agreement can be

reasonably inferred from the defendants' alleged conduct together at the cemetery in 1988, and

the police station in 1989, and the plaintiff's claim is sufficient at this stage of the proceedings.

*See McCray*, 2007 WL 4352748, at *23 (finding a Section 1983 conspiracy claim plausible

where the plaintiffs simply "allege[d] that Defendant police officers and prosecutors acted in

concert to coerce and fabricate statements and conceal exculpatory evidence"); *see also Iverson*

*v. Surber*, No. 13-CV-633, 2014 WL 12908065, at *6 (S.D.N.Y. Mar. 19, 2014) (finding that

while the plaintiff did "not allege specifically that [the defendants] agreed to join a conspiracy,

. . . his allegations that the officers worked in tandem to withhold his mail permits a plausible

inference that they formed at least an implicit agreement").

The defendants' motions to dismiss the plaintiff's Section 1983 conspiracy claim is

denied.

## V.  Equal Protection and Equal Benefit of the Law

The plaintiff asserts Section 1983 and Section 1981 claims against Beisel, alleging that he violated the plaintiff's rights to equal protection and equal benefit of the law.  He claims that Beisel "targeted [the plaintiff], Richard Pereira, and Javier Ramos because they were of Hispanic origin" (ECF No. 33 ¶ 400), and alleges that Beisel frequently used racial epithets.  (*Id.* ¶¶ 401-03.)

"The Equal Protection Clause requires that the government treat all similarly situated people alike."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  "In order to state a race-based claim under the equal protection clause, 'a plaintiff must allege that a government actor intentionally discriminated against him on the basis of race.'"  *Greene v. City of New York*, No. 08-CV-243, 2017 WL 1030707, at \*30 (E.D.N.Y. Mar. 15, 2017) (quoting *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 1999)), *aff'd*, 742 F. App'x 532 (2d Cir. 2018).

"First, courts in this [c]ircuit have found that the use of racial slurs, alone, fail to state a claim for a violation of the equal protection clause of the Fourteenth Amendment."  *Id.* (collecting cases).  Further, the plaintiff has not alleged that Beisel treated similarly situated non-Hispanic people differently.  The plaintiff alleges that Beisel did not investigate white suspects (ECF No. 33 ¶¶ 405-08), but he does not claim that the police believed that there was similar evidence against these men, for example that any of the men borrowed a car similar to the one seen by the warehouse security guard.  These suspects were not similarly situated to the plaintiff. The plaintiff's Section 1983 equal protection claim against Beisel is dismissed.

The plaintiff's Section 1981 claim is also dismissed.  "Section 1981 provides a remedy against private actors who intentionally discriminate on the basis of race or ethnicity."  *Wong v. Yoo*, 649 F. Supp. 2d 34, 68 (E.D.N.Y. 2009); *see also Duplan v. City of New York*, 888 F.3d

612, 621 (2d Cir. 2018) ("[Section] 1981 does not provide a separate private right of action

against state actors.").  Beisel was a NYPD detective, and the plaintiff does not allege that Beisel

discriminated against him as a private actor.

## VI.   *Monell* Liability

The plaintiff argues that the City of New York, the MTA and the LIRR failed to train,

supervise, or discipline their employees on the subjects of fabricating evidence, initiating

prosecution without probable cause or disclosing *Brady* material.  (ECF No. 33 ¶¶ 424-85.)  He

also argues that the QDAO failed to train, supervise, or discipline its employees on disclosing

*Brady* material.  (*Id.* ¶¶ 486-524.)  These allegations give rise to "policy" claims under *Monell v.

Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  "Municipalities

may be sued directly under section 1983 for constitutional deprivations imposed upon the

plaintiff pursuant to a 'governmental custom, policy, or usage of the municipality.'"  *Greene*,

2017 WL 1030707, at *29 (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

"Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat

superior* basis for the tort of its employee."  *Jones*, 691 F.3d at 80.  "Where, however, a 'claim

turns on a failure to train,' a 'municipality's culpability for a deprivation of rights is at its most

tenuous.'"  *Greene*, 2017 WL 1030707, at *29 (quoting *Connick v. Thompson*, 563 U.S. 51, 61

(2011)).

Further, "it is well established that a single incident does not give rise to an unlawful

practice by subordinate officials 'so permanent and well-settled as to constitute custom or

usage.'"  *Plair v. City of New York*, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) (quoting *City of

St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (second quotation marks omitted); *see also

Sorlucco v. New York City Police Department*, 971 F.2d 864, 870 (2d Cir. 1992) (municipality

may not be held liable under Section 1983 for isolated unconstitutional acts of its employees)

(citing *Monell*, 436 U.S. at 694); *Anderson v. City of New York*, 657 F. Supp. 1571, 1574

(S.D.N.Y. 1987) ("[The] plaintiff cannot infer a policy from the alleged violation of his own civil

rights."). "This limitation extends to failure-to-train claims." *Wilson v. City of New York*, No.

18-CV-2262, 2021 WL 5908860, at *7 (E.D.N.Y. Dec. 14, 2021) (citing *Connick*, 563 U.S at

62).

      With respect to the City of New York, the plaintiff relies on the Mollen Commission's

1994 report (the "Mollen report") to allege a municipal policy. "The Mollen Commission was

established to investigate corruption in the NYPD and make recommendations for changes to

prevent further NYPD corruption." *Yanez v. City of New York*, 29 F. Supp. 2d 100, 111

(E.D.N.Y. 1998) (citation omitted). "Research reports may be used to bolster *Monell* claims, but

only if those reports are sufficiently connected to the specific facts of the case and are of

relatively recent vintage." *Isaac*, 2018 WL 5020173, at *17 (citation and quotation marks

omitted). The plaintiff does not sufficiently connect the Mollen report to the alleged facts in this

case. *See Aguirre v. City of New York*, No. 15-CV-6043, 2017 WL 4236552, at *6 (E.D.N.Y.

Sept. 22, 2017) ("As other courts in this Circuit have found in similar Section 1983 actions,

Plaintiff's reliance on reports and articles regarding misconduct by NYPD officers are

inadequate to allege a policy or custom of the City, let alone allege that that policy or custom is

the one that gave rise to Plaintiff's alleged violation." (quotation marks and citations omitted))

(collecting cases). The plaintiff alleges that the defendants coerced Ramos to make statements

implicating Pereira and the plaintiff in Ms. Fernandez's murder, and that they therefore

fabricated evidence and withheld from prosecutors the details of Ramos's interrogations. The

plaintiff cites and appears to combine different portions of the Mollen report that separately

describe incidents in which police officers fabricated evidence, and other incidents in which

officers used excessive force.  (*See e.g.*, ECF No. 33 ¶¶ 445, 454.)  These excerpts do not plausibly suggest that there was a custom of coercing witnesses to make false statements.  *See Aguirre*, 2017 WL 4236552, at *6.

The plaintiff claims that the MTA and LIRR similarly maintained policies or customs that resulted in their employees fabricating evidence or withholding *Brady* materials.  Besides the alleged constitutional violations by Wendel and Sullivan in this case, the plaintiff does not offer any support for his claim that either the MTA or LIRR had unlawful practices "so permanent and well-settled as to constitute custom or usage."  *Praprotnik*, 485 U.S. at 127.

The plaintiff's *Monell* claim against the QDAO must be dismissed because he does not allege any underlying constitutional violation by an individual defendant.  The plaintiff asserts various Section 1983 claims against the individual NYPD and LIRR PD defendants, and briefly describes the involvement of certain prosecutors, including ADAs Dikman and Safran.  However, he does not bring this action against any individual prosecutor involved in his case.  *Vassallo v. Lando*, 591 F. Supp. 2d 172, 202 (E.D.N.Y. 2008) (finding that "no *Monell* claim can lie against the [municipal defendant] pursuant to § 1983" because "no constitutional violation was committed against plaintiff by the individual defendants" (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006))); *see also Rinaldi v. City of New York*, No. 13-CV-4881, 2014 WL 2579931, at *12 (S.D.N.Y. June 10, 2014) ("[E]ven assuming the viability of an underlying claim, Rinaldi's claims against the City should be dismissed because he does not allege that the individual defendants inflicted a constitutional injury in execution of a municipal policy or custom." (citing *Monell,* 436 U.S. at 694)), *report and recommendation adopted*, No. 13-CV-4881, 2014 WL 4626076 (S.D.N.Y. Sept. 15, 2014).

Accordingly, the plaintiff's *Monell* claims against the City of New York, MTA, LIRR and the QDAO are dismissed.

## CONCLUSION

The defendants' motions to dismiss the amended complaint are denied with respect to the plaintiff's Section 1983 and state law claims for malicious prosecution against the individual defendants, and with respect to his Section 1983 claims for denial of due process, excessive pretrial detention and civil rights conspiracy.  The plaintiff's state law malicious prosecution claims against the MTA and LIRR, his Section 1983 and 1981 equal protection claims against Beisel, and his *Monell* claims against the City of New York, MTA, LIRR and the QDAO are dismissed.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
         March 14, 2022